**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **CALIFORNIA INFRASTRUCTURE AND ECONOMIC DEVELOPMENT BANK,** 1325 J Street, Suite 1300, Sacramento, CA 95814 <br><br> and <br><br> **EFFICIENCY MAINE TRUST,** 168 Capitol Street, Suite 1 Augusta, ME 04330 <br><br> and <br><br> **ILLINOIS FINANCE AUTHORITY,** 160 N. LaSalle St., Suite S-1000 Chicago, IL 60601 <br><br> and <br><br> **MINNESOTA CLIMATE INNOVATION FINANCE AUTHORITY,** 85 7th Place East, Suite 280, Saint Paul, Minnesota 55101 <br><br> Plaintiffs, <br><br> v. <br><br> **CITIBANK, N.A.,** 5800 South Corporate Place Sioux Falls, South Dakota 57108, <br><br> and <br><br> **U.S. ENVIRONMENTAL PROTECTION AGENCY** and **LEE ZELDIN** and **W.C. MCINTOSH**, in their official capacities as Administrator and Acting Deputy Administrator of the U.S. Environmental Protection Agency, <br><br> Defendants. | <u>**Civil No. 25-cv-820**</u> <br><br><br> <u>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**</u> |

Plaintiffs California Infrastructure and Economic Development Bank ("California IBank" or "IBank"), Efficiency Maine Trust ("Efficiency Maine"), Illinois Finance Authority ("Illinois Climate Bank"), and Minnesota Climate Innovation Finance Authority ("MnCIFA"), by and through their respective undersigned counsel, for their complaint against defendants Citibank, N.A. ("Citibank"), U.S. Environmental Protection Agency ("EPA"), Lee Zeldin, in his official capacity as EPA Administrator, and W.C. McIntosh, in his official capacity Acting EPA Deputy Administrator, allege as follows.[1]

## PRELIMINARY STATEMENT

1.     This action seeks declaratory and injunctive relief against EPA's unlawful efforts to impede the flow of billions of dollars in duly appropriated, awarded, and disbursed funds to the recipients that Congress expressly intended to support: "green banks," i.e., "organizations that provide capital, leverage private capital, and provide other forms of financial assistance to the rapid deployment of low- and zero-emission products, technologies, and services." 42 U.S.C. § 7434(c)(1). Plaintiffs are state green banks, public or quasi-public entities that provide crucial financial services to pollution-reducing projects in their States. Since February 12, 2025, EPA has pursued a highly irregular and illegal campaign to thwart the $20 billion appropriation that Congress made for Plaintiffs' "green lending" activities, consistent with the President's declared policy opposition to the law that created that appropriation. EPA's campaign violates fundamental constitutional guarantees of liberty in the separation of powers and flouts myriad statutory and regulatory controls on federal agencies' management of Congressional appropriations and finalized awards.

---

[1] For the purpose of this Complaint, "federal Defendants" refers to EPA and the named officers, and "Defendants" refers to all named defendants.

2.      In an arrangement common for federal public-private partnerships, the grants that support these green lending activities placed awarded funds at Citibank as a financial agent for the federal government. *See* 12 U.S.C. §§ 90, 265. Accordingly, Citibank has been one of the primary targets of EPA's pressure campaign. Apparently bowing to those efforts, last month, Citibank stopped honoring Plaintiffs' and other grantees' instructions to draw down funds, in violation of the plain terms of the governing account control agreements. Accordingly, this action also seeks relief against Citibank for breach of contract.

3.      The division of powers between the federal branches is clear: "the legislature makes, the executive executes, and the judiciary construes the law." *Wayman v. Southard*, 23 U.S. (10 Wheat.) 1, 46 (1825) (Marshall, C.J.). In 2022, both houses of Congress passed, and the President signed, the Inflation Reduction Act, Pub. L. No. 117-169, 136 Stat. 1818, which added Section 134 to the Clean Air Act, *see id.* § 60103, 136 Stat. 2065-67. Section 134 creates the Greenhouse Gas Reduction Fund and appropriates $20 billion to green lending activities, with $8 billion earmarked for green lending to low-income and disadvantaged communities. 42 U.S.C. § 7434(a)(2)-(3). Congress instructed EPA to "make grants" within 180 days to recipients—with an ultimate deadline of September 30, 2024—to support either direct lending to greenhouse gas-reducing projects, or indirect investment, i.e., providing funds and technical assistance to create new or support existing green banks at the state and local level. *Id.* § 7434(a)(2)-(3), (b).

4.      EPA faithfully executed Congress's vision for the Greenhouse Gas Reduction Fund—until about two months ago. EPA established two grant programs, the National Clean Investment Fund (NCIF) and Clean Communities Investment Accelerator (CCIA) to distribute the $20 billion appropriations to eligible green banks for direct and indirect investment. EPA established a third program, Solar For All, to fund the deployment of cheap, reliable, and zero-

emission distributed electricity generation in communities under a $7 billion appropriation also under the Greenhouse Gas Reduction Fund. 42 U.S.C. § 7434(a)(1). Most relevant here, on August 8, 2024, EPA finalized a $5 billion award to the Coalition for Green Capital (CGC) as prime grantee with the express goal of "foster[ing] an ecosystem of green banks, community lenders, and community partners by providing them with capital, co-investment opportunities, and other services." Plaintiffs in this action are all subawardees supported by CGC's $5 billion award from EPA.

5.      On his first day in office, January 20, 2025, President Trump announced his administration's policy of "[t]erminating the Green New Deal"—his nickname for the Inflation Reduction Act of 2022 and the Infrastructure Investment and Jobs Act, Pub. L. No. 117-58, 135 Stat. 429 (2021) (sometimes called the Bipartisan Infrastructure Law). Exec. Order 14154, 90 Fed. Reg. 8353, 8357 (Jan. 29, 2025). Consistent with this directive and other agency pronouncements, EPA began "freezing" Inflation Reduction Act and Infrastructure Investment and Jobs Act funds in the final weeks of January 2025—i.e., it refused to disburse funds to grant recipients under awards funded by appropriations from either Act, including Solar For All awards under the Greenhouse Gas Reduction Fund. That unlawful and arbitrary action—part of a broader, government-wide freeze on federal financial assistance—was later enjoined by the U.S. District Court for the District of Rhode Island in *State of New York v. Trump*, No. 1:25-cv-0039-JJM-PAS.

6.      Due to the different structure of the NCIF and CCIA grant programs, however, EPA had to pursue a different tactic against these Inflation Reduction Act funds. Because Congress directed EPA to support recipients that could "provide capital" and "leverage private capital" for green lending, 42 U.S.C. § 7434(c)(1)(A), EPA originally opted to deposit NCIF and

CCIA funds at a private bank—Citibank—as the financial agent of the federal government. *See generally* 31 C.F.R. Part 202 (regulations for depositaries and financial agents of the federal government). But this meant that EPA under the new administration could not simply block awardee draw-downs in its payment portal, as EPA had done for other Inflation Reduction Act-funded awards. The money was at Citibank.

7.     What followed was an extraordinary campaign by EPA Administrator Lee Zeldin to undermine public confidence in his own agency's integrity. Riffing off a hidden-camera exposé by a partisan activist group, Administrator Zeldin posted a video on social media on February 12, 2025, claiming his team had "found" $20 billion in funds "parked" at Citibank by the previous administration and characterizing the financial agent arrangement as a "scheme" to "shovel[] boatloads of cash to far-left activist groups." On February 23, Administrator Zeldin declared the Greenhouse Gas Reduction Fund was a "criminal" scheme on national television. EPA and its officials knew these attacks on the NCIF awards were at bottom attacks on the structure and purposes of the Greenhouse Gas Reduction Fund as Congress had created it. But when the *Washington Post* fact-checked the administration's attacks on the NCIF awards as "overblown," EPA's press office on March 6 accused the paper of having "devolved into the radical left's own Pravda."

8.     EPA apparently then used the coercive power of federal law enforcement to cause Citibank to "freeze" the NCIF and CCIA funds it held for accountholders, in plain violation of the account control agreements governing these funds. As early as February 14, accountholders including Plaintiffs, CGC, and other prime grantees under the NCIF and CCIA awards instructed Citibank to disburse their funds, but Citibank has declined to honor those instructions. Based on public news reporting—including reporting on the high-profile resignation of a veteran federal

prosecutor—Plaintiffs believed that Citibank was acting in response to a letter sent by the Federal Bureau of Investigation (FBI) advising Citibank to freeze these funds. However, in recent communications and filings, Citibank has made clear it is taking direction *from EPA*, and that the actions by FBI, the U.S. Department of Justice, and the U.S. Treasury Department, are all traceable to EPA's campaign to baselessly characterize the NCIF and CCIA awards as fraudulent schemes.

9.      Finally, on March 11, shortly after prime NCIF grantee Climate United Fund sought a temporary restraining order to enjoin EPA's unlawful actions, EPA sent NCIF and CCIA awardees a notice to terminate their awards effective immediately.

10.     EPA's actions are unconstitutional and violate the Administrative Procedure Act. Instead of executing the law as Congress passed it, EPA and its officials have impeded the flow of capital to green banks that Congress intended. Defendants' actions violate the separation of powers by usurping the legislative prerogative to repeal or amend federal appropriations, violate the clauses of the Constitution that govern the repeal or amendment of federal law, and violate the Executive Branch's duty to execute Congress's laws "faithfully" even when the Executive disfavors the policy behind them. EPA also acted *ultra vires*, contrary to statutory and regulatory law, and arbitrarily and capriciously by pursuing unsupported claims of waste, fraud, and abuse and unlawfully terminating the NCIF award, outside of the regular grant management procedures for suspected waste, fraud and abuse or award termination, in order to carry out an executive policy of "[t]erminating" the Inflation Reduction Act.

11.     Plaintiffs—and the Congressionally-mandated mission that they are charged with fulfilling—have been and will continue to be harmed by EPA's unprecedented attacks on the Greenhouse Gas Reduction Fund. While some of Plaintiffs' States have long undertaken green

6

lending activities, others formed green banks in response to and in reliance on Congress's express encouragement and financial support—i.e., "funding and technical assistance to establish *new* . . . public, quasi-public, not-for-profit, or nonprofit entities" for green lending, 42 U.S.C. § 7434(b)(2) (emphasis added)—such that the abrupt freeze and termination of their subawards threatens their ability to carry out their founding mission at all. For new and established green banks alike, confidence in the liquidity and availability of funds is vital to their core lending activities, and EPA's efforts to "poison the well" will cause lasting and irreparable reputational harm to the green banks. Plaintiffs are entitled to declaratory and injunctive relief against EPA and its officials to undo Defendants' unlawful freezes and arbitrary grant termination. Such relief is crucial to ensuring that state green banks can move forward with the critical work provided for in the Inflation Reduction Act—which remains good law to this day—and assuring markets that the funds Congress provided for environmentally sustainable projects will in fact be available.

