**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **CALIFORNIA INFRASTRUCTURE AND ECONOMIC DEVELOPMENT BANK,** 1325 J Street, Suite 1300, Sacramento, CA 95814 | Civil No. 25-cv-820 |

**CALIFORNIA INFRASTRUCTURE AND
ECONOMIC DEVELOPMENT BANK,**
1325 J Street, Suite 1300,
Sacramento, CA 95814

    and

**EFFICIENCY MAINE TRUST,**
168 Capitol Street, Suite 1
Augusta, ME 04330

    and

**ILLINOIS FINANCE AUTHORITY,**
160 N. LaSalle St., Suite S-1000
Chicago, IL 60601

    and

**MINNESOTA CLIMATE INNOVATION
FINANCE AUTHORITY,**
85 7th Place East, Suite 280,
Saint Paul, Minnesota 55101

             Plaintiffs,

   v.

**CITIBANK, N.A.,**
5800 South Corporate Place
Sioux Falls, South Dakota 57108,

    and

**U.S. ENVIRONMENTAL PROTECTION
AGENCY** and **LEE ZELDIN** and **W.C.
MCINTOSH**, in their official capacities as
Administrator and Acting Deputy
Administrator of the U.S. Environmental
Protection Agency,

             Defendants.

Civil No. 25-cv-820

1

## PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Pursuant to Federal Rule of Civil Procedure 65 and Local Civil Rule 65.1(c), Plaintiffs California Infrastructure and Economic Development Bank, Efficiency Maine Trust, Illinois Finance Authority, and Minnesota Climate Innovation Finance Authority hereby move for a preliminary injunction that (1) converts the relief extended in the Court's temporary restraining order, issued in related case *Climate United Fund et al. v. Citibank, N.A. et al.*, Case No. 1:25-cv-698, ECF No. 28, to a preliminary injunction that lasts the duration of this action and (2) further enjoins Defendant Citibank, N.A. ("Citibank") from violating its obligations to disburse funds in response to valid, ordinary-course disbursement instructions from Plaintiffs. Plaintiffs further request that the Court order the Defendants to file a status report within twenty-four hours of the issuance of any preliminary injunction confirming their compliance with the order.

As set forth below, Defendants have unlawfully withheld funds from Plaintiffs in violation of the Administrative Procedure Act, the Constitution, and the parties' contractual obligations. Plaintiffs will suffer imminent and irreparable injury should Defendants continue to illegally withhold these funds or seek to transfer them to the federal government.

**Local Civil Rule 7(m) Statement**:  Counsel for Plaintiffs conferred with counsel for Defendants prior to filing this motion.  The parties reached agreement regarding the timing for filing, briefing, and hearing this motion, as reflected in their Joint Status Report, ECF No. 10. Defendants oppose Plaintiffs' motion.

Date:  March 24, 2025                    Respectfully submitted,

ROB BONTA
Attorney General of California

s/ Meghan Strong
**MEGHAN STRONG**
THEODORE A. MCCOMBS
JOHN D. ECHEVERRIA
DYLAN REDOR
MEGAN RICHARDS
Deputy Attorneys General
California Department of Justice
455 Golden Gate Avenue
San Francisco CA 94102
(415) 510-3877
meghan.strong@doj.ca.gov

*Attorneys for California Infrastructure and Economic Development Bank*


KWAME RAOUL
Attorney General of Illinois

s/ Jason E. James
**JASON E. JAMES**
Assistant Attorney General
MATTHEW J. DUNN
Chief, Environmental
Enforcement/Asbestos Litigation Division
Office of the Attorney General of Illinois
201 W. Pointe Drive, Suite 7
Belleville, IL 62226
(217) 843-0322
jason.james@ilag.gov

*Attorneys for Illinois Finance Authority*

KEITH ELLISON
Minnesota Attorney General

s/ Peter N. Surdo
**PETER N. SURDO**
Special Assistant Attorney General
OLIVER LARSON
Manager, Environment and Natural Resources
Division
CATHERINE RIOS-KEATING
Special Assistant Attorney General
Minnesota Attorney General's Office
445 Minnesota Street, Suite 600
651-757-1061
peter.surdo@ag.state.mn.us

*Attorneys for Minnesota Climate Innovation Finance Authority*


AARON M. FREY
Attorney General of Maine

s/ Emma Akrawi
**EMMA AKRAWI**
SCOTT W. BOAK
Assistant Attorneys General
Office of the Maine Attorney General
6 State House Station
Augusta, ME 04333
(207) 626-8800
Emma.Akrawi@maine.gov

*Attorneys for Efficiency Maine Trust*

# TABLE OF CONTENTS

**Page**

Introduction ................................................................................................................8

Statement of Facts......................................................................................................9

    I.      Plaintiffs Are Subgrantees of Funds Appropriated under the Inflation Reduction Act .........................................................................................9

    II.     Plaintiffs Execute Account Control Agreements with Citibank...........................10

    III.   Plaintiffs' Requests for Disbursements under the ACAs and Citibank's Refusal to Comply ........................................................................................11

    IV.   Defendants' Funding Freezes and Ultimate Terminations Without Evidence or Support.....................................................................................12

    V.    NCIF Grantees File Suit Against Citibank and EPA and Obtain a Temporary Restraining Order ......................................................................15

Legal Standard .........................................................................................................16

Argument...................................................................................................................16

    I.      Plaintiffs Are Likely to Succeed on the Merits ...........................................16

        A.    Plaintiffs Are Likely to Succeed on the Merits of Their Claims Against the EPA Defendants.....................................................18

            1.    The Termination Notice Is Contrary to Law and Unconstitutional..............................................................18

            2.    The Termination Notice Violates Federal Regulations.................20

        B.    Plaintiffs Are Likely to Succeed on the Merits of Their Claims Against Citibank................................................................21

    II.     Plaintiffs Will Suffer Irreparable Injury.....................................................22

        A.    Plaintiffs Face Imminent Loss of Business and Reputational Harms from EPA's and Citibank's Freeze of NCIF Funds ...............................23

        B.    Plaintiffs Face Imminent Reputational Harms from EPA Effectuating its Termination Notice.............................................26

        C.    Plaintiffs Face Irreparable Economic Harms from EPA Clawing Back Funds Based on the March 11 Termination Notice.........................28

    III.   The Balance of Equities Weighs in Favor of Plaintiffs .....................................30

    IV.   The Public Interest Favors a Preliminary Injunction ..........................................30

Conclusion ................................................................................................................31

# TABLE OF AUTHORITIES

**Page**

CASES

*Advance Am. v. FDIC*
  2017 WL 2672741 (D.D.C. Feb. 23, 2017) .................................................. 16

*\*Atlas Air, Inc. v. Int'l Bhd. of Teamsters*
  280 F. Supp. 3d 49 (D.D.C. 2017) .......................................................... 26

*Beattie v. Barnhart*
  663 F. Supp. 2d 5 (D.D.C. 2009) .......................................................... 23

*Bowen v. Massachusetts*
  487 U.S. 879 (1988) ...................................................................... 17

*City & Cnty. of San Francisco v. Trump*
  897 F.3d 1225 (9th Cir. 2018) ............................................................ 19

*\*City of Houston v. Dep't of Hous. & Urban Dev.*
  24 F.3d 1421 (D.C. Cir. 1994) ............................................................ 28

*Climate United Fund v. Citibank, N.A. et al.*
  No. 1:25-cv-698 ..................................................................... *passim*

*Clinton v. City of New York*
  524 U.S. 417 (1998) ...................................................................... 19

*Cmtys. for a Better Env't v. Cenco Ref. Co.*
  179 F. Supp. 2d 1128 (C.D. Cal. 2001) .................................................... 31

*Coalition for Green Capital v. Citibank, N.A. et al.*
  No. 1:25-cv-735 .......................................................................... 15