12. Citibank's actions breached its contracts with Plaintiffs. Citibank has refused to honor Plaintiffs' valid disbursement requests, despite its unambiguous contractual obligation to do so. The governing contracts provide one exclusive mechanism for Citibank to refuse to follow accountholders' instructions, and that mechanism has not been invoked. In disregarding Plaintiffs' instructions, Citibank has wrongfully withheld the award funds that Plaintiffs have an immediate right to possess. Its actions are willful or, at the very least, based on gross negligence.

13. Plaintiffs' access to their funds should be restored. The Court should direct Citibank to specifically perform its contractual obligations to disburse funds upon instruction and award Plaintiffs any consequential damages for Citibank's breach.

## THE PARTIES

14.     Plaintiff California Infrastructure and Economic Development Bank is a public agency and instrumentality of the State of California within the California Governor's Office of Business and Economic Development, headquartered at 1325 J Street, Suite 1300, Sacramento, CA 95814. Created in 1994 to finance public infrastructure and private development in California, IBank offers a suite of financing and credit enhancement products that support public, private, and nonprofit sector entities investing in climate mitigation and resilience projects in California, including through its Climate Catalyst Revolving Loan Fund. IBank is an "eligible recipient" of Greenhouse Gas Reduction Fund monies under 42 U.S.C. § 7434(c)(1) and a subawardee of CGC's NCIF award.

15.     Plaintiff Efficiency Maine Trust is a quasi-state agency and instrumentality of the State of Maine, headquartered at 168 Capitol Street, Suite 1, Augusta, Maine 04330-6856, with authority to provide financing as set forth in state statute. *See* 35-A M.R.S. §§ 10103(2), 10104, 10105(8)(A), 10109(4), 10116, 10119(2), 10129, 10154, and 10203. Efficiency Maine was established by the Maine Legislature in 2009 to develop, plan, coordinate, and implement energy efficiency and alternative energy resources programs in Maine in order to achieve goals including but not limited to reducing energy costs to residents, maximizing adoption of cost-effective weatherization and energy efficiency measures, and reducing greenhouse gas emissions through the use of cost-effective energy and energy efficiency investments. *Id*. § 10103(1). Efficiency Maine is an "eligible recipient" of Greenhouse Gas Reduction Fund monies and a subawardee of CGC's NCIF award. Pursuant to a separate agreement between Efficiency Maine and CGC, Efficiency Maine is also the borrower of a $10,000,000 loan funded by CGC's NCIF award.

16.    Plaintiff Illinois Finance Authority is a body politic and corporate, headquartered at 160 N. LaSalle St., Suite S-1000, Chicago, Illinois 60601. Created in 2004, the Illinois Finance Authority provides access to low-cost capital to public and private institutions that are aligned with its mission of fostering economic development, creating and retaining jobs, and improving quality of life for Illinois residents. As the Illinois Climate Bank, it is an "eligible recipient" of Greenhouse Gas Reduction Fund monies and a subawardee of CGC's NCIF award.

17.    Plaintiff Minnesota Climate Innovation Finance Authority is a body politic and corporate of the State of Minnesota, headquartered at the Minnesota Department of Commerce, 85 7th Place East, Suite 280, Saint Paul, Minnesota 55101. The Minnesota legislature established MnCIFA in 2023 to stimulate the development of clean energy and greenhouse gas emissions reduction projects using innovative financing tools to leverage public and private capital to overcome market barriers that inhibit the financing of these projects. Minn. Stat. § 216C.411. MnCIFA is an "eligible recipient" of Greenhouse Gas Reduction Fund monies and a subawardee of CGC's NCIF award.

18.    Defendant EPA is a federal agency headquartered at 1200 Pennsylvania Avenue N.W., Washington, D.C. 20460. EPA was tasked by Congress with disbursing the grant funds appropriated in the Inflation Reduction Act's Greenhouse Gas Reduction Fund and administers the NCIF grant.

19.    Defendant Lee Zeldin is the Administrator of EPA and EPA's highest-ranking, Cabinet-level official. Administrator Zeldin oversees the EPA and is responsible for the actions and decisions challenged in this suit. Defendant Zeldin is sued in his official capacity.

20.    Defendant W.C. McIntosh is the Acting Deputy Administrator of EPA and the EPA official who signed the "Notice of Termination" on March 11, 2025. Defendant McIntosh is sued in his official capacity.

21.    Defendant Citibank is a national banking association organized under the laws of the United States with its main office at 5800 South Corporate Place, Sioux Falls, South Dakota 57108.

## JURISDICTION AND VENUE

22.    The Court has federal question jurisdiction over Plaintiffs' claims against Defendants EPA, Zeldin, and McIntosh under 28 U.S.C. § 1331 and 5 U.S.C. § 702.

23.    This Court has supplemental jurisdiction over the claims against Defendant Citibank under 28 U.S.C. § 1367(a) because these claims are so related to the federal question claims against Defendants EPA, Zeldin, and McIntosh that they form part of the same case or controversy under Article III of the U.S. Constitution. The Court also has diversity jurisdiction over these claims under 28 U.S.C. § 1332(a). All Plaintiffs are considered the citizens of their respective States (California, Illinois, Maine, and Minnesota), while Citibank is considered a citizen of South Dakota, where its main office is located, and the amount in controversy exceeds $75,000.

24.    Venue is proper in this district because EPA is located in this district and a substantial part of the acts or omissions giving rise to the claims occurred in this district. 28 U.S.C. § 1391(e). Three related cases, *Climate United Fund v. Citibank*, No. 1:25-cv-00698, *Coalition for Green Capital v. Citibank*, No. 1:25-cv-00735, and *Power Forward Communities v. Citibank*, No. 1:25-cv-00762, have also been filed in this district.

## FACTUAL ALLEGATIONS

### A.  The Inflation Reduction Act established statutory grant programs.

25.     On August 16, 2022, the President signed the Inflation Reduction Act after passage in both houses of Congress. Pub. L. No. 117-169, 136 Stat. 1818. The Inflation Reduction Act provided for historic investments in projects to tackle the climate crisis, advance environmental justice, and secure America's position as a world leader in domestic clean energy manufacturing.[2] Key to the Inflation Reduction Act's success was its attention to ensuring that pollution-reducing energy, transportation, and infrastructure projects could secure the necessary financing.[3] The Act was also projected to reduce the federal deficit by $58 billion.[4]

26.     The Inflation Reduction Act includes, among other provisions, a $27 billion appropriation to spur pollution-reducing projects under the "Greenhouse Gas Reduction Fund" umbrella. According to EPA, the Greenhouse Gas Reduction Fund is designed "to mobilize financing and private capital to address the climate crisis, ensure our country's economic competitiveness, and promote energy independence while delivering lower energy costs and economic revitalization to communities that have historically been left behind."[5]

---

[2] *Inflation Reduction Act of 2022*, U.S. DEPT. OF ENERGY, https://www.energy.gov/lpo/inflation-reduction-act-2022, *archived at* https://perma.cc/KR8C-SAEL.

[3] *See, e.g.*, *Transforming Clean Energy Financing and Supply Chains in the United States: LPO One Year After the IRA*, U.S. DEPT. OF ENERGY, https://www.energy.gov/lpo/articles/transforming-clean-energy-financing-and-supply-chains-united-states-lpo-one-year-after, *archived at* https://perma.cc/D2ZE-XNAG.

[4] *Summary Estimated Budgetary Effects of Public Law 117-169*, CONGRESSIONAL BUDGET OFFICE COST ESTIMATE 1, 3 (Sept. 7, 2022), https://www.cbo.gov/system/files/2022-09/PL117-169_9-7-22.pdf, *archived at* https://perma.cc/JPX2-67RW.

[5] *Greenhouse Gas Reduction Fund*, U.S. EPA, https://www.epa.gov/greenhouse-gas-reduction-fund, *archived at* https://perma.cc/5JGY-6QAT.

27. EPA created three grant programs under the Greenhouse Gas Reduction Fund appropriation. First, the National Clean Investment Fund directs $14 billion to establish national clean financing institutions to deliver accessible, affordable financing for clean technology projects nationwide. Second, the Clean Communities Investment Accelerator directs $6 billion to establishing hubs that provide funding and technical assistance to community lenders working in low-income and disadvantaged communities, providing an immediate pathway to deploy projects in those communities, while also building capacity of hundreds of community lenders to finance projects for years. Third, the Solar For All program directly supports the deployment of rooftop and community solar generation, enabling 900,000 households in low-income and disadvantaged communities to benefit from affordable and reliable distributed solar energy.

28. EPA described how the two green lending programs, combined, would create a national clean financing network for clean energy and climate solutions across sectors, ensuring communities have access to the capital they need to participate in and benefit from a cleaner, more sustainable economy.

29. It is critically important to address greenhouse gas emissions through projects supported by the NCIF and CCIA green lending programs. As the federal government's most recent National Climate Assessment concludes, without "rapid and deep reductions" in global greenhouse gas emissions, "the risks of accelerating sea level rise, intensifying extreme weather, and other harmful climate impacts will continue to grow. Each additional increment of warming is expected to lead to more damage and greater economic losses," while "the risk of catastrophic or unforeseen consequences also increases." Conversely, "each increment of warming that the world avoids . . . reduces the risks and harmful impacts of climate change. . . . In addition to

reducing risks to future generations, rapid emissions cuts are expected to have immediate health and economic benefits."[6]

**B.    In implementing the Inflation Reduction Act, EPA selected grant recipients and set up Citibank as a Financial Agent.**

30.    After a public, competitive application process, in April 2024, EPA selected three entities to serve as prime grantees for the NCIF: Climate United Fund ($6.97 billion), Coalition for Green Capital ($5 billion), and Power Forward Communities ($2 billion). Along with the five CCIA grantees, these entities are the "recipients" or "prime grantees." As of filing, EPA's website continues to state that "throughout the multi-staged review and selection process for each program, EPA ensured that applications were reviewed and scored in accordance with a process that was robust, consistent, and ethical."[7]

31.    As directed by Congress, EPA obligated funds to these prime grantees in late summer 2024. 42 U.S.C. § 7434(a)(2)-(3), (b).

32.    While most prime grantees were tasked with deploying the NCIF and CCIA funds to directly support qualified projects, CGC's grant contemplated subgranting its awarded funds to various subrecipients. Plaintiffs California IBank, Efficiency Maine, Illinois Climate Bank, and MnCIFA are subrecipients under CGC's NCIF grant. The qualified projects they are to support using NCIF funds will provide jobs, improve the environment, build out critical infrastructure, and provide for resiliency and adaptation programs in their respective States.