*Confed. Tribes of Chehalis Rsrv. v. Mnuchin*
  2020 WL 3791874 (D.D.C. July 7, 2020) .................................................... 28

*\*Endo Par Innovation Co., LLC v. Becerra*
  2024 WL 2988904 (D.D.C. 2024) ........................................................... 29

*Kirwa v. U.S. Dept. of Defense*
  285 F. Supp. 3d 21 (D.D.C. 2017) ......................................................... 17

*\*League of Women Voters of U.S. v. Newby*
  838 F.3d 1 (D.C. Cir. 2016) .............................................................. 31

# TABLE OF AUTHORITIES

<u>Page</u>

*Open Cmtys. All. v. Carson
    286 F. Supp. 3d 148 (D.D.C. 2017) ...................................................30

Pac. Merch. Shipping Ass'n v. Goldstene
    639 F.3d 1154 (9th Cir. 2011) .........................................................30

*Patriot, Inc. v. U.S. Dept. of Hous. & Urban Dev.
    963 F. Supp. 1 (D.D.C. 1997) ..........................................................26

Rodriguez v. Robbins
    715 F.3d 1127 (9th Cir. 2013) .........................................................30

Sherley v. Sebelius
    644 F.3d 388 (D.C. Cir. 2011) .........................................................16

Winter v. Nat. Res. Def. Council, Inc.
    555 U.S. 7 (2008) ...........................................................................16

STATUTES

United States Code, Title 5
    § 706(2)(C) ...................................................................................18

United States Code, Title 42
    § 7434(a)(2)-(3)...................................................................... 9, 18, 19
    § 7434(c)(1) ..................................................................................29

Clean Air Act
    § 134 ..............................................................................................9

CONSTITUTIONAL PROVISIONS

United States Constitution, Article I
    § 1 ................................................................................................19

COURT RULES

Federal Rules of Civil Procedure
    Rule 65(b)(1)..................................................................................16

# TABLE OF AUTHORITIES

**Page**

OTHER AUTHORITIES

Code of Federal Regulations, Title 2
    § 200 ..................................................................................................................... 18, 20
    § 200.113 .................................................................................................................. 13
    § 200.303 .................................................................................................................. 13
    § 200.340 .................................................................................................................. 20
    § 200.340(a)(4) ......................................................................................................... 20
    § 200.340(b) ........................................................................................................ 20, 21
    §§ 200.345-346 ......................................................................................................... 30
    §§ 200.399-40 ........................................................................................................... 14
    § 200.501 .................................................................................................................. 13

Federal Register
    Vol. 89 ................................................................................................................. 20, 21
    Vol. 90 ...................................................................................................................... 19

*Read the Resignation Letter by Denise Cheung, a Veteran D.C. Federal
    Prosecutor*, THE WASHINGTON POST (Mar. 6, 2025),
    https://www.washingtonpost.com/dc-md-va/2025/02/18/read-resignation-
    letter-denise-cheung/ ............................................................................................... 14

## STATEMENT OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

### INTRODUCTION

For over a month, Defendants have engaged in a series of unlawful actions that have deprived Plaintiffs of access to and use of funds to which they are legally entitled. Without any legal basis for doing so, EPA has purported to terminate National Clean Investment Fund (NCIF) grants, of which Plaintiffs are subgrantees, and Citibank has refused to disburse funds to Plaintiffs despite its clear contractual obligation to do so. EPA's actions are contrary to law, *ultra vires*, arbitrary and capricious, and constitute a fundamental violation of separation of powers. Citibank, in turn, has willfully breached its contracts with Plaintiffs. The Court already concluded in related litigation that the primary recipients of the grants are likely to succeed on the merits of their claims against Defendants. The same is true of Plaintiffs here, who are subgrantees of one of those primary grantees, Coalition for Green Capital (CGC).[1]

For their part, Plaintiffs have acted consistent with Congress's directives for these funds and Plaintiffs' contracts with Citibank. But Defendants actions now prevent them from effectuating their missions and congressional mandates. Without access to these funds, Plaintiffs are already suffering, and will continue to suffer, irreparable economic and reputation harms. And while the TRO relief the Court ordered in the related litigation extends to Plaintiffs' funds, Plaintiffs filed their own action to ensure their rights are protected and to provide evidence of their unique and direct harms as subgrantees. Plaintiffs further seek a preliminary injunction to ensure that injunctive relief extends for the full duration of any dispute among the parties. The Court should convert the temporary restraining order it already issued to a preliminary injunction

---

[1] As noted in the parties Joint Status Report, ECF No. 10, Plaintiffs agreed to make their best efforts to avoid duplicating the issues briefed in the prime grantee plaintiffs' Memorandum of Law in Support of Consolidated Motion for Preliminary Injunction, filed in the related, consolidated action. *Climate United Fund*, No. 1:25-cv-698, ECF No. 33-1. Plaintiffs hereby incorporate by reference the arguments made in the primary grantee plaintiffs' motion to the extent they are relevant to Plaintiffs' motion. *Id.* at 38-55, 65-67, 70-71 (citations to ECF-generated pagination throughout). Plaintiffs set out in this motion a short summary of certain of their positions on the merits for context but, consistent with their agreement with Defendants, focus mainly on their particular harms as state green banks.

and issue further relief enjoining Citibank from violating its obligations to disburse funds in response to valid, ordinary-course disbursement instructions from Plaintiffs. Such injunctive relief is necessary to ensure that Plaintiffs' interests in the NCIF funds, to which they are lawfully entitled, are protected.

## STATEMENT OF FACTS

### I. PLAINTIFFS ARE SUBGRANTEES OF FUNDS APPROPRIATED UNDER THE INFLATION REDUCTION ACT

In 2022, both houses of Congress passed, and the President signed, the Inflation Reduction Act, Pub. L. No. 117-169, 136 Stat. 1818. The Act added Section 134 to the Clean Air Act, *see id.* § 60103, 136 Stat. 2067-67, which created the Greenhouse Gas Reduction Fund. The Greenhouse Gas Reduction Fund appropriates $20 billion for financing zero-emission and other pollution-reducing projects, colloquially called "green" lending, with $8 billion earmarked for green lending to low-income and disadvantaged communities. 42 U.S.C. § 7434(a)(2)-(3). Congress instructed EPA to "make grants" within 180 days to recipients—with an ultimate deadline of September 30, 2024—to support both "direct" lending to greenhouse gas-reducing projects and "indirect investment," i.e., providing funds and technical assistance to create new or support existing green banks at the state and local level. *Id.* § 7434(a)(2)-(3), (b).

EPA created three grant programs under the Greenhouse Gas Reduction Fund. One of these programs, the National Clean Investment Fund (NCIF), directs $14 billion to establish national green lending institutions to deliver accessible and affordable financing for clean technology projects nationwide. One of the prime grantees of this fund, Coalition for Green Capital (CGC), was awarded a $5 billion grant that specifically contemplated subgranting its awarded funds to various recipients. Plaintiffs are subrecipients under CGC's NCIF grant. Plaintiffs will use their NCIF funds to support projects that will create jobs, improve the environment, build critical infrastructure, and provide for resiliency and adaptation programs in their respective States.

## II.    PLAINTIFFS EXECUTE ACCOUNT CONTROL AGREEMENTS WITH CITIBANK

The NCIF award requires Plaintiffs' subgrant funds to be held at Citibank under a financial agency agreement between Citibank and the U.S. Department of Treasury.  Each Plaintiff's account at Citibank is governed by an Account Control Agreement (ACA) between Citibank (as Bank), CGC (as the Secured Party), and the Plaintiff (as Pledgor).  Each Plaintiff's ACA sets forth Citibank's obligations to follow disbursement instructions from the accountholder (i.e. Plaintiff, as Pledgor), as well as an exclusive mechanism whereby CGC (as the Secured Party) may take control of the accounts.  Unlike primary grantees like CGC, for whom the Secured Party on their ACA is EPA, EPA is not a party to Plaintiffs' ACAs, nor does EPA have any rights to assert control over Plaintiffs' accounts under the respective ACAs.