---

[6] U.S. GLOBAL CHANGE RESEARCH PROGRAM, *Fifth National Climate Assessment: Overview* 1-5 (2023), https://nca2023.globalchange.gov/downloads/NCA5_Ch1_Overview.pdf, *archived at* https://perma.cc/M2MB-2RXP.

[7] *Greenhouse Gas Reduction Fund: Review and Selection Process*, U.S. EPA, https://www.epa.gov/greenhouse-gas-reduction-fund/review-and-selection-process, *archived at* https://perma.cc/6SP5-UTE5.

33.     The NCIF award requires Plaintiffs' subgrant funds to be held at Citibank under a financial agency agreement between Citibank and the U.S. Department of the Treasury (Treasury). Citibank and Treasury entered into a Financial Agency Agreement effective September 19, 2024 (FAA). Each of Plaintiffs' accounts at Citibank are governed by an Account Control Agreement (ACA) between Citibank, CGC, and the respective Plaintiff. Among other provisions, the ACAs set forth Citibank's obligations to follow disbursement instructions from the accountholder (or Pledgor) as well as an exclusive mechanism whereby the Secured Party may take control of the accounts. On or about January 22, 2025, Plaintiffs, as Pledgors, each executed an ACA with Citibank and CGC as the Secured Party. Each of the NCIF prime grantees (CGC, Climate United, and Power Forward) also executed ACAs, as Pledgors, with Citibank, and with EPA as the Secured Party.

34.     EPA contemplated this financial agent arrangement from the NCIF program's inception—and described it in the original July 2023 Notice of Funding Opportunity as critical both to allow recipients to leverage private capital and to "ensure that EPA's interests are protected." EPA designed, structured, and negotiated the FAA and the individual ACAs to provide transparency and accountability. For example, and as discussed further below, the prime grantees' ACAs include provisions that allow EPA, as Secured Party, to take exclusive control of the prime grantees' funds at Citibank under certain specified conditions.

35.     The below diagram depicts this arrangement between EPA, Citibank, the prime grantees, and the subrecipients including Plaintiffs:



36.    Section 1(a) of the ACAs provides that Citibank "maintains the Accounts for the Pledgor"—here, each Plaintiff—"and all property (including, without limitation, all funds and financial assets) held by [Citibank] for the accounts of the Pledgor are, and will continue to be, credited to the Accounts in accordance with the instructions given by the Pledgor (unless otherwise provided herein)."

37.    Section 2 requires Citibank to "comply with all instructions, notifications, and entitlement orders the Bank receives directing the disposition of funds and financial assets in the Accounts including, without limitation, directions to distribute proceeds of any such transfer or redemption of interest or dividends on financial assets in the Accounts, substantially in the form

15

attached hereto . . . , originated by the Pledgor, until the time that that Bank receives a notice, substantially in the form attached hereto as Exhibit A (a 'Notice of Exclusive Control') from the Secured Party that the Secured Party is exercising its right to exclusive control over an Account." In Plaintiffs' ACAs, the Secured Party is the prime NCIF grantee, CGC. After Citibank receives such a notice, Citibank must "comply with all instructions, notifications, and entitlement orders" it receives from CGC, "without further consent by the Pledgor."

38.    This is the exclusive mechanism for Citibank to disregard the instructions of its accountholder. Indeed, Section 6(a) takes pains to limit "the duties, responsibilities, and obligations of the Bank" (i.e., Citibank) "to those expressly set forth in the Agreement," and Section 9 confirms that the ACAs constitute "the entire agreement between the parties and sets forth in its entirety the obligations and duties of the Bank with respect to the assets in the Accounts." The ACAs further clarify the consequences of particular government actions:

a.    Section 6(c) of the ACAs authorizes Citibank "to comply with final orders issued or process entered by any court with respect to the assets in the Accounts, without determination by the Bank of such court's jurisdiction in the matter."

b.    Section 6(b) of the ACAs limits Citibank's liability "for any damage, loss, or injury resulting from any action taken or omitted in the absence of gross negligence or willful misconduct (as finally adjudicated by a court of competent jurisdiction)." It also limits Citibank's liability "for not performing any act or fulfilling any obligation hereunder by reason of any occurrence beyond its control (including, without limitation, any provision of any present or future law or regulation or any act of any governmental authority. . . .").

39.     In other words, under the ACAs, Citibank is authorized to restrict Plaintiffs' access to their Accounts only if CGC issues a Notice of Exclusive Control to Citibank, or a court issues a final order or process with respect to the assets in Plaintiffs' Citibank accounts. To date, Plaintiffs have not received or been made aware of a Notice of Exclusive Control issued by CGC. On information and belief, CGC has not issued a Notice of Exclusive Control regarding Plaintiffs' Citibank accounts. And no court has issued any final order or process with respect to the assets in the Plaintiffs' accounts.

**C.    Plaintiffs' Requests for Disbursements under the ACAs and Citibank's Refusal to Comply**

40.     Since February 14, 2025, Plaintiffs have submitted or attempted to submit instructions to Citibank directing that funds and financial assets in their Citibank accounts be disbursed, but Citibank has failed to comply with the Plaintiffs' valid instructions for disbursement, or has failed to remedy the impediments to Plaintiffs' completing instructions for disbursement.

41.     On February 14, 2025, Plaintiff IBank submitted instructions to Citibank directing Citibank to disburse $415,314 from IBank's accounts to IBank. This request was valid and proper; it complied with all applicable requirements of the ACA. For example, it used the proper "Account Direction" form specified in the ACA.

42.     The previous day, on February 13, 2025, IBank had made contact with a Citibank representative, who advised IBank that Citibank had frozen all of the NCIF grant funds based on a social media posted issued by Administrator Zeldin (discussed *infra*) indicating an intent to terminate Citibank's FAA. Citibank further advised IBank that it was awaiting further direction from EPA.

43.    On February 14, 2025, Citibank informed IBank that it was unfreezing IBank's account and would honor IBank's disbursement instructions. Accordingly, IBank submitted its request to Citibank directing Citibank to disburse $415,314.

44.    On February 15, 2025, when the request had yet to be fulfilled, IBank emailed Citibank to ask about the status. Citibank did not respond.

45.    In the following days, IBank repeatedly requested information from Citibank about the status of its funds, but Citibank either did not respond or refused to provide IBank with any information justifying its inaction on IBank's instructions.

46.    To date, Citibank has not disbursed funds in response to IBank's February 14 request. Plaintiffs' Citibank accounts do not reflect that any such transaction has occurred.

47.    The other Plaintiffs have similarly submitted or attempted to submit requests for disbursements but encountered similar obstruction from Citibank.

48.    Plaintiff MnCIFA has attempted to submit instructions to Citibank directing that MnCIFA's funds and financial assets in its Citibank accounts be disbursed to MnCIFA using all the valid and proper requirements under the ACA, but Citibank's electronic systems have been inoperable, and Citibank has been unresponsive to requests that it cure the problem.

49.    On February 14, 2025, Illinois Climate Bank requested to draw funds from its Citibank account consistent with the ACA, but Citibank has not followed Illinois Climate Bank's instructions, and Illinois Climate Bank has been unable to draw funds since that date. Illinois Climate Bank received no information from Citibank about the reasons its draw requests have not been processed.

50.    On February 20, 2025, Efficiency Maine submitted a request to Citibank to transfer $10,000,000.00 (the amount of its loan from CGC) to its account at Camden National

Bank. That request was not processed, and as of March 17, 2025, Efficiency Maine has not received the requested funds.

51.     Later on February 20, 2025, Efficiency Maine submitted a second request to transfer funds totaling $242,807.83 for reimbursement of two qualified program administration expenses in the amounts of $225,000 and $17,807.83, respectively. The second request was not processed, and, as of March 17, 2025, Citibank has not disbursed Efficiency Maine's funds in response to either of its requests.

52.     On February 26, 2025, Plaintiff IBank emailed Citibank a letter stating that Citibank had failed to comply with its instructions as required by its ACA; requesting that Citibank identify the basis for its apparent refusal to comply with valid disbursement instructions; informing Citibank that its apparent refusal was threatening to cause significant harm to IBank, including by preventing IBank from fulfilling its contractual obligations to third parties and demanding that Citibank immediately disburse funds. Citibank never responded to this letter and did not disburse IBank's funds.

53.     On March 7, the Attorneys General for the States of Minnesota, Colorado, Maine, Maryland and New York, each of which have green banks that are subrecipients of CGC's NCIF award, similarly emailed Citibank a letter requesting that Citibank identify the basis for its apparent refusal to comply with valid disbursement instructions; informing Citibank that its apparent refusal was threatening to cause significant harm to Plaintiffs, including by preventing Plaintiffs from fulfilling their contractual obligations to third parties; and demanding that Citibank immediately disburse Plaintiffs' funds in accordance with their instructions. Citibank never responded to Plaintiffs' letter, and did not disburse Plaintiffs' funds.

54.     On information and belief, all three prime NCIF grantees similarly instructed Citibank to disburse funds and were similarly ignored. On information and belief, on March 3, after persistent attempts to extract an explanation from Citibank for the freeze on accounts and persistent silence from the bank, Citibank informed prime grantee Climate United that the bank was "awaiting further guidance" from EPA and other federal officials before it would disburse funds.

**D.    The Defendants' freeze and terminations are the result of the Executive's policy opposition to the Inflation Reduction Act, not evidence of grantee misconduct, fraud, waste, or abuse.**

55.     Since the Inflation Reduction Act's passage, Congress has considered but rejected dozens of bills intended to repeal all or part of it, several of which have proposed repealing the Greenhouse Gas Reduction Fund appropriation.[8] None of those bills have been successful. The Inflation Reduction Act's appropriation to the Greenhouse Gas Reduction Fund remains good law.

56.     On his first day in office, January 20, 2025, President Trump announced his administration's policy of "[t]erminating the Green New Deal." Exec. Order 14154, 90 Fed. Reg. 8353, 8357 (Jan. 29, 2025). Consistent with this directive and other agency pronouncements, EPA began "freezing" funding for programs under both the Inflation Reduction Act and the Infrastructure Investment Jobs Act.

57.     Under this unlawful freeze, the executive refused to disburse funds to grant recipients under Inflation Reduction Act and Infrastructure Investment and Jobs Act programs

---

[8] Riki Fujii-Rajani and Sanjay Patnaik, *What will happen to the Inflation Reduction Act under a Republican trifecta?*, BROOKINGS (Jan. 6, 2025), https://www.brookings.edu/articles/what-will-happen-to-the-inflation-reduction-act-under-a-republican-trifecta/, *archived at* https://perma.cc/FQG7-ZW34.

that were duly authorized, appropriated, awarded, and already underway. These included Solar
For All awards under the Inflation Reduction Act's Greenhouse Gas Reduction Fund. That
unlawful and arbitrary action—part of a broader, government-wide freeze on federal financial
assistance—was enjoined in a temporary restraining order and later, a preliminary injunction,
issued by the U.S. District Court for the District of Rhode Island in *State of New York v. Trump*,
ECF Nos. 50, 161, No. 1:25-cv-0039-JJM-PAS (Jan. 31 & Mar. 6, 2025).