Plaintiffs' ACAs make clear that Citibank is not authorized to restrict Plaintiffs' access to their Accounts unless CGC first issues a Notice of Exclusive Control to Citibank, or a court issues a final order or process with respect to the assets in Plaintiffs' Citibank accounts.

Section 1(a) of each ACA provides that Citibank "maintains the Accounts for the Pledgor"—here, each Plaintiff—"and all property (including, without limitation, all funds and financial assets) held by [Citibank] for the accounts of the Pledgor are, and will continue to be, credited to the Accounts in accordance with the instructions given by the Pledgor (unless otherwise provided herein)."  Wu Decl. Ex. 1 at 1.[2]

> Section 2 requires Citibank to:
> comply with all instructions, notifications, and entitlement orders the Bank receives directing the disposition of funds and financial assets in the Accounts including, without limitation, directions to distribute proceeds of any such transfer or redemption of interest or dividends on financial assets in the Accounts, substantially in the form attached hereto . . . , originated by the Pledgor, until the time that that Bank receives a notice, substantially in the form attached hereto as Exhibit A (a 'Notice of Exclusive Control') from the Secured Party that the Secured Party is exercising its right to exclusive control over an Account.

---

[2] Citations are to IBank's ACA, but each of Plaintiffs' ACAs are attached to their representative's respective declarations and are the same for purposes of the relevant provisions cited herein.

*Id.* at 2.  In Plaintiffs' ACAs, the Secured Party is the prime NCIF grantee, CGC.  *See id.* at 1. After Citibank receives such a notice, Citibank must "comply with all instructions, notifications, and entitlement orders" it receives from CGC, "without further consent by the Pledgor."  *Id.* at 2.

The Notice of Exclusive Control is the exclusive mechanism for Citibank to disregard the accountholder's instructions.  Indeed, Section 6(a) takes pains to limit "the duties, responsibilities, and obligations of the Bank" (i.e., Citibank) "to those expressly set forth in the Agreement," and Section 9 confirms that the ACA "constitutes the entire agreement between the parties and sets forth in its entirety the obligations and duties of the Bank with respect to the assets in the Accounts."  *Id.* at 3, 5.

Each ACA further clarifies the consequences of particular government actions.  Section 6(c) of the ACAs authorizes Citibank "to comply with final orders issued or process entered by any court with respect to the assets in the Accounts, without determination by the Bank of such court's jurisdiction in the matter."  *Id.* at 4.  Section 6(b) of the ACA limits Citibank's liability "for any damage, loss, or injury resulting from any action taken or omitted in the absence of gross negligence or willful misconduct (as finally adjudicated by a court of competent jurisdiction)."  *Id.*  It also limits Citibank's liability "for not performing any act or fulfilling any obligation hereunder by reason of any occurrence beyond its control (including, without limitation, any provision of any present or future law or regulation or any act of any governmental authority. . . .)."  *Id.*

## III.  PLAINTIFFS' REQUESTS FOR DISBURSEMENTS UNDER THE ACAS AND CITIBANK'S REFUSAL TO COMPLY

Despite Citibank's clear obligations under the ACAs, Citibank has refused to comply with the parties' agreements.  Since February 14, 2025, Plaintiffs have submitted instructions to Citibank directing that funds and financial assets in their Citibank accounts be disbursed using the proper "Account Direction" form specific in the ACA.  Wu Decl. ¶¶ 14-20; Meister Decl. ¶¶ 13-14; Stoddard Decl. ¶¶ 16-18; Swan Decl. ¶¶ 17-23.  Plaintiffs' submitted requests were

valid and proper; they complied with all applicable requirements of the ACA.  Wu Decl. ¶¶ 14-20; Meister Decl. ¶¶ 13-14; Stoddard Decl. ¶¶ 16-18.

Citibank has failed to comply with the Plaintiffs' valid instructions for disbursement. Plaintiffs' Citibank accounts do not reflect that any transaction has occurred, and Plaintiffs to date have not received any funds from their Citibank accounts.  Wu Decl. ¶¶ 20-25; Meister Decl. ¶¶ 13-14; Stoddard Decl. ¶¶ 16-18.

Plaintiffs have reached out to Citibank repeatedly requesting that Citibank identify the basis for its apparent refusal to comply with valid disbursement instructions and demanding that Citibank immediately disburse Plaintiffs' funds.  Citibank has ignored Plaintiffs' inquiries.  On February 26, 2025, IBank contacted Citibank to request that they identify the basis for their refusal to comply with disbursement instructions and to state that Citibank's refusal to comply with disbursement instructions was causing significant harm.  Wu Decl. ¶ 26 & Ex. 4.   Citibank did not respond.  On March 7, 2025, the Attorneys General for the States of Minnesota, Maine, Maryland, and New York, all of which have state green banks that are subrecipients under CGC's award, similarly emailed Citibank a letter requesting the basis for Citibank's failure to comply with its obligations and demanding that Citibank immediately disburse Plaintiffs' funds in accordance with their instructions.  Swan Decl. ¶ 24.  Still Citibank did not reply. Swan Decl. ¶ 25 & Ex. 2.

## IV.  DEFENDANTS' FUNDING FREEZES AND ULTIMATE TERMINATIONS WITHOUT EVIDENCE OR SUPPORT

It quickly became clear that Citibank's refusal to comply with its obligations under the ACAs was due to the new federal administration's hostility to the Inflation Reduction Act.  On the first day of his second term, January 20, 2025, President Trump announced his administration's policy of "[t]erminating the Green New Deal." Exec. Order 14154, 90 Fed. Reg. 8353, 8357 (Jan. 29, 2025).  The executive order makes clear that this "Green New Deal" refers to the entirety of the Inflation Reduction Act and the Infrastructure Investment Jobs Act, two duly enacted laws that the President views as unsound policy.  *Id.*  Consistent with this directive

and other agency pronouncements, EPA began "freezing" funding for programs under both the Inflation Reduction Act and the Infrastructure Investment Jobs Act.

Setting its sights on NCIF funds, EPA began a media campaign smearing the program, issued an unlawful directive to Citibank to freeze the funds in Plaintiffs' and other grantee and subgrantees' accounts, and ultimately proclaimed to terminate the grant program altogether.

Defendants EPA, Zeldin, and McIntosh—and, on information and belief, other senior EPA political appointees not yet identified—began making public, unsupported accusations of waste, fraud, and abuse to justify future action to "claw back" the NCIF funds disbursed to Citibank. As further detailed in Plaintiffs' complaint, Administrator Zeldin made a series of statements in the media, claiming that the Greenhouse Gas Reduction Fund was a "scheme" that was "purposefully designed to obligate all of the money in a rush job with reduced oversight." Compl. ¶ 59.

Contrary to Administrator Zeldin's claims, the NCIF award and subawards are subject to the same robust controls as any other EPA-administered grant.  The recipients are the subject of audits, 2 C.F.R. § 200.501, must establish and maintain effective internal controls, 2 C.F.R. § 200.303, and must disclose specific information related to integrity and compliance, 2 C.F.R. § 200.113.

Instead of invoking these well-defined mechanisms for policing grants, without any lawful basis and before it had even purported to terminate the grants, EPA directed Citibank to freeze NCIF award funds entirely.  On February 17, 2025—in a process that ultimately led veteran prosecutor Denise Cheung to resign—the FBI apparently sent two separate letters to Citibank making a "recommendation" to place a 30-day administrative freeze on the NCIF funds.  Compl. ¶¶ 64-67.  Though the letters suggested the freeze was a recommendation, it is clear they were intended to coerce Citibank into freezing the accounts.  The interim United States' Attorney's demand that Ms. Cheung issue a letter to Citibank affirmatively ordering Citibank to freeze the

accounts confirms this.[3]  *Id.*  But whatever the language used, Citibank got the message. Apparently acting on this recommendation, Citibank froze Plaintiffs' accounts, and the funds have been inaccessible for draw-downs by Plaintiffs ever since.  Wu Decl. ¶ 25; Meister Decl. ¶ 14; Stoddard Decl. ¶¶ 17-18.