58.     Due to the different structure of the NCIF and CCIA grant programs from the
other Inflation Reduction Act and Infrastructure Investment and Jobs Act programs, however, the
new EPA leadership could not simply lock up these funds with the stroke of a pen. Instead,
Defendants EPA, Zeldin, and McIntosh—and, on information and belief, other senior EPA
political appointees not yet identified—began making public, unsupported accusations of waste,
fraud, and abuse to justify future action to "claw back" the NCIF and CCIA funds that had
already been obligated to the grantees (as required by Congressional mandate, *see* 42 U.S.C.
§ 7434(a)(2)-(3), (b)) and disbursed to their accounts at Citibank.

59.     On February 12, 2025, Administrator Zeldin posted a video on social media
attacking the green investment programs, based on a hidden-camera "sting" video circulated
months prior.[9] That prior video was posted to X.com (formerly Twitter) by Project Veritas, an
organization that uses surreptitiously recorded and selectively edited camera footage to sway
public opinion against organizations, programs, or causes they oppose. In his own video,
Administrator Zeldin cites a metaphor used by the individual recorded by Project Veritas—

---

[9] *Administrator Zeldin Announces that Billions of Dollars Worth of "Gold Bars" Have
Been Located at Outside Financial Institution*, U.S. EPA (Feb. 13, 2025),
https://www.epa.gov/newsreleases/administrator-zeldin-announces-billions-dollars-worth-gold-
bars-have-been-located, *archived at* https://perma.cc/5U9V-Y8T5.

identified as a former EPA staffer—of "[throwing] gold bars off the Titanic" and characterizes the $20 billion deposited at Citibank under the NCIF and CCIA awards as "the gold bars" that his team had just "found" or "located." Administrator Zeldin asserted, "This scheme was the first of its kind in EPA history and it was purposefully designed to obligate all of the money in a rush job with reduced oversight."

60.     Contrary to Administrator Zeldin's claims, the NCIF award and subawards are subject to the same robust controls as any other EPA-administered grant. EPA staff scrutinize EPA grants using well-defined monitoring activities, grant reporting obligations, and internal financial controls.[10] All grantees who receive awards over a certain threshold, including CGC, are subject to the single-audit requirements of 2 C.F.R. § 200.501. EPA's independent Office of the Inspector General regularly audits agency programs for waste, fraud, and abuse. 5 U.S.C. § 401 *et seq*. In a report reviewing single audit findings reported to the Inspector General from 2019-2021, the Inspector General stressed that the single audit is one of the primary tools for preventing waste, fraud, and abuse.[11]

---

[10] *See*, *e.g.*, *Office of Grants & Debarment, What To Expect When You're Expecting… A Grant*, U.S. EPA 26-35 (Mar. 29, 2023), https://www.epa.gov/system/files/documents/2023-03/What%20to%20Expect%20When%20You%27re%20Expecting...%20a%20Grant%20Presentation_3.29.2023.pdf, *archived at* https://perma.cc/LNV2-MSL4; *see also Agency Financial Report: Fiscal Year 2024*, U.S. EPA, 19-21 (Nov. 15, 2024), https://www.epa.gov/system/files/documents/2024-11/epa-fy-2024-agency-financial-report.pdf, *archived at* https://perma.cc/249X-SYH4 (analyzing and certifying internal financial controls, and identifying specific vulnerabilities and corresponding corrective actions).

[11] *Considerations From Single Audit Reports For The EPA's Administration of Infrastructure Investment And Jobs Act Funds*, U.S. EPA OFFICE OF INSPECTOR GENERAL (Sept. 14, 2022), https://www.epaoig.gov/sites/default/files/documents/2022-09/_epaoig_20220914-22-N-0057.pdf, *archived at* https://perma.cc/C5CA-T9YX.

61.     EPA's 2024 Financial Report states that EPA evaluated its internal controls in accordance with OMB Circular A-123 and that it operates a comprehensive internal control program, which ensures compliance with the requirements of Federal Managers Financial Integrity Act and other laws and regulations.[12]

62.     Such regulations include 2 C.F.R. § 200.303, which requires grant recipients to establish and maintain effective internal controls over federal awards, and 2 C.F.R. § 200.113, which requires grant recipients to disclose specific information related to integrity and compliance when receiving federal funds.

63.     EPA also requires the use of general grant terms and conditions, which all require grantees to report on fraud, waste, and abuse.[13] Those grant terms and conditions are reflected in the grant and subgrant agreements that govern CGC's and Plaintiffs' funds.

64.     Instead of invoking these well-defined mechanisms for policing grants, EPA pursued a pressure campaign—in public and in secret—to coerce Citibank to freeze the NCIF and CCIA award funds. Subsequent to Administrator Zeldin's February 12 announcement, on February 17, EPA apparently caused the FBI to send two separate letters to Citibank making a "recommendation" to place a 30-day administrative freeze of the $20 billion NCIF/CCIA funds.

---

[12] *Agency Financial Report*, *supra* note 10.

[13] *General Terms and Conditions*, U.S. EPA (Oct. 1, 2023) https://www.epa.gov/system/files/documents/2023-09/fy_2023_epa_general_terms_and_conditions_effective_october_1_2023_or_later.pdf, *archived at* https://perma.cc/6RPP-PNLX; General Terms and Conditions, U.S. EPA (Oct. 1, 2024) https://www.epa.gov/system/files/documents/2024-10/fy_2025_epa_general_terms_and_conditions_effective_october_1_2024_or_later.pdf, *archived at* perma.cc/YUK9-V2&T.

The funds have been inaccessible for draw-downs by the prime grantees and subgrantees since the FBI issued the February 17, 2025, letters.

65.    Neither EPA nor Citibank have shared these letters with Plaintiffs. Until recently, much of Plaintiffs' understanding of the events behind Citibank's freeze of their funds came from public news reporting about the resignation of Denise Cheung, the former Chief of the Criminal Division in the United States Attorney's Office in Washington, D.C.[14]

66.    Ms. Cheung's resignation letter is public.[15] In it, Ms. Cheung states that the Office of the Deputy Attorney General instructed her to open a criminal investigation and issue grand jury subpoenas based at least in part on the existence of the hidden-camera Project Veritas video. Ms. Cheung further assets that she consulted with the FBI but could not determine that any probable cause existed for securing a warrant that could freeze the accounts at Citibank. Her account indicates that the "recommendation" to Citibank to impose a 30-day administrative freeze in the two FBI letters was a compromise position short of probable cause—the Office of the Deputy Attorney General insisted that a freeze directive go out, but she could not find probable cause for sending one.

---

[14] Ryan Reilly, *Veteran Federal Prosecutor Resigns Over Bank Freeze Order From Trump Appointee*, NBC NEWS (Feb. 18, 2025 3:23 PM) https://www.nbcnews.com/politics/justice-department/veteran-federal-prosecutor-resigns-bank-freeze-order-trump-appointee-rcna192619, *archived at* https://perma.cc/WUE2-P6K5; Eileen Sullivan, Glenn Thrush, and Adam Goldman, *Prosecutor in U.S. Attorney's Office in Washington Abruptly Resigns*, The NEW YORK TIMES (Feb. 18, 2025), https://www.nytimes.com/2025/02/18/us/politics/denise-cheung-federal-prosecutor-quits.html; Spencer S. Hsu, Carol D. Leonnig and Nicolás Rivero, *High-ranking D.C. federal prosecutor resigns over order to freeze EPA funds*, THE WASHINGTON POST (Feb. 18, 2025), https://www.washingtonpost.com/investigations/2025/02/18/federal-prosecutor-dc-resigns/.

[15] *Read the Resignation Letter by Denise Cheung, a Veteran D.C. Federal Prosecutor*, THE WASHINGTON POST (Mar. 6, 2025),  https://www.washingtonpost.com/dc-md-va/2025/02/18/read-resignation-letter-denise-cheung/.

67.    After the recommendation letters were issued, Ms. Cheung asserts that the interim United States Attorney demanded she send a follow-up letter that *required* Citibank to institute a freeze. When she refused, the interim United States Attorney demanded her resignation.

68.    On information and belief, after Ms. Cheung's forced resignation, interim United States Attorney Ed Martin then attempted to obtain a seizure warrant. On information and belief, and based on credible news reports, a United States Magistrate Judge of the United States District Court for the District of Columbia found that Mr. Martin's request and accompanying FBI agent affidavit failed to establish a reasonable belief that a crime had occurred.[16]

69.    On March 2, 2025, Defendant McIntosh referred the Greenhouse Gas Reduction Fund to EPA's Office of the Inspector General, alleging "concerning matters." The March 2 referral letter failed, however, to identify any actual evidence of any financial mismanagement, conflicts of interest, or oversight failures.

70.    On information and belief, only on March 4, 2025, did Citibank receive an actual directive from any government agency not to disburse funds from Plaintiffs' Citibank accounts. On information and belief, the Treasury Department told Citibank that it had been informed of EPA's "concerns regarding potential fraud and/or conflicts of interest related to the Greenhouse Gas Reduction Fund," and that "EPA anticipates developing additional account controls," and "we are further instructing Citibank not to disburse funds from any of the [Greenhouse Gas Reduction Fund] accounts prior to the end of the day Sunday, March 9, 2025."

---

[16] FBI Takes Up EPA Probe Amid Pushback From Judge, Prosecutors, THE WASHINGTON POST (Feb. 27, 2025), https://www.washingtonpost.com/dc-md-va/2025/02/27/trump-fbi-epa-grant-investigation/.

71.    On March 5, 2025, however, EPA issued a statement to the media that the "freeze on funds is at the discretion of Citibank."[17] Citibank issued its own statement that it was awaiting—and would continue to follow—EPA's instructions not to disburse funds from any of the NCIF/CCIA accounts: "Our role as financial agent does not involve any discretion over which organizations receive grant funds. Citi will of course comply with any binding instructions from the federal government."

72.    On information and belief, on March 10, 2025, EPA directly ordered Citibank to "pause the processing of payment instruction of the [Greenhouse Gas Reduction Fund] accounts until further notice." The message included, "it is critical that the Bank not resume processing payment instructions for the [Greenhouse Gas Reduction Fund] accounts."

73.    On information and belief, the Treasury Department similarly instructed Citibank to comply with EPA's instructions.