Directing Citibank to freeze the accounts was not enough for the EPA.  On March 11, 2025, less than 24 hours before the Court was to hear argument in a related case on a grant awardee's motion for temporary restraining order related to this freeze, EPA sent all NCIF grant awardees, including CGC, a notice purporting to terminate their awards effective immediately. Strong Decl. Ex. B.  The termination letters, signed by Defendant McIntosh, all included similar content:

- An invocation of agency "authority under 2 C.F.R. §§ 200.399-40 (*sic*)";
- An allegation of "substantial concerns regarding program integrity, the award process, programmatic fraud, waste, and abuse, and misalignment with the Agency's priorities, which collectively undermine the fundamental goals and statutory objectives of the award";
- Several allegations of alleged material deficiencies relating to oversight; and
- The Agency's desire to guard against "potential" violations of the Appointments Clause and the private nondelegation doctrine.

The March 11 termination letter to CGC did not identify what the "substantial concerns" were.  It did not identify whether any alleged programmatic fraud actually existed, or the basis on which it had been identified.  It did not identify what the Agency's priorities were, or how the grantee's project was misaligned with them.  It also did not identify what material deficiencies existed with respect to oversight.  As far as EPA's or the Administrator's public statements shed any light on these "substantial concerns," they suggest concerns with EPA's past conduct, not

---

[3] *Read the Resignation Letter by Denise Cheung, a Veteran D.C. Federal Prosecutor*, THE WASHINGTON POST (Mar. 6, 2025), https://www.washingtonpost.com/dc-md-va/2025/02/18/read-resignation-letter-denise-cheung/.

CGC's or its subgrantees' actions.  The termination letter concluded with a statement that the federal Defendants intend to redistribute the Greenhouse Gas Reduction Fund money to unspecified new recipients.

## V.    NCIF GRANTEES FILE SUIT AGAINST CITIBANK AND EPA AND OBTAIN A TEMPORARY RESTRAINING ORDER

Already pending before the Court are three related and consolidated actions brought by the three primary recipients of NCIF funds from EPA: Climate United Fund, CGC, and Power Forward Communities.  *Climate United Fund v. Citibank, N.A. et al.*, No. 1:25-cv-698; *Coalition for Green Capital v. Citibank, N.A. et al.*, No. 1:25-cv-735; *Power Forward Communities, Inc.*, No. 1:25-cv-762.  The grantees bring similar claims against Citibank and the EPA Defendants, and Plaintiffs filed a Notice of Related Case regarding these cases together with their complaint. ECF No. 6.

On March 18, 2025, the Court issued a temporary restraining order enjoining Defendants from giving effect to the EPA Defendants' termination letters; enjoining the EPA Defendants from taking action to implement the termination of the grants, including taking action that results in the transfer, re-obligation, or re-allocation of the grant funds Citibank accounts or issuing a Notice of Exclusive Control under its agreements; and enjoining Citibank from moving or transferring grant funds to any party other than the accountholders, absent an order from the Court.  *Climate United Fund*, No. 1:25-cv-698, ECF No. 29.  While that TRO provides interim relief for both grantees and subgrantees like Plaintiffs, Plaintiffs filed suit and now bring this motion to ensure their interests as state green banks continue to be adequately protected and that any injunctive relief lasts for the duration of any litigation.  Plaintiffs also bring suit to offer the Court evidence of their direct harms as subgrantees and request additional relief that ensures Citibank resumes disbursing limited, ordinary-course funds, as it is obligated to do, to allow Plaintiffs to continue time-sensitive due diligence activities while this action is pending.  That limited relief is necessary to avoid the additional irreparable harms from irrecoverable delays and

lost business that would result if all processes associated with these funds were halted for this action's duration.

## LEGAL STANDARD

A preliminary injunction is warranted where the moving party establishes that (1) it is likely to succeed on the merits; (2) irreparable harm is likely in the absence of preliminary relief; (3) the balance of equities tips in the movant's favor; and (4) an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); Fed. R. Civ. P. 65(b)(1). When "balancing the competing claims of injury," the Court must "consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24.

## ARGUMENT

Plaintiffs are likely to succeed on the merits in this action. Neither the EPA nor Citibank have any basis for freezing Plaintiffs' funds, and EPA's purported termination of the NCIF Grant Agreement is unlawful and arbitrary and capricious. Given the immediate and irreparable harm Plaintiffs will face absent preliminary relief, a preliminary injunction is necessary to preserve the status quo and protect Plaintiffs' interests during the pendency of the litigation. Plaintiffs must be able to access their funds to avoid imminent economic and reputational harms. And absent preliminary relief, there is a significant risk that EPA may attempt to order Citibank to return the disputed funds to the federal government so that EPA may attempt to use Plaintiffs' funds for other purposes. Finally, the balance of equities and the public interest also support injunctive relief while Plaintiffs pursue this litigation.

## I.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS

"A movant may show a likelihood of success on the merits by demonstrating that it is 'more likely than not' that she will prevail." *Advance Am. v. FDIC*, 2017 WL 2672741, at *3 (D.D.C. Feb. 23, 2017) (quoting *Sherley v. Sebelius*, 644 F.3d 388, 398 (D.C. Cir. 2011)). Under the alternative sliding scale approach, if the other factors "strongly favor the movant, the movant need only show the existence of a 'serious legal question' on the merits" to succeed. *Id.* Where, as here, "multiple causes of action are alleged, plaintiff need only show likelihood of success on

one claim to justify injunctive relief."[4]  *Kirwa v. U.S. Dept. of Defense*, 285 F. Supp. 3d 21, 35 (D.D.C. 2017) (citation omitted).

First, as a preliminary matter, this Court has jurisdiction over Plaintiffs claims for the same reasons it has jurisdiction over the primary grantees' claims.  *Climate United Fund*, No. 1:25-cv-698, ECF No. 33-1 at 33-37.  Plaintiffs' claims against EPA are not "in essence" for breach of contract.  Indeed, Plaintiffs as subgrantees are not even party to any contract to which EPA is also a party.  As the Court recognized in issuing the TRO, "[a]t bottom Plaintiffs do not bring simple breach of contract claims—they challenge adverse agency action."  *Climate United Fund*, No. 1:25-cv-698, ECF No. 28 at 12; *accord Bowen v. Massachusetts*, 487 U.S. 879, 904–07 (1988) (rejecting notion that cases relying on the APA and seeking equitable relief including restoration of payment belong in the Court of Claims).  The Court has jurisdiction over this challenge to agency action.

Turning, then, to the merits, the Court has already held that grantees in the related actions are likely to succeed on the merits of their claims.  *Climate United Fund*, No. 1:25-cv-698, ECF No. 28 at 14.  Plaintiffs here, whose claims are substantially similar, are equally likely to succeed.  The EPA's actions are in clear violation of the APA and separation of powers.  The EPA had no statutory authority to issue the termination letter to CGC or to order Citibank to withhold funds from Plaintiffs, and its actions throughout this matter have been arbitrary and capricious and contrary to law.  For its part, Citibank has no lawful basis for freezing Plaintiffs' funds.  Citibank's refusal to follow Plaintiffs' instructions for disbursement of their funds constitutes a direct breach of the parties' Account Control Agreements.