74.    On March 8, prime NCIF grantee Climate United Fund sought a temporary restraining order to enjoin EPA's unlawful actions. *Climate United Fund v. Citibank*, No. 1:25-cv-00698, ECF No. 2 (D.D.C.). The hearing on Climate United's application was originally scheduled for March 11, 2025, but, on information and belief, the federal Defendants requested a 24-hour extension until March 12.

75.    During the 24-hour extension period, EPA sent all NCIF/CCIA grant awardees a notice purporting to terminate their awards effective immediately. Along with the termination,

---

[17] Leah Garden, *Citibank and EPA Spar Over Frozen Climate Action Funds*, TRELLIS (March 2, 2025), https://trellis.net/article/citibank-and-epa-spar-over-frozen-greenhouse-gas-reduction-fund/, *archived at* https://perma.cc/2CHX-UFVF.

Defendant Zeldin issued a statement that EPA was terminating the Financial Agent arrangement with Citibank. EPA's Press Office posted a video in which Defendant Zeldin describes purported "countless issues" attendant to the Greenhouse Gas Reduction Fund. None of the issues he identifies, however, establishes any grantee noncompliance, mismanagement, or lack of oversight, much less any fraud, wase, or abuse.

76.     The termination letters came under the signature of Defendant McIntosh. All of these letters included similar content:

- An invocation of agency "authority under 2 C.F.R. §§ 200.399-40 (*sic*);"

- An allegation of "substantial concerns regarding program integrity, the award process, programmatic fraud, waste, and abuse, and misalignment with the Agency's priorities, which collectively undermine the fundamental goals and statutory objectives of the award;"

- Several allegations of alleged material deficiencies relating to oversight;

- The Agency's desire to guard against "potential" violations of the Appointments Clause and the private nondelegation doctrine.

77.     The March 11 termination letter did not identify what the "substantial concerns" were. It did not identify whether any alleged programmatic fraud actually existed, or the basis on which it had been identified. The letter did not identify what the Agency's priorities were, or how the grantee's project was misaligned with them. The termination letter also did not identify what material deficiencies existed with respect to oversight.

78.     The termination letter concludes with a statement that the federal Defendants intend to redistribute the Greenhouse Gas Reduction Fund money to unspecified new recipients.

**E.     Plaintiffs are harmed by the Defendants' improperly instituted freezes and terminations.**

79.     Defendants' actions have deprived Plaintiffs of access to and use of funds to which they are legally entitled.

80.     As green banks, Plaintiffs provide financial products to deliver energy, transportation, and infrastructure projects that are insufficiently supported by other financial markets and to achieve desired economic development, public health, environmental, and other public benefit outcomes. As public or quasi-public agencies, Plaintiffs are also accountable to the public and their public-benefit missions in ways that private banks are generally not.

81.     Otherwise, the state green banks' business resembles those of a more familiar private bank: offering loans, credit enhancements, and other financing products that earn interest for the bank; investing or otherwise providing equity that earns a return; and offering similar financial services that earn money for the bank. The proceeds of such financial products and services in turn support further lending, investment, and revenue-generating activities for the state green bank.

82.     Plaintiffs have spent months identifying qualified projects to support with financing and investment under their NCIF subawards with CGC. The work of identifying and vetting pollution-reducing projects, negotiating agreements, and coordinating with CGC as the prime grantee has caused Plaintiffs to expend administrative costs. However, due to Citibank's ongoing freeze, none of the Plaintiffs can draw down funds to cover these incurred, valid costs to the extent their program seeks such coverage.

83.     Plaintiffs have identified and actively negotiated financing agreements with their customers (i.e., qualified projects) and contracted for services from third-party consultants and other vendors that depend on the availability of the funds held at Citibank. The ongoing freeze

and EPA's termination of the NCIF award threatens loss of those business opportunities and placing Plaintiffs in breach of executed agreements. A prolonged freeze or termination of the NCIF award will certainly result in the cancellation of financing for qualified projects, which will result in lost revenue for Plaintiffs, and likely result in the imminent cancellation of some qualified projects altogether. Even if Plaintiffs later prevail in this action, Defendants will have successfully "poisoned the well" by calling into question the legitimacy of these funds and delaying Plaintiffs' access to them for so long that all of Plaintiffs' prospective borrowers will have opted for alternative sources of funding—or chosen to cancel their projects altogether.

84.    Plaintiffs face substantial harms in lost business and reputational harm from Defendants' actions. Through their unlawful and arbitrary actions, EPA and its officials have cast a significant cloud of uncertainty over the funds that Plaintiffs expected and in certain cases have committed to use to support qualified projects. That cloud will likely render NCIF funds unusable for purposes of raising private capital (e.g., pledging receivables or securitizing NCIF loans for additional private capital, or purchasing interests in loans to qualified projects). Simply put, lenders and borrowers will not do business with a bank that cannot provide the promised funds. By rendering the availability of all NCIF award monies so uncertain, Defendants threaten immediate and lasting damage to Plaintiffs' credibility with their customers and vendors and their ability to retain and attract business.

85.    In addition, Plaintiffs have made expenditures of non-NCIF funds in expectation of projects receiving NCIF support from others. The unfulfilled promise of NCIF fund causes Plaintiffs additional economic loss through those expenditures.

86.    Finally, the loss of qualified projects substantially harms the public mission of state green banks. EPA's aggressive campaign to impede the flow of Congressionally approved

funds to this public mission and paint the entire green lending industry as wasteful and fraudulent will wreak immediate and lasting harm on state green banks to pursue the mission for which they were created.

87.    Efficiency Maine Trust continues to be unable to access the more than $25 million in funds held in its Citibank account, which represents more than a doubling of the total capital that Efficiency Maine currently has under management through its loan program. Without the ability to access these grant and loan funds, Efficiency Maine cannot support the full scope of programs that it otherwise could, nor can it supply financing to as many energy improvement projects for Maine residents and small businesses as it otherwise would.

88.    Efficiency Maine forecasts that without the additional influx of capital being held at Citibank, it will exhaust its available capital in the next 12 months and be forced to discontinue financing on energy efficiency projects. This will disproportionately impact creditworthy small businesses and low- and moderate-income households who face steeper barriers to financing such projects than other customer classes.

89.    To illustrate the cost of these funds being frozen, a typical Maine home that switches from an old, conventional furnace or boiler to a modern, high-efficiency heat pump system will save more than $700 annually on their heating bills. For a typical low- or moderate-income home in Maine, the total project cost will be in the range of $10,000-$15,000. Of this total, customers seek to take advantage of Efficiency Maine low-interest loans by borrowing, on average, $6,700 per project. With the funds currently frozen at Citibank, Efficiency Maine would be able to finance 1,865 projects per year at the average borrowing level for each of the next three years. Without those funds, a significant fraction of these households will instead face more

than $700 in higher annual heating bills, and the more than four hundred firms that install heat pumps in Maine will forego the revenues that would have been associated with these projects.

90.    Moreover, these funds were formally awarded, publicly announced, and reported in the media, but subsequently were declared frozen due to assertions of improper conduct. As a consequence, the firms marketing heat pumps in Maine and their customers have questioned the integrity and reliability of these funds and Efficiency Maine's association with them.

91.    The harms to Plaintiffs' reputations run even beyond the NCIF context. For example, Plaintiff Illinois Climate Bank funds its operations primarily through fees from conduit finance transactions and income on its general funds, with additional smaller sources of support through grant programs and interest income on funded loans. The termination of Illinois Climate Bank's NCIF subaward on the bases suggested by the EPA's termination letter will limit Illinois Climate Bank's (and other Plaintiffs') ability to apply for or receive federal and state grants in the future. Even if EPA takes no direct action against Illinois Climate Bank, Illinois Climate Bank will be obligated to make disclosures when applying for federal and Illinois state grant opportunities. This may make Illinois Climate Bank ineligible or less competitive in future grant applications and may obligate state/federal agencies or pass-through entities to impose onerous and unwarranted administrative conditions on any grant funds provided to Illinois Climate Bank.

92.    Illinois Climate Bank also believes that third parties may be deterred from using certain of its services due to an increased risk of one or more federal audits resulting from the federal Defendants' allegations surrounding the NCIF grant. One of Illinois Climate Bank's (and other Plaintiffs') core purposes is to provide low-cost tax-exempt financing for eligible borrowers. Being identified as an alleged conspirator in a scheme to defraud the United States falsely suggests a serious lack of integrity and internal controls—which, if true, would warrant

more scrutiny of Illinois Climate Bank's bond issues and related transactions. This perception could negatively impact one or more ratings assigned to bonds issued or to be issued by the Illinois Climate Bank, and this perception could negatively impact terms and conditions of financial undertakings of borrowers, programs, and transactions supported by the Illinois Climate Bank, in each case which could make the Illinois Climate Bank an undesirable forum for tax-exempt financing and increase borrower costs, thus hindering one of the Illinois Climate Bank's core sources of revenue.

93.    While some of Plaintiffs' States have long undertaken green lending activities, others formed green banks in response to and in reliance on Congress's express encouragement and financial support—i.e., "funding and technical assistance to establish *new* . . . public, quasi-public, not-for-profit, or nonprofit entities" for green lending, 42 U.S.C. § 7434(b)(2) (emphasis added)—such that the abrupt freeze and termination of their subawards threatens their ability to carry out their founding mission at all. For new and established green banks alike, confidence in the liquidity and availability of funds is vital to their core lending activities, and EPA's efforts to "poison the well" will cause lasting and irreparable reputational harm to the green banks.

**COUNT 1**

**VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. § 706(2): UNLAWFUL AS CONTRARY TO LAW, ULTRA VIRES (Federal Defendants)**

94.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs.

95.    Defendants have taken official action purporting to terminate the Greenhouse Gas Reduction Fund grants to the prime recipients, which were intended to implement the NCIF.

96.    Federal Defendants have also taken final official action effectuating a freeze on the grantees' and subgrantees' Greenhouse Gas Reduction Fund accounts by either recommending or outright instructing Defendant Citibank not to disburse funds to which subrecipients are entitled. Defendant Citibank complied with the federal Defendants' recommendations and instructions.

97.    Defendants' final actions are not in accordance with, and are contrary to, the law.

98.    Defendants' actions unwind, and are thus contrary to, the specific requirements of the Inflation Reduction Act and its statutory mandate to establish and implement the Greenhouse Gas Reduction Fund. 42 U.S.C. § 7434.

99.    Defendants' actions to freeze or terminate Plaintiffs' access to federal funds that were duly appropriated by Congress in the Inflation Reduction Act violate the Impoundment Control Act. 2 U.S.C. § 683.

100.    No agency may take any action that exceeds the scope of its constitutional or statutory authority.

101.    No constitutional or statutory authority authorizes EPA to refrain from fulfilling its statutory duties, or to violate federal law.