---

[4] While this motion focuses mainly on Plaintiffs' APA claims against the EPA Defendants, Plaintiffs also assert additional claims against the EPA Defendants in their complaint, including violation of the separation of powers.  ECF No. 1 at ¶¶ 140-173.  Similarly, though this motion focuses mainly on EPA's unlawful termination of the NCIF grants, Plaintiffs also challenge EPA's unlawful direction to Citibank to freeze Plaintiffs' accounts prior to the freeze.  *E.g.*, Compl.¶¶ 64-73, 96, 106, 125, 135.  Plaintiffs are likely to succeed on the merits of these claims as well, including for the reasons asserted by primary grantee plaintiffs in *Climate United Fund*, No. 1:25-cv-698, ECF No. 33-1 at 46-47.

### A. Plaintiffs Are Likely to Succeed on the Merits of Their Claims Against the EPA Defendants

Under the APA, a court must "hold unlawful and set aside agency action, findings, and conclusions found to be . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C). The EPA Defendants have taken official action purporting to terminate NCIF grants and directing Citibank to freeze these funds in the process, without any legal basis to support its actions. The EPA Defendants' actions are contrary to statute and the Uniform Grant Guidance regulations in 2 C.F.R. Part 200, as well as arbitrary and capricious.

The EPA's Notice of Termination provided no substantive explanation or justification for its purported termination. The notice identified "substantial concerns regarding program integrity, the award process, programmatic fraud, waste, and abuse, and misalignment with the Agency's priorities," but it did not identify what the "substantial concerns" are, their source, or evidence supporting them. The letter did not identify whether any alleged programmatic fraud actually existed, or the basis on which it had been identified. The letter did not identify what the Agency's priorities were, or how the grantee's project was misaligned with them. The letter made it appear that the "concerns" were toward the actions and process taken by EPA officials in the prior federal administration, not any actions taken by grantees or subgrantees, but it did not identify what material deficiencies existed in that process or with respect to program oversight. *See Climate United Fund*, 1:25-cv-698, ECF No. 33-1 at 38-42.

### 1. The Termination Notice Is Contrary to Law and Unconstitutional

EPA's actions are directly contrary to law. In passing the Inflation Reduction Act, Congress appropriated funds to the Greenhouse Gas Reduction Fund only until September 30, 2024, and directed EPA to "make grants, on a competitive basis and beginning not later than 180 calendar days after August 16, 2022, to eligible recipients." 42 U.S.C. § 7434(a)(2)-(3). Explicitly included in the definition of "eligible recipients" were entities "designed to provide capital, leverage private capital, and provide other forms of financial assistance for the rapid deployment of low- and zero-emission products, technologies, and services"—i.e., green banks

like Plaintiffs. *Id.* § 7434(c). And that is what EPA did under the previous administration, making grants consistent with Congress's directive. EPA Defendants' actions effectively undo the agency's prior implementation of Congress's instructions, unmaking the entire grant program that Congress created with the declared intent of "[t]erminating" the Inflation Reduction Act. Exec. Order 14154, 90 Fed. Reg. at 8357. *See also Climate United Fund*, No. 1:25-cv-698, ECF No. 33-1 at 45-46.

EPA's actions violate the separation of powers and usurp the legislative function for similar reasons. The Constitution "grants the power of the purse to Congress," not the executive agencies. *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1231 (9th Cir. 2018); *see* U.S. Const. art. I, § 9, cl. 7 (Appropriations Clause); U.S. Const. art. I, § 8, cl. 1 (Spending Clause). Congress also possesses exclusive power to legislate. Article I, Section 1 of the Constitution enumerates that: "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States." U.S. Const. art. I, § 1; *see also Clinton v. City of New York*, 524 U.S. 417, 438 (1998) ("There is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes."). By passing the Inflation Reduction Act, Congress exercised its appropriations and spending power to create the Greenhouse Gas Reduction Fund. And by seeking to freeze lawfully-obligated funds and terminate grants made under that fund EPA seeks to usurp and undo that power. Indeed, EPA's chief justifications for its termination of the NCIF grant boil down to how *Congress* chose to structure the Greenhouse Gas Reduction Fund. Compl. ¶ 149; *see Climate United Fund*, No. 1:25-cv-698, ECF No. 33-1 at 49-50. The the Constitution does not allow executive agencies the power to amend or repeal appropriations they disfavor through freezes and grant terminations. EPA's unilateral action directing the freeze of Plaintiffs' accounts and the termination of the grant awards violates the separation of powers by overriding the careful judgments of Congress. Whatever EPA's disagreements with Congress' choice to appropriate funds to the Greenhouse Gas Reduction Fund, the Constitution does not authorize EPA to obstruct that appropriation. *See Climate United Fund*, No. 1:25-cv-698, ECF No. 33-1 at 51-52.

### 2.    The Termination Notice Violates Federal Regulations

EPA's purported termination is also unlawful because it is contrary to the Uniform Grant Guidance regulations found in 2 C.F.R. Part 200.  Section 200.340(a) provides that EPA may only terminate the grant agreement in limited circumstances: (1) failure to comply with the terms and conditions of the Federal award, (2) with consent, (3) upon notice by the recipient, or (4) pursuant to the terms and conditions of the Federal award, including, to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities.  None of these circumstances is present here.

Subparts (2) and (3) do not apply because the grant recipients have neither sought to terminate their awards nor consented to termination.  Subpart (1) does not apply because the EPA Defendants have not identified any instance of noncompliance.  Indeed, the termination notice does not have any suggestion that the grantees have not complied with the grant.  Rather, the notice is addressed to EPA's own actions under the previous administration.

Subpart (4) does not apply either.  Subpart (4) may permit EPA to terminate "an award that no longer effectuates the program goals or agency priorities" but only if such termination is "pursuant to the terms and conditions of the Federal award."  2 C.F.R. § 200.340(a)(4).  And § 200.340(b), in turn, requires that an agency "must clearly and unambiguously specify all termination provisions in the terms and conditions of the Federal award."  When read together, subparts (a)(4) and (b) reveal that an agency may only terminate an award based on agency priorities *if* the award's terms and conditions "clearly and unambiguously" authorize a termination on that basis.  *See Climate United Fund*, 1:25-cv-698, ECF No. 33-1 at 39, 43-44.  Further, the Office of Management and Budget's own guidance in issuing these regulations confirms as much.  *Guidance for Federal Financial Assistance*, 89 Fed. Reg. 30,046, 30,089 (Apr. 22, 2024).[5]  That guidance makes clear that agencies may terminate an award on this basis

---

[5] The 2024 guidance applies in this matter.  *See Applicability Date for the Office of Management and Budget's Regulatory Revisions*, 89 Fed. Red. 55,262 (July 3, 2024) ("The revised version of 2 CFR 200.340 will apply to EPA financial assistance agreements awarded or amended to add funds on or after July 3, 2024.").

but *only* "[p]rovided that the language is included in the terms and condition of the award." *Id.* The guidance further "underscore[ed] the need for agencies and pass-through entities to clearly and unambiguously communicate termination conditions in the terms and conditions of the award." *Id.*

The terms and conditions for the NCIF award to CGC (the award for which Plaintiffs are subawardees) contain no provision for termination based on agency priorities, much less the "clear and unambiguous" authorization that § 200.340(b) requires. *See* Strong Decl. Ex. A. It is therefore not lawful for EPA to terminate the grant on any basis sounding in agency priorities.

EPA's post hoc attempts to justify its termination after the fact are no more successful than the vague justifications in the termination letters. Even when the Court ordered EPA to make a proffer of evidence supporting its terminations in the *Climate United* action, EPA's submission was sorely deficient for the reasons discussed in depth in the primary grantees' motion, arguments Plaintiffs incorporate by reference here. *Climate United Fund*, 1:25-cv-698, ECF No. 33-1 at 47-50.

Because EPA's purported termination is contrary to law, arbitrary and capricious, and in excess of authority, Plaintiffs are likely to succeed on the merits of their claims challenging that termination.