102.    Under the APA, a court must "hold unlawful and set aside agency action, findings, and conclusions found to be . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C). For the same reasons that the Defendants' conduct violated the statutory mandates of the Inflation Reduction Act and protections of the Impoundment Control Act, such conduct exceeds the federal Defendants' jurisdiction, authority, and limitations.

103.     Plaintiffs are therefore entitled to a declaration that the Defendants' conduct is

contrary to law under the Inflation Reduction Act and the Impoundment Control Act and *ultra*

*vires*. Plaintiffs are further entitled to a corresponding preliminary and permanent injunction

restoring the subrecipients' access to the Greenhouse Gas Reduction Fund accounts held in their

name at Defendant Citibank.

## COUNT 2

**VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. § 706(2): UNLAWFUL AS CONTRARY TO UNIFORM GRANT GUIDANCE (Federal Defendants)**

104.     Plaintiffs incorporate by reference the allegations contained in the preceding

paragraphs.

105.     Defendants have taken final official action purporting to terminate the

Greenhouse Gas Reduction Fund grants to the prime recipients, which were intended to

implement the NCIF.

106.     Federal Defendants have also taken final official action effectuating a freeze on

the grantees' and subgrantees' Greenhouse Gas Reduction Fund accounts by either

recommending or outright instructing Defendant Citibank not to disburse funds to which

subrecipients are entitled. Defendant Citibank complied with the federal Defendants'

recommendations and instructions.

107.     Defendants' final actions are not in accordance with, and are contrary to, the

Uniform Grant Guidance regulations found in 2 C.F.R. Part 200.

108.     2 C.F.R. § 200.340(a) provides that EPA may only terminate the agreement in

limited circumstances (1) failure to comply with the terms and conditions of the Federal award,

(2) with consent, (3) upon notice by the recipient, or (4) pursuant to the terms and conditions of

the Federal award, including, to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities. Of these, subparts (2) and (3) do not apply because the recipients have neither sought to terminate their awards nor consented to termination.

109.    2 C.F.R. § 200.340(a)(1) does not apply because Defendants have not identified any instance of noncompliance, nor have defendants identified any evidence of waste, fraud, status, or abuse.

110.    And 2 C.F.R. § 200.340(a)(4) does not apply either. When 2 C.F.R. § 200.340 was amended in 2020, the Office of Management and Budget (OMB) confirmed that the termination language relating to agency priorities still constrained agencies from instituting arbitrary cancellations. *Guidance for Grants and Agreements* 85 Fed. Reg. 49,506, 49,509 (Aug. 13, 2020). In 2024, OMB completed another round of revisions to this provision. *Guidance for Federal Financial Assistance*, 89 Fed. Reg. 30,046 (Apr. 22, 2024).[18] After considering removal of the "agency priorities" provision of (a)(4) altogether, OMB determined to keep the provision as a permissive condition that *may* form a ground for termination, but *only if* "the language is included in the terms and condition of the award." *Id*. at 30,089. The agency must "clearly and unambiguously" include (a)(4) in the grant agreement for it to be an available basis for termination under 2 C.F.R. § 200.340(a)(4). *Id*; *accord* 2 C.F.R. § 200.340(b) (requiring the agency to "clearly and unambiguously" specify all termination provisions in the terms and conditions of the Federal award).

---

[18] The 2024 guidance applies in this matter. *See Applicability Date for the Office of Management and Budget's Regulatory Revisions*, 89 Fed. Reg. 55,262 (July 3, 2024) ("The revised version of 2 CFR 200.340 will apply to EPA financial assistance agreements awarded or amended to add funds on or after July 3, 2024.").

111.    Here, because the applicable grant agreements do not include at all the "agency priorities" provision of (a)(4) as a ground for termination—much less "clearly and unambiguously"—in their terms and conditions, 2 C.F.R. § 200.340(a)(4) provides no authority for EPA to terminate the awards.

112.    The federal Defendants' actions to terminate the NCIF awards based on an allegation that their purported concerns "collectively undermine the fundamental goals and statutory objectives of the award" thus does not constitute a valid basis for termination under 2 C.F.R. § 200.340(a)(1) or (a)(4). The federal Defendants acted contrary to the governing regulations. 2 C.F.R. § 200.340(b); *see* 89 Fed. Reg. at 30,089.

113.    2 C.F.R. § 200.342 further requires Defendants to provide grantees and subgrantees like Plaintiffs here with an opportunity to object and provide information challenging its determination prior to terminating the grant agreement.

114.    Defendants' actions purported to terminate the awards to the subrecipient-Plaintiffs without providing an opportunity to object and provide information challenging EPA's determination prior EPA's purported termination of the grant agreement.

115.    The federal Defendants' conduct surrounding the Citibank account freezes fare no better. 2 C.F.R. § 200.305(b)(6) provides that payments "must not be withheld at any time" unless the agency finds that the recipient or subrecipient failed to comply with the terms of the federal award, or that the recipient or subrecipient is delinquent in a debt to the United States. No such finding has been made.

116.    More specifically, Defendants took actions to cause Citibank to withhold payments to the subrecipient-Plaintiffs without making the required finding that any subrecipient

failed to comply with the terms of the federal award, or that the recipient was delinquent in a debt to the United States.

117.    To the contrary, 2 C.F.R. § 200.339 provides that once a grant program uses grant funds for a program purpose and incurs a financial obligation, EPA can only seek claims on those funds if they were used for costs that did not comply with the terms and conditions of the grant award agreement or if there is adequate evidence of waste, fraud, or abuse.

118.    Defendants have made no findings that the obligated funds the subgrantees are seeking to access were in any way inconsistent with the terms and conditions of the grant award; nor is there any adequate evidence of waste, fraud, or abuse.

119.    And for both freezes and termination, 2 C.F.R. § 200.208 requires federal agencies to ensure that specific Federal award conditions and performance expectations are consistent with the program design. To that end, Section 200.208 allows the agency to impose specific conditions based on considerations such as compliance (or noncompliance) with the terms and conditions of the award and other risk factors. 2 C.F.R. § 200.208(b). Subsection 208 further requires the agency to provide notice of any specific conditions it decides to impose as a result of those risk factors, and to provide an opportunity to satisfy them; when satisfied, the specific conditions must be promptly removed.  2 C.F.R. § 200.208(d)-(e).

120.    2 C.F.R. § 200.339 provides remedies that apply when such specific conditions have not been met. Relevant here, the remedies include (a) imposing a temporary hold on payments until the recipient takes corrective action, and (c) suspension or termination of the award in its entirety.

121.    Defendants' actions are contrary to these procedures. Defendants effectively imposed a hold on payments and unilaterally terminated the awards without identifying any risk

factors, without imposing any specific conditions, without giving the required notice to the

awardees, and without providing an opportunity to cure. 2 C.F.R. § 200.208. Contrary to Section

200.208's notice-and-cure requirements, Defendants operated in secret to lock up Plaintiffs'

access to their accounts. In imposing a hold, Defendants improperly resorted to the remedies

available for noncompliance with the specific conditions under Section 200.208 without making

the prerequisite finding of noncompliance in the first place. 2 C.F.R. § 200.339(a).

122.     Based on the foregoing, plaintiffs are entitled to a declaration that the Defendants'

conduct is unlawful under the Uniform Grant Guidance and OMB guidance regarding the same.

Plaintiffs are therefore further entitled to a corresponding preliminary and permanent injunction

barring EPA from unlawfully impeding the subrecipients' access to the Greenhouse Gas

Reduction Fund accounts held in their name at Defendant Citibank.


## COUNT 3

### VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. § 706(2): ARBITRARY AND CAPRICIOUS (Federal Defendants)

123.     Plaintiffs incorporate by reference the allegations contained in the preceding

paragraphs.

124.     Defendants have taken final official action purporting to terminate the

Greenhouse Gas Reduction Fund grants to the prime recipients, which were intended to

implement the NCIF.

125.     Federal Defendants have also taken final official action effectuating a freeze on

the Greenhouse Gas Reduction Fund's programs through the NCIF by instructing Defendant

Citibank not to disburse funds to which subrecipients are entitled.

126.    The federal Defendants have not articulated any rational explanation as to why EPA is taking action to terminate the grant funds, or to instruct defendant Citibank not to disburse grant funds. Although Defendants have suggested concerns over waste, fraud, and abuse motivated their actions against the NCIF grantees and subgrantees, these concerns refer to allegations of irresponsible or suspicious statements and behavior by Defendant EPA's previous employees, not misconduct by grantees or subgrantees.

127.    Most of Defendants' actions in the name of policing waste, fraud, and abuse were routed through—and in fact run contrary to—EPA's existing structures for detecting and preventing fraud, waste, and abuse.

128.    It is particularly troubling that EPA continued its pressure campaign to freeze the accounts even after career prosecutors determined that probable cause did not exist, and despite a United States Magistrate's denial of a seizure warrant.

129.    Without any evidence suggesting waste, fraud, or abuse by the recipients of funds, the federal Defendants cannot make any "rational connection" between the information they possessed had and the actions they took.

130.    Based on the foregoing, plaintiffs are entitled to a declaration that the Defendants' decision to terminate the grant agreements and otherwise instruct defendant Citibank not to disburse the subrecipients' funds is arbitrary and capricious. Plaintiffs are further entitled to a corresponding preliminary and permanent injunction restoring the subrecipients' access to the Greenhouse Gas Reduction Fund accounts held in their name at Defendant Citibank.

## COUNT 4

**EQUITABLE ULTRA VIRES—CONDUCT OUTSIDE THE SCOPE OF STATUTORY AUTHORITY CONFERRED ON THE EXECUTIVE (Federal Defendants)**

131.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs.

132.    Federal courts possess the power in equity to grant injunctive relief "with respect to violations of federal law by federal officials." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326–27 (2015). Indeed, the Supreme Court has repeatedly allowed equitable relief against federal officials who act "beyond th[e] limitations" imposed by federal statute. *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689 (1949).

133.    No agency may take any action that exceeds the scope of its constitutional or statutory authority.

134.    No constitutional or statutory authority authorizes EPA to refrain from fulfilling its statutory duties, or to violate federal law.

135.    As detailed *supra* in paragraphs 95-122 and *infra* in paragraphs 155-164, the federal Defendants' conduct in freezing the subrecipients' accounts and terminating the grant awards was contrary to the Inflation Reduction Act, the Impoundment Control Act, and the Uniform Grant Guidance regulations in 2 C.F.R. Part 200, and is contrary to the Executive's constitutional duty to faithfully execute the laws of the United States.

136.    Nothing in the Inflation Reduction Act, 2 C.F.R. Part 200, or the Executive's constitutionally prescribed powers gave EPA authority to pursue a freeze and termination of Greenhouse Gas Reduction Fund grants based on its policy opposition to Congress's legislative judgments.