### B. Plaintiffs Are Likely to Succeed on the Merits of Their Claims Against Citibank

Plaintiffs are also likely to prevail in their breach of contract claim against Citibank. Citibank's obligations under the ACAs are clear: it is required to disburse the funds of Plaintiff Green Banks at Plaintiffs' request. The sole exception to this obligation is when Citibank has been issued a Notice of Exclusive Control by CGC. In the absence of this triggering event, Citibank's refusal to comply with Plaintiffs' valid requests for disbursement breaches the explicit terms of the parties' agreements.

Plaintiff state green banks, as Pledgors, each executed an ACA with Citibank, as Bank, and CGC, as the Secured Party. Plaintiffs have each performed in accordance with the terms of their respective ACAs. Citibank has not.

As discussed *supra*, the ACA requires Citibank to comply with Plaintiffs' directions to distribute funds to them and only authorizes Citibank to restrict Plaintiffs' access to their Accounts if CGC issues a Notice of Exclusive Control to Citibank, or a court issues a final order or process with respect to the assets in Plaintiffs' Citibank Accounts. To date, Plaintiffs have not received or been made aware of a Notice of Exclusive Control issued by CGC. Wu Decl. ¶ 12; Swan Decl. ¶ 14. As Plaintiffs understand it, CGC never sent such a notice.

Despite the fact that the sole circumstance in which it could refuse Plaintiffs' instructions was not triggered, Citibank has, for over a month, failed or refused to comply with those instructions. Since February 14, 2025, Plaintiffs have submitted instructions to Citibank directing that funds and financial assets in their Citibank Accounts be disbursed. Wu Decl. ¶¶ 14-27; Meister Decl. ¶¶ 13-14; Stoddard Decl. ¶¶ 16-19. Each of these requests went unfulfilled and ignored. *Id.* Plaintiffs' requests for information about why their funds were frozen were similarly ignored. *Id.*

Plaintiffs have since learned, through pleadings filed in related litigation, that Citibank was apparently acting at the ultimate direction of EPA in freezing Plaintiffs' funds. *See Climate United Fund*, No. 1:25-cv-00698, ECF No. 14 at 8-10. But no provision found anywhere in the Account Control Agreements authorizes Citibank to follow such directives over the explicit instructions of the Pledgors, i.e., Plaintiffs.

Citibank is therefore in breach of the ACAs, and Plaintiffs are likely to succeed on the merits of their breach of contract claim.

## II.    PLAINTIFFS WILL SUFFER IRREPARABLE INJURY

If the EPA and Citibank are permitted to continue to withhold Plaintiffs' funds, Plaintiffs will be irreparably harmed. And these harms will only compound the longer Plaintiffs' cannot access their funds, necessitating the need for durable relief under a preliminary injunction.

Plaintiffs have already suffered immediate harms, both economic and reputational, due to Defendants' actions. Their inability to access their funds has prevented them from conducting due diligence on and making financing commitments to eligible projects. And the cloud of uncertainty surrounding these funds and unsupported accusations by EPA have already harmed Plaintiffs' reputations. In order to mitigate these harms and prevent them from becoming irreparable, Plaintiffs require access to their funds during the pendency of this litigation. At a minimum, Plaintiffs must be able to obtain funds to cover administrative costs and costs associated with due diligence, underwriting activities, and obtaining credit approval so that they can continue identifying eligible projects to fund and keep them on track for financing after a final judgment enters. If Plaintiffs are unable to continue these activities, their harms will be irreparable even if they do later prevail on the merits. Plaintiffs therefore request an injunction that prohibits Citibank from ignoring or declining ordinary-course disbursement requests.

"An irreparable harm is an imminent injury that is both great and certain to occur, and for which legal remedies are inadequate." *Beattie v. Barnhart*, 663 F. Supp. 2d 5, 9 (D.D.C. 2009). Defendants' actions have deprived Plaintiffs of access to and use of funds to which they are legally entitled. Without access to the funds obligated to them, Plaintiffs are currently suffering and will continue to suffer irreparable economic and reputational harms. Plaintiffs will also suffer additional and irreparable harms if the funds currently in their accounts are sent back to the federal government by Citibank at EPA's request.

A.    **Plaintiffs Face Imminent Loss of Business and Reputational Harms from EPA's and Citibank's Freeze of NCIF Funds**

Plaintiffs face increasing risk of losing qualified projects, with the corresponding harms to their reputations as lenders in the financial markets, the longer Defendants' actions prevent them from accessing their funds. Plaintiffs have spent months identifying qualified projects to support with financing and investment under their NCIF subawards with CGC. Before Plaintiffs commit funds to finance these projects, they must complete important preparatory work—conducting due diligence and underwriting activities and obtaining credit approvals—that entail administrative

expenditures, including payment to third-party underwriting consultants and other vendors.  Wu Decl. ¶ 29.  Defendants' freeze has made it impossible to cover these administrative costs with NCIF funds, requiring Plaintiffs to suspend or curtail the work that would keep these projects on track for finalizing a loan or similar financing commitment.  Without this continued work toward a financing commitment, many of Plaintiffs' identified qualified projects will be forced to cancel work with Plaintiffs and seek alternative financing instead.  A prolonged freeze or outright termination of the NCIF award will certainly result in the cancellation of financing for qualified projects, and likely result in the imminent cancellation of some qualified projects altogether. More than lost business revenue, these cancellations of financing for projects and the projects themselves would work lasting and irreparable damage to Plaintiffs' reputations as financial partners and to public confidence in the green lending industry as a whole.

As just a few examples of the specific harms Plaintiffs have and will suffer as a result of Defendants' actions:

- Plaintiff IBank has been conducting due diligence on a loan of approximately $40 million to finance the construction of electric vehicle charging infrastructure in California.  Wu Decl. ¶ 29.  Due to the freeze on its funds, IBank has already had to curtail the work it was doing with an underwriting consultant and attempt to conduct due diligence through its own staff.  *Id.*  A continued freeze threatens to disrupt the project entirely, as the applicant was hoping for approval in March, but IBank is unable to issue a financing commitment without access to its NCIF subgrant funds. *Id.*

- Plaintiff MnCIFA has spent more than a year developing a pipeline of eligible projects and stands ready to deploy the NCIF funds in accordance with the terms of its subaward, which has an extremely expedited period of performance ending December 31, 2025.  Swan Decl. ¶ 30.  MnCIFA has dedicated substantial resources to properly and quickly deploying these funds, and the longer the delay on its ability to draw on the NCIF funds, the more MnCIFA is impaired in complying with its

subaward. *Id.* ¶ 32. MnCIFA's board of directors relied on its NCIF subaward in approving MnCIFA's commitment to funding several new loans. MnCIFA has approved seven loans for funding thus far, totaling $22.1 million. *Id.* ¶ 33. If NCIF funding is not available, MnCIFA will have to significantly slow its pace of lending, given its original state appropriation (of non-NCIF funds) must also cover its operating expenses. *Id.*

- Plaintiff Efficiency Maine Trust has been denied access to the more than $25 million, an amount that more than doubles the total capital that Efficiency Maine currently has under management through its loan program. Stoddard Decl. ¶¶ 11-12. Without the ability to access its funds, Efficiency Maine will exhaust its available capital for its revolving loan fund in the next 12 months and likely be forced to discontinue financing on energy efficiency projects. *Id.* ¶ 27. To illustrate the cost of these funds being frozen, a typical Maine home that switches from an old, conventional furnace or boiler to a modern, high-efficiency heat pump system will save more than $700 annually on their heating bills. *Id.* ¶ 28. For a typical low- or moderate-income home in Maine, the total project cost will be in the range of $10,000-$15,000. *Id.* Of this total, customers seek to take advantage of Efficiency Maine low-interest loans by borrowing, on average, $6,700 per project. *Id.* With the funds currently frozen at Citibank, Efficiency Maine would be able to finance 1,243 projects per year at the average borrowing level for each of the next three years. *Id.* Without those funds, a significant fraction of these households will instead face more than $700 in higher annual heating bills, and the more than four hundred firms that install heat pumps in Maine will forego the revenues that would have been associated with these projects. *Id.*

In addition to these specific examples, it is axiomatic that delay will hamper the Plaintiffs' ability to fund projects, and in many cases, such delay is fatal. For example, MnCIFA describes a significant geothermal project to support a 1,000-unit affordable housing development. Swan

Decl. ¶¶ 28(a), 35.  In large scale construction projects like this, there are numerous components that need to come together in sequence—geothermal systems are only one part of the overall construction plan, and need to be installed before other stages.  Such projects will need go ahead without the Plaintiffs' programs if the timing does not work out.  In this context, delaying funding is no mere delay; it operates to thwart the project entirely.  Plaintiffs are harmed when they cannot engage in projects that it is their mission to fund.