137.    Defendants' conduct in freezing the subrecipients' accounts and terminating the grant awards without regard to the authorizing statutes, regulations, and terms that govern the awards is contrary to law and outside of Defendants' authority.

138.    Pursuant to 28 U.S.C. § 2201, Plaintiffs are entitled to a declaration that Defendants' actions to freeze the subrecipients' accounts and terminate the grant awards is contrary to law and outside of Defendants' authority.

139.    Plaintiffs are further entitled to a preliminary and permanent injunction preventing Agency Defendants from maintaining or reinstating the termination and freeze, and agency actions implementing them.

## COUNT 5

**VIOLATION OF THE SEPARATION OF POWERS—USURPING THE LEGISLATIVE FUNCTION; APPROPRIATIONS CLAUSE; SPENDING CLAUSE; LEGISLATIVE VESTING CLAUSE (Federal Defendants)**

140.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs.

141.    Federal courts possess the power in equity to grant injunctive relief "with respect to violations of federal law by federal officials." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326–27 (2015). Plaintiffs are "entitled to invoke the equitable jurisdiction to restrain enforcement" of unconstitutional acts by federal officials. *Panama Ref. Co. v. Ryan*, 293 U.S. 388, 414 (1935).

142.    The Constitution "grants the power of the purse to Congress," not the executive agencies. *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1231 (9th Cir. 2018); *see* U.S. Const. art. I, § 9, cl. 7 (Appropriations Clause); U.S. Const. art. I, § 8, cl. 1 (Spending Clause). The Appropriations Clause thus provides that "[n]o Money shall be drawn from the Treasury, but

in Consequence of Appropriations made by Law." U.S. Const. Art. I, § 9, cl. 7. The

Appropriations Clause is a "straightforward and explicit command" that "no money can be paid

out of the Treasury unless it has been appropriated by an act of Congress." *Office of Pers. Mgmt.

v. Richmond*, 496 U.S. 414, 424 (1990) (quoting *Cincinnati Soap Co. v. United States*, 301 U.S.

308, 321 (1937)).

143.    Consistent with these principles, the executive acts at the lowest ebb of his

constitutional authority and power when he acts contrary to the will of Congress by attempting to

unilaterally decline to spend appropriated funds. *See Youngstown Sheet & Tube Co. v. Sawyer*,

343 U.S. 579, 637–38 (1952) (Jackson, J., concurring).

144.    Congress also possesses exclusive power to legislate. Article I, Section 1 of the

Constitution enumerates that: "[a]ll legislative Powers herein granted shall be vested in a

Congress of the United States, which shall consist of a Senate and a House of Representatives."

U.S. Const. art. I, § 1; *see also Clinton v. City of New York*, 524 U.S. 417, 438 (1998) ("There is

no provision in the Constitution that authorizes the President to enact, to amend, or to repeal

statutes.").

145.    The Constitution strictly controls how legislation enacted by Congress and signed

by the President may be amended or repealed. Article I of the Constitution prescribes a "single,

finely wrought and exhaustively considered[] procedure" for enacting such an amendment or

repeal: passage of a new bill by both houses of Congress and presentment to the President for his

signature or veto. *Immigration & Naturalization Serv. v. Chadha*, 462 U.S. 919, 951 (1983); *see*

U.S. Const. art. I, § 7, cls. 2, 3. The Constitution identifies specific roles for the Executive in the

lawmaking process, via the Recommendation Clause and the Presentment Clause, which creates

the President's veto power; outside these roles, the Executive Branch has no authority to change

the law to suit the President's policy. U.S. Const. art. II, § 3; *id.* § 7, cl. 2; *cf. Perry v. Merit Sys. Prot. Bd.*, 582 U.S. 420, 441 (2017) (Gorsuch, J., dissenting) ("If a statute needs repair, there's a constitutionally prescribed way to do it. It's called legislation. To be sure, the demands of bicameralism and presentment are real and the process can be protracted. But the difficulty of making new laws isn't some bug in the constitutional design: it's the point of the design, the better to preserve liberty.").

146.    By passing the Inflation Reduction Act through both houses of Congress and with the President's signature, Congress exercised its appropriations and spending power to create the Greenhouse Gas Reduction Fund. With that appropriation, Congress directed $20 billion to support green lending. Specifically, Congress appropriated funds to support direct investment, i.e., providing financial assistance to "qualified projects" that avoid or reduce greenhouse gas emissions and other pollution "in partnership with, and by leveraging investment from, the private sector," and indirect investment, i.e., establishing new or supporting existing green banks that would lend to qualified projects. 42 U.S.C. § 7434(a)(2)-(3), (b), (c)(1). Congress expressly directed EPA to start making grants by February 2023 and finish by September 30, 2024.

147.    The current presidential administration opposes the Inflation Reduction Act as bad policy. On his first day in office, President Trump directed his administration to "terminate the Green New Deal," by which he means the Inflation Reduction Act as well as the Infrastructure Investment and Jobs Act. As directed, the next week, EPA began categorically suspending the disbursement of grant funds appropriated under both laws.

148.    The federal Defendants' successful campaign to pressure Citibank into freezing Plaintiff's accounts under the NCIF subawards is an extension of that unlawful effort to unwind the Inflation Reduction Act's policy.

149.    Far from identifying grounds to suspect waste, fraud, or abuse by Plaintiffs in the expenditure of their subawards, the federal Defendants have justified their actions to freeze funds and terminate the grants by citing features of Congress's appropriation that they oppose. Chief among these objections are the financial agency arrangement with Citibank, *but see* 42 U.S.C. § 7434(c)(3)(A); *supra* paras. 2, 6, 34 (financial agency arrangements characteristic of public-private partnerships); the speed with which EPA obligated funds to grantees during the summer and fall of 2024, *but see* 42 U.S.C. § 7434(a)(2)-(3) (September 30, 2024 deadline to obligate funds); the creation of new green banks to manage grant funds, *but see id.* § 7434(b)(2) (defining "indirect investment"); and the discretion of green lenders to select the projects to finance, *but see id.* § 7434(b), (c)(1), (c)(3) (charging *grantees* with investing in or financing qualified projects). And the federal Defendants repeatedly and negatively highlight the size of the funds at issue—$20 billion—which was, of course, Congress's choice as well.

150.    If carried to its end, EPA's campaign to "poison the well" threatens to effectively repeal the appropriation altogether. By casting a cloud of uncertainty over the availability and legitimacy of the $20 billion appropriation, EPA will render the entire funding stream toxic to risk-averse financial market participants. Unless the rights of grantees and subgrantees to these duly obligated and disbursed funds are swiftly clarified, the entire $20 billion will likely be unusable for the purposes Congress intended.

151.    The Defendants' unilateral executive action to freeze the Plaintiffs' accounts and terminate the grant awards violates the separation of powers. By thwarting the disbursement of funds appropriated by Congress to the recipients it intended, based on the Executive's own policy opposition to the appropriation, the Executive has overridden the careful judgments of Congress. The federal Defendants' actions threaten to effectively zero out that appropriation—

something only Congress may do, and only through the mechanisms of bicameralism and presentment.

152.    Pursuant to 28 U.S.C. § 2201, Plaintiffs are entitled to a declaration that Defendants actions to freeze the subrecipients' accounts and terminate the grant awards violates the constitutional separation of powers doctrine, the Appropriations Clause, the Spending Clause, Legislative Vesting Clause, and/or the Presentment Clause, and impermissibly arrogates to the executive power that is reserved to Congress.

153.    Plaintiffs are further entitled to a preliminary and permanent injunction preventing Agency Defendants from maintaining or reinstating the termination and freeze, and agency actions implementing them.

## COUNT 6

## VIOLATION OF THE SEPARATION OF POWERS—TAKE CARE CLAUSE (Federal Defendants)

154.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs.

155.    Federal courts possess the power in equity to grant injunctive relief "with respect to violations of federal law by federal officials." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326–27 (2015). Plaintiffs are "entitled to invoke the equitable jurisdiction to restrain enforcement" of unconstitutional acts by federal officials. *Panama Ref. Co. v. Ryan*, 293 U.S. 388, 414 (1935).

156.    The Constitution prescribes exactly what the Executive must do, prior to any amendment or repeal, when the President disagrees with the law that Congress has passed: execute it. The Take Care Clause provides that the Executive "shall take Care that the Laws be

faithfully executed." U.S. Const. Art. II, § 3; *Utility Air Reg. Grp. v. Env't Prot. Agency*, 573

U.S. 302, 327 (2014) ("Under our system of government, Congress makes laws and the President

. . . 'faithfully execute[s]' them.").

157.    The Executive violates the Take Care Clause where it declines to execute or

otherwise undermines statutes enacted by Congress and signed into law or duly promulgated

regulations implementing such statutes. *See In re United Mine Workers of Am. Int'l Union*, 190

F.3d 545, 551 (D.C. Cir. 1999) ("the President is without authority to set aside congressional

legislation by executive order"); *Kendall v. United States*, 37 U.S. 524, 613 (1838) (rejecting

argument that by charging the President with faithful execution of the laws, the Take Care

Clause "implies a power to forbid their execution").

158.    The current presidential administration opposes the Inflation Reduction Act as

bad policy. On his first day in office, President Trump directed his administration to "terminate

the Green New Deal," by which he means the Inflation Reduction Act as well as the

Infrastructure Investment and Jobs Act. As directed, the next week, EPA began categorically

suspending the disbursement of grant funds appropriated under both laws.

159.    The federal Defendants' successful campaign to pressure Citibank into freezing

Plaintiff's accounts under the NCIF subawards is an extension of that unlawful effort to unwind

the Inflation Reduction Act's policy.

160.    Far from identifying grounds to suspect waste, fraud, or abuse by Plaintiffs in the

expenditure of their subawards, the federal Defendants have justified their actions to freeze funds

and terminate the grants by citing features of Congress's appropriation that they oppose. *See*

*supra* para. 149.

161.    If carried to its end, EPA's campaign to "poison the well" threatens to effectively repeal the appropriation altogether. By casting a cloud of uncertainty over the availability and legitimacy of the $20 billion appropriation, EPA will render the entire funding stream toxic to risk-averse financial market participants. Unless the rights of grantees and subgrantees to these duly obligated and disbursed funds are swiftly clarified, the entire $20 billion will likely be unusable for the purposes Congress intended.

162.    The Defendants' unilateral executive action to freeze the Plaintiffs' accounts and terminate the grant awards violates the separation of powers. Far from faithfully executing Congress's appropriation, the federal Defendants' actions threaten to effectively zero out that appropriation.