Reputational harms are also a problem here, and the reputational harms to Plaintiffs from cancelled financing and projects will be severe.  "Injury to reputation or goodwill is not easily measurable in monetary terms, and so often is viewed as irreparable."  *Atlas Air, Inc. v. Int'l Bhd. of Teamsters*, 280 F. Supp. 3d 49, 103 (D.D.C. 2017).  Through their unlawful and arbitrary actions, EPA and its officials, as well as Citibank, have cast a significant cloud of uncertainty over the funds that Plaintiffs expected, and in certain cases have committed, to use to support qualified projects.  Simply put, borrowers will not do business with a bank that cannot provide promised funds.  By rendering the availability of all NCIF award monies so uncertain, Defendants threaten immediate and lasting damage to Plaintiffs' credibility with their customers and vendors and their ability to retain and attract business.  Even if Plaintiffs later prevail in this action, absent interim injunctive relief that extends beyond the existing TRO, EPA and Citibank will have successfully "poisoned the well" by delaying Plaintiffs' access to funds for so long that all of Plaintiffs' prospective borrowers will have opted for alternative sources of funding—or chosen to scrap their projects altogether.

### B.    Plaintiffs Face Imminent Reputational Harms from EPA Effectuating its Termination Notice

EPA's March 11 termination letter threatens additional severe reputational harms to Plaintiffs if given effect.  In *Patriot, Inc. v. U.S. Dept. of Hous. & Urban Dev.*, 963 F. Supp. 1, 5 (D.D.C. 1997), the court concluded that HUD's characterization of the plaintiffs' as "'enticing' senior citizens into meetings and 'pressuring' them to obtain reverse mortgages 'under the guides of sound estate planning'" damaged the plaintiffs' reputation and supported the need for

injunctive relief.  Here too, EPA has recklessly insinuated without outright stating in its letter that CGC—and by extension Plaintiffs as subawardees—have committed fraud, waste, and abuse and otherwise acted in a deficient manner.  But EPA offers no evidence for these accusations. EPA thus impugns the reputation of Plaintiffs without support, causing them harm that cannot be remedied without immediate injunctive relief that publicly recognizes the lack of evidence for these insinuations and prevents the EPA from implementing its baseless termination notice.

As just a few examples of the specific reputational harms Plaintiffs will suffer:

- The termination of the NCIF grant will limit the ability of Illinois Finance Authority, operating as Illinois Climate Bank, to apply for or receive federal and state grant funds.  Even if EPA takes no direct action against Illinois Climate Bank, Illinois Climate Bank will be obligated to make disclosures when applying for federal and Illinois state grant opportunities.  Under current federal grant practice, this would automatically make Illinois Climate Bank ineligible or less competitive in future grant applications and would obligate state/federal agencies or pass-through entities to impose onerous and unwarranted administrative conditions on any grant funds provided to Illinois Climate Bank.  Meister Decl. ¶ 21.

- The termination of this grant would similarly cause collateral harm to IBank's other, non-NCIF-funded programs, many of which have been in place for several decades, including the Infrastructure State Revolving Fund, Small Business Finance Center, Expanding Venture Capital Access Program, and IBank's conduit bond program.  Wu Decl. ¶ 33.  For example, the Infrastructure State Revolving Fund program has long enjoyed a AAA rating on the bonds it issues to fund its loan pool.  *Id.*  Termination of this grant would likely be viewed adversely by credit rating agencies, placing this rating at risk, which would decrease the amount of bonds IBank can issue to grow its program, and increase the interest rates IBank charges the borrowers, most of which are small to medium municipalities.  *Id.*

- The termination of Efficiency Maine's NCIF subaward on the bases suggested by EPA's March 11, 2025, letter will limit Efficiency Maine's ability to apply for or receive federal grant funds.  Even if EPA takes no direct action against Efficiency Maine, Efficiency Maine will be obligated to make disclosures when applying for federal grant opportunities.  Stoddard Decl. ¶ 35.

These reputational harms are particular to Plaintiffs, who as state green banks are uniquely positioned to support residents of their States by providing crucial financial services to pollution-reducing projects in their States.  In that role, Plaintiffs depend on their reputations and ability to obtain state and federal grants to provide such support, and as public or quasi-public entities, they suffer direct reputational harms as a result of Defendants' actions.

### C.    Plaintiffs Face Irreparable Economic Harms from EPA Clawing Back Funds Based on the March 11 Termination Notice

Plaintiffs will suffer additional irreparable harms if the Court does not extend the existing TRO's relief for the pendency of this litigation, to ensure that EPA cannot claw back Plaintiffs' funds from Citibank.  First, there is an imminent risk that Defendants will take such an action once no court order is in place prohibiting it, despite the fact that no law or contract authorizes them to do so.  EPA has consistently expressed its desire to claw back the funds and has already announced its intent to "re-obligate" Plaintiffs' funds to other entities.  If EPA is successful in achieving this aim, it may be impossible to later return those same funds to Plaintiffs, even if they later prevail in this action.  In cases involving government expenditure, "once the relevant funds have been obligated, a court cannot reach them in order to award relief."  *City of Houston v. Dep't of Hous. & Urban Dev.*, 24 F.3d 1421, 1426-27 (D.C. Cir. 1994).  Indeed, in *City of Houston*, the court held that the plaintiff "must" seek injunctive relief "preventing the agency from disbursing those funds" at issue.  *Id.*; *see also Confed. Tribes of Chehalis Rsrv. v. Mnuchin*, 2020 WL 3791874, at *2 (D.D.C. July 7, 2020) ("Plaintiffs would suffer irreparable harm if the court denied injunctive relief and the Secretary then distributed the withheld [] funds . . . . Such payments could result in this case becoming moot before receiving a full hearing").

Plaintiffs are also at risk of being deprived of a statutory entitlement, which is an irreparable harm. *Endo Par Innovation Co., LLC v. Becerra*, 2024 WL 2988904, at *7 (D.D.C. 2024) ("[A] clear statutory entitlement is not merely economic harm, and its loss may be sufficiently irreparable to justify emergency injunctive relief because once the statutory entitlement has been lost, it cannot be recaptured." (internal quotation marks and citation omitted)). Congress appropriated funds for the Greenhouse Gas Reduction Fund to accomplish its statutory objectives and explicitly directed that those funds should be granted to organizations that are "designed to provide capital, leverage private capital, and provide other forms of financial assistance for the rapid deployment of low- and zero-emission products, technologies, and services"—i.e., the exact purpose that Plaintiff green banks are designed for. 42 U.S.C. § 7434(c)(1). And CGC lawfully delegated subgrants to Plaintiffs consistent with its own grant agreement and the Inflation Reduction Act. Plaintiffs are thus lawful and intended subawardees of Greenhouse Gas Reduction Fund funds. If they are revoked now, the harm Plaintiffs will suffer is irreparable because the funds "cannot be recaptured later." *Id.*

*          *          *

The only thing currently stopping EPA from inflicting (or, at a minimum, seeking to inflict) these irreparable harms on Plaintiffs is the TRO in the *Climate United* action. That protection should be extended via a preliminary injunction in this action to ensure EPA does not take action that would irretrievably remove Plaintiffs' funds from their accounts while this action is pending. In addition, to ensure Plaintiffs can continue their due diligence, underwriting, and credit approval activities and ensure there are still qualified projects that can be financed with these funds, the Court should restore the status quo ante litem and enjoin Citibank from violating its obligation to disburse funds to Plaintiffs, which—like any depository institution holding the property of a customer—is an obligation Citibank has always been required to meet under the ACA.