163.    Pursuant to 28 U.S.C. § 2201, Plaintiffs are entitled to a declaration that Defendants actions to freeze the subrecipients' accounts and terminate the grant awards violates the constitutional separation of powers doctrine and the Take Care Clause.

164.    Plaintiffs are further entitled to a preliminary and permanent injunction preventing Agency Defendants from maintaining or reinstating the termination and freeze, and agency actions implementing them.

## COUNT 7

### VIOLATION OF THE SPENDING CLAUSE AND TENTH AMENDMENT (Federal Defendants)

165.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs.

166.    Federal courts possess the power in equity to grant injunctive relief "with respect to violations of federal law by federal officials." *Armstrong v. Exceptional Child Ctr., Inc.*, 575

U.S. 320, 326–27 (2015). "[T]he President's actions may . . . be reviewed for constitutionality." *Franklin v. Mass.*, 505 U.S. 788, 801 (1992). Plaintiffs are "entitled to invoke the equitable jurisdiction to restrain enforcement" of unconstitutional acts by federal officials, including "executive orders." *Panama Ref. Co. v. Ryan*, 293 U.S. 388, 414 (1935)

167.    The Spending Clause of the U.S. Constitution provides that Congress—not the Executive—"shall have Power to lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States . . . ." U.S. Const. art. I, § 8, cl. 1.

168.    The Tenth Amendment of the U.S. Constitution provides that "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X.

169.    When actions by the federal government come in the form of "threats to terminate . . . significant independent grants," the actions "are properly viewed as a means of pressuring the States to accept policy changes" and are barred by the Tenth Amendment. *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 580 (2012).

170.    States must also have fair notice of the terms that apply to the disbursement of funds to them. *See Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17, 25 (1981); *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 583–84 (2012).

171.    The Defendants' actions to freeze the subrecipients' accounts and terminate the grant awards altered the terms upon which grants were obligated and disbursed contrary to Congressional authority. These alterations are coercive, retroactive, ambiguous, and unrelated to the purpose of the grants affected.

172.    Pursuant to 28 U.S.C. § 2201, Plaintiffs are entitled to a declaration that the Defendants' actions to freeze the subrecipients' accounts and terminate the grant awards violates the Spending Clause.

173.    Plaintiffs are also entitled to a preliminary and permanent injunction barring the Agency Defendants from maintaining or reinstating the account freezes or grant terminations, and agency actions implementing them.

**COUNT 8**

**BREACH OF CONTRACT (Citibank)**

174.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs.

175.    Plaintiffs each entered into a valid contract with Citibank when they executed their respective ACAs.

176.    Plaintiffs have each performed in accordance with the contract. Pursuant to Section 2 of the ACAs, since February 14, 2025, Plaintiffs have each submitted or attempted to submit instructions to Citibank substantially in the form of Exhibit B to the ACAs, the Account Direction form, to disburse funds from their Accounts.

177.    The ACAs impose a duty on Citibank to comply with "all instructions, notifications and entitlement orders [Citibank] receives directing the disposition of funds and financial assets in the Accounts" from Plaintiffs, "until that time that [Citibank] receives a notice, substantially in the form attached hereto as Exhibit A (a "Notice of Exclusive Control") from [CGC]." On information and belief, Citibank has not received a Notice of Exclusive Control from CGC.

49

178.    Since February 14, Citibank has declined to comply with Plaintiffs' valid instructions to disburse funds. Citibank has also refused to confirm that it will comply with Plaintiffs' valid instructions moving forward. Plaintiffs' Citibank accounts are currently frozen.

179.    Citibank has therefore breached the ACAs by freezing Plaintiffs' accounts and failing to comply with Plaintiffs' valid instructions directing the disposition of funds and financial assets in Plaintiffs' Citibank Accounts.

180.    Plaintiffs have suffered, and will continue to suffer, damage as a direct result of Citibank's breach. Such damage has resulted solely from Citibank's own gross negligence and willful misconduct.

181.    Pursuant to 28 U.S.C. § 2201, Plaintiffs are entitled to a declaration that (1) Citibank's failure to disburse funds from Plaintiffs' Citibank Accounts is a breach of the ACAs, and (2) Citibank must abide by all instructions issued by Plaintiffs unless and until CGC issues a Notice of Exclusive Control.

182.    Plaintiffs are further entitled to an injunction and order mandating that Citibank specifically perform its obligations under the ACA, including its obligations under Section 2 of the ACA to disburse funds in accordance with valid Pledgor instructions.


**COUNT 9**

**SPECIFIC PERFORMANCE (Citibank)**

183.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs.

184.    Plaintiffs each entered into a valid contract with Citibank when they executed their respective ACAs.

185.    Plaintiffs have substantially performed their contractual obligations, and are willing and able to perform their remaining obligations.

186.    Citibank is able to fulfill its contractual obligations by complying with Plaintiffs' valid instructions directing the disposition of funds and financial assets in Plaintiffs' Citibank accounts.

187.    Plaintiffs lack an adequate remedy at law. In particular, Plaintiffs face irreparable harms, including reputational harms and the imminent suspension of lending to mission-critical qualified projects, that a later damages award would come too late to remedy.

188.    Therefore, Plaintiffs are entitled to an injunction and order mandating that Citibank specifically perform its obligations under the ACA, including its obligations under Section 2 of the ACA to disburse funds in accordance with valid Pledgor instructions.

## COUNT 10

### CONVERSION (Citibank)

189.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs.

190.    In accordance with the ACAs, Plaintiffs have an immediate legal right to possess the funds and financial assets held in their Citibank accounts.

191.    Citibank has wrongfully and intentionally exercised dominion and control over Plaintiffs' funds in Plaintiffs' accounts without Plaintiffs' consent, including by failing to comply with Plaintiffs' valid instructions directing the disposition of the funds and financial assets in Plaintiffs' accounts, without any lawful justification.

192.     Citibank has exercised an unauthorized dominion over the funds in Plaintiffs' accounts to the exclusion of Plaintiffs' right of possession, including by failing to comply with Plaintiffs' valid and lawful instructions.

193.     Citibank's actions have caused injury to Plaintiffs.

194.     Plaintiffs are entitled to damages in an amount to be determined at trial.

195.     Plaintiffs are entitled to an injunction and order mandating that Citibank cease its wrongful retention of the funds in Plaintiffs' accounts resulting from its failure to comply with Plaintiffs' lawful instructions.

196.     Under 28 U.S.C. § 2201, Plaintiffs are further entitled to a declaration that Citibank's failure to comply with the valid and lawful instructions of Plaintiffs directing the disposition of funds and financial assets in Plaintiffs' Accounts constitutes a conversion of Plaintiffs' accounts and the funds in the accounts.

**COUNT 11**

**REPLEVIN (Citibank)**

197.     Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs.

198.     Plaintiffs have an immediate and superior legal right to direct the disposition of funds and financial assets in their Citibank accounts, and to direct the disposition of any funds and financial assets as instructed to Citibank thereafter.

199.     Citibank has wrongfully and unlawfully withheld the funds and financial assets in Plaintiffs' accounts from Plaintiffs, including by failing to comply with Plaintiffs' valid and lawful instructions.

200.    Plaintiffs demanded that Citibank disburse the funds and financial assets in Plaintiffs' accounts, but Citibank refused to do so.

201.    Citibank's intentional actions have caused injury to Plaintiffs.

202.    Plaintiffs are entitled to an injunction and order mandating that Citibank cease its wrongful detention of Plaintiffs' Citibank Accounts, and the funds therein, as a result of its failure to comply with Plaintiffs' valid and lawful instructions directing the deposit of funds and financial assets in Plaintiffs' Accounts.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court:

1.    Issue a judicial declaration that Defendants EPA, Zeldin, and McIntosh's actions to direct Citibank to freeze Plaintiffs' funds and to terminate the NCIF award are unconstitutional and/or unlawful because they violate the APA and the U.S. Constitution;

2.    Pursuant to 5 U.S.C. § 706, vacate the purported termination of the NCIF award;

3.    Preliminarily and permanently enjoin the federal Defendants from issuing instructions to Citibank to freeze, withhold, or transfer NCIF funds except in strict accordance with the terms of the Financial Agency Agreement;

4.    Issue a judicial declaration that Citibank's failure to honor Plaintiffs' instructions to disburse funds in their accounts violates the Account Control Agreements and other applicable law and constitutes breach of contract and a conversion of Plaintiffs' accounts and the funds therein;

5.    Enjoin and order Citibank to cease wrongfully detaining Plaintiffs' funds by failing to comply with Plaintiffs' lawful and valid instructions directing the disposition of funds

and financial assets in Plaintiffs' accounts, and directing Citibank to specifically perform its contractual obligations under the ACAs, including by complying with Plaintiffs' valid and lawful instructions, both with respect to Plaintiffs' previously submitted instructions and any future instructions;

6.      Award damages against Citibank, in an amount to be determined at trial;

7.      Award the Plaintiffs their reasonable fees, costs, and expenses, including attorneys' fees, pursuant to 28 U.S.C. § 2412; and

8.      Grant other such relief as this Court may deem proper.

Respectfully submitted,

ROB BONTA
Attorney General of California

s/ Meghan Strong
**MEGHAN STRONG**
THEODORE A. MCCOMBS
JOHN D. ECHEVERRIA
DYLAN REDOR
MEGAN RICHARDS
Deputy Attorneys General
California Department of Justice
455 Golden Gate Avenue
San Francisco CA 94102
(415) 510-3877
meghan.strong@doj.ca.gov

*Attorneys for California Infrastructure and
Economic Development Bank*

KWAME RAOUL
Attorney General of Illinois

s/ Jason E. James
**JASON E. JAMES**
Assistant Attorney General
MATTHEW J. DUNN
Chief, Environmental
Enforcement/Asbestos Litigation Division
Office of the Attorney General of Illinois
201 W. Pointe Drive, Suite 7
Belleville, IL 62226
(217) 843-0322
jason.james@ilag.gov

*Attorneys for Illinois Finance Authority*

KEITH ELLISON
Minnesota Attorney General

s/ Peter N. Surdo
**PETER N. SURDO**
Special Assistant Attorney General
OLIVER LARSON
Manager, Environment and Natural Resources
Division
CATHERINE RIOS-KEATING
Special Assistant Attorney General
Minnesota Attorney General's Office
445 Minnesota Street, Suite 600
651-757-1061
peter.surdo@ag.state.mn.us

*Attorneys for Minnesota Climate Innovation
Finance Authority*

AARON M. FREY
Attorney General of Maine

s/ Emma Akrawi
**EMMA AKRAWI**
SCOTT W. BOAK
Assistant Attorneys General
Office of the Maine Attorney General
6 State House Station
Augusta, ME 04333
(207) 626-8800
Emma.Akrawi@maine.gov

*Attorneys for Efficiency Maine Trust*