### III.  THE BALANCE OF EQUITIES WEIGHS IN FAVOR OF PLAINTIFFS

As discussed *supra*, Plaintiffs will suffer imminent and irreparable economic and reputational harms if they are unable to access the funds in their accounts or EPA otherwise effectuates its termination.  On the other hand, Defendants would suffer no harm from a preliminary injunction.  A party "cannot suffer harm from an injunction that merely ends an unlawful practice."  *Open Cmtys. All. v. Carson*, 286 F. Supp. 3d 148, 179 (D.D.C. 2017) (quoting *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013)).  As the party merely holding these funds as a financial agent of the United States, Citibank will suffer no harm by being ordered to comply with the terms of the ACAs.  As for EPA, it cannot establish any harm that will result from the disbursement of funds it already agreed could be disbursed in the manner requested.  These valid, ordinary-course administrative costs will not represent the bulk of the NCIF subawards—the capital that would be committed only upon finalization of a qualified project's financing.  EPA would likewise possess the same post-award mechanisms to ensure program integrity specified in the Uniform Grant Guidance, including mechanisms to audit, disallow, or even recover improper expenses, subject to all the protections and dispute procedures for subrecipients.  *See* 2 C.F.R. §§ 200.345-346.  And certainly, EPA cannot show any harm from the funds, at a minimum, being maintained in their current location until the parties' dispute is resolved.

### IV.  THE PUBLIC INTEREST FAVORS A PRELIMINARY INJUNCTION

Finally, the public interest favors a preliminary injunction because the public will be harmed by Plaintiffs' current and future inability to access their grant funds.  The qualified projects Plaintiffs seek to use these grant funds for will create jobs, improve the environment, build out critical infrastructure, and provide resilience and adaptation programs in the states in which each Plaintiff is located.  Without access to their grant funds, Plaintiffs will be unable to achieve this mission, and the public will suffer as a result.  If Plaintiffs are permitted to continue their work, the public will directly benefit from their activities.  *See Pac. Merch. Shipping Ass'n v. Goldstene*, 639 F.3d 1154, 1180-81 (9th Cir. 2011) (noting that state "clearly has an especially

powerful interest in controlling the harmful effects of air pollution"); *see also Cmtys. for a Better Env't v. Cenco Ref. Co.*, 179 F. Supp. 2d 1128, 1148 (C.D. Cal. 2001), *aff'd*, 35 F. App'x 508 (9th Cir. 2002) ("[W]hen an environmental injury is sufficiently likely, the balance of harms will usually favor the issuance of an injunction to protect the environment.").

Moreover, "[t]here is generally no public interest in the perpetuation of unlawful agency action." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (citation omitted). "To the contrary, there is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." *Id.* (internal quotation marks and citation omitted). Accordingly, the public interest strongly weights in favor of Plaintiffs' requested injunctive relief.

## CONCLUSION

For the foregoing reasons, Plaintiffs request that the Court enter a preliminary injunctive that extends the relief provided by the temporary restraining order issued in the related actions for the pendency of this litigation, as described below, and provides the following additional relief:

- EPA Defendants and Citibank should continue to be enjoined from giving effect to EPA Defendants' termination letter, pending a final determination on the merits;

- EPA Defendants should continue to be enjoined from transmitting or taking action to implement the termination of grantees' grants or, by extension, Plaintiffs' grants, including taking action that results in the transfer, re-obligation, or re-allocation of Plaintiffs' subgrant funds in Plaintiffs' Citibank accounts, issuing a Notice of Exclusive Control under its agreements, or causing Plaintiffs' prime grantee (CGC) to issue a Notice of Exclusive Control under their agreements;

- Defendant Citibank should continue to be enjoined from moving or transferring Plaintiffs' subgrant funds to any party other than the accountholders, absent an order from this Court;

- Defendant Citibank should be enjoined from violating its obligations to disburse funds in response to valid, ordinary-course disbursement instructions from Plaintiffs, including in response to both past and future requests from Plaintiffs; and

- EPA Defendants should be enjoined from directing, recommending, or otherwise causing or attempting to cause Citibank to freeze Plaintiffs' accounts or otherwise violate Citibank's obligations to disburse funds in response to valid, ordinary-course instructions from Plaintiffs.


Date:  March 24, 2025                    Respectfully submitted,

ROB BONTA                               KEITH ELLISON
Attorney General of California          Minnesota Attorney General

s/ Meghan Strong                        s/ Peter N. Surdo
**MEGHAN STRONG**                       **PETER N. SURDO**
THEODORE A. MCCOMBS                     Special Assistant Attorney General
JOHN D. ECHEVERRIA                      OLIVER LARSON
DYLAN REDOR                             Manager, Environment and Natural Resources
MEGAN RICHARDS                          Division
Deputy Attorneys General                CATHERINE RIOS-KEATING
California Department of Justice         Special Assistant Attorney General
455 Golden Gate Avenue                  Minnesota Attorney General's Office
San Francisco CA 94102                  445 Minnesota Street, Suite 600
(415) 510-3877                          651-757-1061
meghan.strong@doj.ca.gov                peter.surdo@ag.state.mn.us

*Attorneys for California Infrastructure and*   *Attorneys for Minnesota Climate Innovation*
*Economic Development Bank*                      *Finance Authority*


(Additional signatures on following page)

KWAME RAOUL
Attorney General of Illinois

s/ Jason E. James
**JASON E. JAMES**
Assistant Attorney General
MATTHEW J. DUNN
Chief, Environmental
Enforcement/Asbestos Litigation Division
Office of the Attorney General of Illinois
201 W. Pointe Drive, Suite 7
Belleville, IL 62226
(217) 843-0322
jason.james@ilag.gov

*Attorneys for Illinois Finance Authority*

AARON M. FREY
Attorney General of Maine

s/ Emma Akrawi
**EMMA AKRAWI**
SCOTT W. BOAK
Assistant Attorneys General
Office of the Maine Attorney General
6 State House Station
Augusta, ME 04333
(207) 626-8800
Emma.Akrawi@maine.gov

*Attorneys for Efficiency Maine Trust*

SA2025301171/44561266.docx

# CERTIFICATE OF SERVICE

Case Name:    ***California Infrastructure and Economic Development Bank, et al. v. Citibank, N.A., et al.***

Case No.      **1:25-cv-00820**

I hereby certify that on March 24, 2025, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

- **PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

- **DECLARATION OF CHRISTOPHER MEISTER with Exhibit A**

- **DECLARATION OF MICHAEL STODDARD with Exhibit A**

- **DECLARATION OF MEGHAN STRONG IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION with Exhibits A and B**

- **DECLARATION OF KARI GROTH SWAN, EXECUTIVE DIRECTOR OF MINNESOTA CLIMATE INNOVATION FINANCE AUTHORITY with Exhibits 1 and 2**

- **DECLARATION OF SCOTT WU, EXECUTIVE DIRECTOR OF CALIFORNIA INFRASTRUCTURE AND ECONOMIC DEVELOPMENT BANK with Exhibits 1 to 4**

- **[PROPOSED] ORDER**

I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct and that this declaration was executed on March 24, 2025, at San Francisco, California.

|  |  |
| --- | --- |
| G. Pang | |
| Declarant | Signature |

SA2025301171/44561209.docx