**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **CALIFORNIA INFRASTRUCTURE AND ECONOMIC DEVELOPMENT BANK, EFFICIENCY MAINE TRUST, ILLINOIS FINANCE AUTHORITY, & MINNESOTA CLIMATE INNOVATION FINANCE AUTHORITY,**<br><br>                    Plaintiffs,<br><br>     v.<br><br>**CITIBANK, N.A., U.S. ENVIRONMENTAL PROTECTION AGENCY** and **LEE ZELDIN** and **W.C. MCINTOSH**, in their official capacities as Administrator and Acting Deputy Administrator of the U.S. Environmental Protection Agency,<br><br>                    Defendants. | Civil No. 1:25-cv-820<br><br><br>**DECLARATION OF SCOTT WU, EXECUTIVE DIRECTOR OF CALIFORNIA INFRASTRUCTURE AND ECONOMIC DEVELOPMENT BANK** |

**DECLARATION OF SCOTT WU**

I, Scott Wu, declare under penalty of perjury that the following is true and correct:

1.      I am a resident of the State of California. I am over the age of 18 and have

personal knowledge of all the facts stated herein, except to those matters stated upon information

and belief; as to those matters, I believe them to be true. If called as a witness, I could and would

testify competently to the matters set forth below.

2.      Since 2020, I have been the Executive Director for the California Infrastructure

and Economic Development Bank ("IBank").

3.      In this role I have chief responsibility for all aspects of IBank's programs and

activities, strategic goals, funding and daily operations. Throughout my career I have held

several executive positions in the financial sector. I am a graduate of Dartmouth College and Harvard Business School. IBank's Climate Catalyst program, the recipient of the National Clean Investment Fund (NCIF) funds that are the subject of this declaration, was established under my tenure, in 2020. I have overseen all aspects of IBank's application, negotiation and closing of its NCIF subaward with the Coalition for Green Capital (CGC).

4.     IBank is an instrumentality of the State of California that was created in 1994 by the Bergeson-Peace Infrastructure and Economic Development Bank Act. IBank is a component unit of the State of California located within the Governor's Office of Business and Development, located at 1325 J Street, Suite 1300, Sacramento, California 95814.

5.     IBank's purpose is to finance public infrastructure and private development that promote a healthy climate for jobs, contribute to a strong economy and improve the quality of life in California communities. To this end, IBank offers a wide array of financial products, including various forms of financing and credit enhancement products that support public, private, and nonprofit sector entities investing in climate mitigation and resilience projects in California.

### IBank's Receipt of a National Clean Investment Fund Subgrant

6.     IBank is an "eligible recipient" of Greenhouse Gas Reduction Fund monies under 42 U.S.C. § 7434(c)(1).

7.     The Environmental Protection Agency (EPA) granted an NCIF award to CGC of $5 billion. The award was to be used to establish national clean financing institutions that would be able to deliver accessible, affordable financing for clean technology projects.

8.     IBank received an NCIF subaward from CGC in the amount of $446,257,500.

9.       On February 14, 2023, EPA announced its initial program design for the Greenhouse Gas Reduction Fund which includes NCIF. IBank began preparing for this program within days of that announcement. On July 14, 2023, EPA published its Notice of Funding Opportunity number EPA-R-HQ-NCIF-23, later revised on August 11, 2023. The deadline for application specified in the notice was October 12, 2023. IBank joined CGC's coalition as a subgrantee under CGC's grant application.

10.      On April 4, 2024, EPA announced the selected NCIF recipients, after which negotiations commenced between the EPA and awardees, and later between awardees and subawardees, on the contract terms and EPA terms & conditions governing the program. CGC completed its grant agreement with EPA in August of 2024. IBank concluded negotiations with CGC during the first week of January, 2025, executing the subgrant agreement and related documents on January 8, 2025, subject to final approval from IBank's Board of Directors. On January 22, 2025, the Board granted approval to accept the subaward, and on January 23, CGC transferred the entire amount of the subaward to IBank's Citibank account (as discussed further below).

**IBank's Account Control Agreement and Citibank's Freeze on IBank's Funds**

11.      The subgrant required IBank to establish an account at Citibank to hold the grant funds and enter into an Account Control Agreement governing the account. Under the terms of the agreement, CGC was a secured party for the account. A true and correct copy of the Account Control Agreement is attached as Exhibit 1.

12.      Under the Account Control Agreement with Citibank, IBank has the right to access and draw on its grant funds, unless CGC issues a Notice of Exclusive Control to Citibank. IBank has never received notice or a copy of a Notice of Exclusive Control issued by CGC. On

information and belief, to date, CGC has never issued a Notice of Exclusive Control to Citibank to restrict IBank's NCIF account.

13.     The $446,257,500 subaward was the only source of funds transferred to the account by CGC or any other party. The funds were deposited in January and as of March 17, 2025, the account has also been credited interest of $1,915,655, which IBank also does not have access to.

**Requests for Disbursements**

14.     According to account records, on February 11, 2025, there were approximately $446,724,934 of funds (including $467,434 of interest at that time) in IBank's account at Citibank.

15.     On February 11, 2025, I approved internally an administrative funds transfer request to be issued to Citibank in the amount of approximately $415,314. The disbursement was to pay for compensation, benefits and contracted support services relating to NCIF. IBank staff began to prepare a disbursement request to Citibank.

16.     On February 12, 2025, I became aware of a tweet from EPA administrator Lee Zeldin that appeared to show his intent to terminate the NCIF grant program.

17.     On February 13, 2025, at approximately 1 p.m. PT, I spoke with Daniel Figoni, Director, Citi NAM Public Sector Banking. Mr. Figoni told me that all funds were paused based on Mr. Zeldin's social media post, and that Citibank had asked EPA for direction. Mr. Figoni acknowledged my contention that the process to exercise security control had not been followed.

18.     On February 14, 2025, at approximately 8 a.m. PT, Daniel Figoni called me to say that Citibank was sending a letter to EPA to express that while they take the social media announcement seriously, they have contractual obligations that they need to adhere to and until

they receive written direction from EPA otherwise, they will unfreeze the accounts and honor

transfer requests.

19.     Later on February 14, at 1:32 p.m. PT, IBank submitted the request for $415,314

of administrative reimbursements to Citibank. A true and correct copy of the signed draw request

and wire instructions are attached as Exhibit 2.

20.     IBank's draw request was valid and proper and complied with all applicable

requirements of the Account Control Agreement. However, despite Citibank's claim that it was

unfreezing the account, it never honored IBank's draw request.

21.     On February 15, 2025, which was the Saturday of President's Day weekend,

IBank representatives emailed Citibank to request the status of the wire transfer but did not

receive a response to that email correspondence.

22.     On February 18, 2025, at 10:43 a.m. PT, Daniel Figoni emailed in response to my

request for the Citibank letter to EPA: "Hi Scott - apologies, we're not able to share that. We

have not seen a response back from the EPA and are continuing to move forward with the

payments."

23.     However, later that day, on information and belief, Citibank again froze the funds.

While there was no express communication from Citibank or any other party about the freeze, as

the day proceeded it became clear that IBank's draw request had not been processed. Press

reports also began to circulate stating that on President's Day the FBI had issued a letter to

Citibank recommending a thirty-day freeze on all NCIF accounts. Representatives of IBank

repeatedly tried to contact Citibank to determine why Citibank had not disbursed IBank's funds

and received no response.

24.     On February 19, 2025, at approximately 1 p.m., Daniel Figoni returned my call only to say that they were not in a position to say anything at this time. I asked him to confirm if Citibank had received a letter from the FBI as reported and if so, why Citibank would follow a request from the FBI unless the FBI had received a court order. Citibank stopped responding after this.

25.     While Citibank's online account upload platform generated an automatic email acknowledging receipt of the February 14 disbursement request, the request has never been reflected in IBank's account, nor has it been reflected in another Citibank online account viewing portal (Citi Velocity) as either having been received or processed. To date, IBank has not received funds in response to its February 14 request. True and correct copies of the Citibank acknowledgement emails are attached as Exhibit 3

26.     On February 26, 2025, the California Attorney General emailed Citibank a letter on behalf of IBank stating that Citibank had failed to comply with its instructions as required by its Account Control Agreement; requesting that Citibank identify the basis for its apparent refusal to comply with valid disbursement instructions; informing Citibank that its apparent refusal was threatening to cause significant harm to IBank, including by preventing IBank from fulfilling their contractual obligations to third parties and demanding that Citibank immediately disburse funds. A true and correct copy of that letter is attached as Exhibit 4. Citibank never responded to this letter, and did not disburse IBank's funds

27.     As of the date of this declaration, Citibank has not disbursed any of IBank's funds.

**IBank's Plans for the Subgrant Funds**

28.    IBank has been implementing its NCIF program to partner with private-sector investors, developers, community organizations, and others to deploy projects, and mobilize private capital at scale to meet the NCIF program objectives. These objectives include reduction of greenhouse gases and other air pollutants; delivering benefits of projects to American communities, including low-income and disadvantaged communities and mobilizing additional private capital to leverage NCIF funds to demonstrate the market-wide opportunity for financial markets and institutions to finance clean technology projects.

29.    IBank has been in the process of conducting due diligence, underwriting activities and obtaining credit approval for the following projects, in order to fund them with the NCIF subaward:

    a.    A loan of approximately $40 million to a private company to finance the construction of approximately 16 electric vehicle charging infrastructure sites mainly in the San Francisco Bay Area and Los Angeles. IBank had initiated due diligence including analyzing the company's financial models, reviewing historical financial statements, and validating the company's contracts, among other steps. IBank had been working with its underwriting consultant, Guidehouse, but had to curtail the work with the consultant when the NCIF funds were frozen. IBank staff is now attempting to proceed with due diligence independently. While the applicant had been hoping for IBank to approve the financing in March, the disruption has slowed our process, possibly by several months or longer. We are unable to issue a financing commitment without access

to the NCIF funds, which has raised doubts from the applicant of our ability to provide financing.

b.  A loan of approximately $10 million to a private company to finance the construction of a renewable hydrogen refueling station in the Fresno area. Anticipated customers would be local transit agencies looking to expand their hydrogen-powered fleets. IBank had initiated due diligence, including analyzing the company's financial model, investigating the local transit authorities' long term zero-emission transit plans, reviewing company and related entity financials, and scrutinizing existing and anticipated offtake and incentive contracts, among other steps. IBank had been working with Guidehouse but had to curtail the work with the consultant when the NCIF funds were frozen. IBank staff is now attempting to proceed with due diligence independently. While the applicant had been hoping for IBank to approve the financing in April, the disruption has slowed our process, possibly by several months or longer. We are unable to issue a financing commitment without access to the NCIF funds, which has raised doubts from the applicant of our ability to provide financing.

c.  A loan guarantee of approximately $16 million, in support of a loan of approximately $20 million, to be made by a community bank to a private company to finance the installation of solar and/or battery storage energy systems on single- and multi-family residential properties, primarily in the San Francisco Bay Area and Los Angeles. IBank staff has initiated a pre-screening of the financing request with the goal of referring the request to Guidehouse for further due diligence, but has had to put this process on hold. While the bank had been

hoping for IBank to approve the financing in April, the disruption has slowed our process, possibly by several months or longer. We are unable to issue a guarantee commitment without access to the NCIF funds, which has raised doubts from the applicant of our ability to provide the guarantee. In addition, the lead lender has indicated that, absent an IBank loan guarantee, the lender would not proceed with issuing the loan.

d. A warehouse credit facility of up to $50 million to a private entity, to serve as credit enhancement to induce banks and CDFIs to expand their Commercial Property Assessed Clean Energy (C-PACE) lending activities to small commercial and multi-family residential properties throughout the state. IBank staff has initiated a pre-screening of the financing request with the goal of referring the request to Guidehouse for further due diligence, but has had to put this process on hold. While the applicant had been hoping for IBank to approve the financing in April, the disruption has slowed our process, possibly by several months or longer. We are unable to issue a financing commitment without access to the NCIF funds, which has raised doubts from the applicant of our ability to provide the loan. The absence of financing is likely to result in private capital sources refraining from entering the submarket for small- to medium-sized C-PACE borrowers.  This represents a market worth an estimated $350+ million that otherwise may not receive financing from private capital markets.

e. Financing of approximately $80 million to sub-agencies within the California State Treasurer's Office (STO) to provide credit enhancement (loan loss reserves and debt service reserves) across various programs to induce participating lenders

to make loans for energy efficiency upgrades to single-family residences and small commercial properties, and loans for small businesses to acquire zero-emission heavy-duty vehicles. On March 6 IBank's internal credit committee provided preliminary approval (the step preceding final Board approval) of approximately $14 million for STO's residential lending program, and is working with STO staff to further refine the other proposals. IBank staff has been handling due diligence for these requests in house; however, the inability to rely on our underwriting consultant to process other pipeline opportunities has slowed down our timeline on the STO requests. STO staff has also de-prioritized these requests given the NCIF funding freeze. STO has requested a pause in underwriting activities until the freeze is resolved. Due to budgetary and regulatory constraints, STO is unlikely to be able to source significant funds to expand its programs as intended, absent the NCIF funding.

f.  In addition to the priority projects above, which could result in nearly $200 million in financing in the near term, approximately 19 other projects, for a total of nearly $550 million, currently remain at an earlier stage in our pipeline (at the 'Prospect' phase, by our internal terminology). Some of the larger opportunities include zero-emission rolling stock for a high-speed rail developer, and a portfolio of projects for a large commercial solar and storage developer. At this time, we are severely limited in our ability to proceed forward on these prospects, due to the freezing of the NCIF funds.

**Immediate Harm to IBank**

30.    EPA and Citibank's freeze of IBank's account and failure to honor IBank's reimbursement requests has caused immediate and continuing harm to IBank.

31.    First, EPA and Citibank's action has harmed projects undertaken with prospective NCIF funding:

    a.    Referring to the nearly $200 million of priority projects described above, each of these fall into one of the NCIF priority project categories of Distributed Energy Generation and Storage, Net-Zero Building Emissions, and Zero-Emissions Transportation, as do nearly all of the projects in our prospect pipeline. Those that do not fall into the three categories may still proceed (subject to CGC approval) if they meet the NCIF program's 'six-factor test' which addresses a project's ability to reduce GHG emissions, local benefits resulting from the technology, and mobilization of private capital, among other factors. Considering that most of the projects in our pipeline lack viable financing alternatives, the potential impacts from these projects, as further detailed below, would be foregone for California.

    b.    Based on IBank's information and industry knowledge, it is likely that the freeze on funds will have several specific effects. For example, for the projects listed above, foreseeable harms include: lender(s) that will not proceed with issuing loans; private capital sources refraining from entering the submarket for small- to medium-sized C-PACE borrowers; another state agency unwilling to proceed in underwriting until the freeze is resolved, resulting in a curtailment of planned expansions and new program launches; additional impacts that could include project delay (which typically increases financing costs and holding costs or

survivability), project curtailment or significant value engineering, higher cost of capital, or project failure.

c.  IBank has spent considerable time and effort cultivating the above and other investment opportunities, along with the private capital sources that accompany each deal. The delay in deal flow and completion caused by the freeze presents a real risk to IBank's reputation in the capital markets and among project developers. Furthermore, IBank's subaward agreement requires a period of performance that ends on December 31, 2025. IBank must disburse or obligate the entirety of its subaward by that date or risk the remaining balance being returned to CGC. The freeze has delayed implementation of IBank's workplan designed to meet this deployment timeframe, which raises the risk of private capital sources backing out of deals as the perception grows that we will be unable to obligate funds to qualified projects by that deadline.

d.  The NCIF has stated goals of reducing greenhouse gas emissions; delivering benefits to communities, with at least 40% of these benefits accruing to disadvantaged communities; and the mobilization of private capital in support of clean technologies. In our Board-approved subaward implementation plan submitted to CGC, we conservatively estimated that the full deployment of the subaward would result in annual greenhouse gas reductions in the state of approximately 180,000 tons, prior to any of the funds revolving. The STO programs described earlier are expected to result in approximately 15,500 tons of greenhouse gas reductions; the EV charging station project is forecast to result in over 6,700 tons of greenhouse gas reductions.

e.  We would expect to exceed the 40% NCIF disadvantaged target. In IBank's well-established Small Business Finance Center program, disadvantaged borrowers consistently comprise well over 50% of the program's beneficiaries. IBank staff have proactively sought out projects in and benefiting disadvantaged communities to ensure program compliance. For the $50 million C-PACE opportunity described earlier, while the applicant currently estimates that roughly half of its pipeline is located in disadvantaged communities, if it received an NCIF-funded loan it would pursue a proactive market-building strategy for boosting this representation further. Other borrowers, including one that provides no-cost solar and battery energy storage systems for low-income households, are at risk of losing access to capital entirely if they are unable to access IBank's Climate Loan Guarantee. The STO residential energy upgrade program is projected to support over 4,800 small loans (average size of about $18,500) in its first year of NCIF funding; many of these recipients would be disadvantaged customers.

f.  Each NCIF-funded transaction must mobilize private capital by at least a 1:1 ratio, meaning additional private investment of at least $446 million generated by IBank's NCIF award. IBank's forecasts showed leverage ratios of 1.9x in year one, rising to 6.3x over the seven-year performance period (these are consistent with CGC's own projections in its NCIF application to EPA), which would imply private leverage of up to $2.8 billion within California during that timeframe. For the C-PACE transaction, the NCIF funds would serve as a debt service reserve for lenders. The sponsor estimates that every $1 of reserves funded would support $5 to $10 in loans, before accounting for recycling over time.

32.     The EPA's attacks on the Greenhouse Gas Reduction Fund are also causing continuing and escalating harm to IBank's business. Confidence in the liquidity and availability of funds is vital to our core lending activities. The EPA and Citibank's freezing of funds risks public and private confidence in the liquidity and availability of funds offered by IBank. Without assurances that IBank will be able to access funds, potential borrowers, co-investors, and other business partners will not enter into agreements with IBank, seeing it and its NCIF subaward as too risky a source of financing. This will cause lasting and irreparable reputational harm to IBank.

33.     This harm will be especially focused on IBank's Climate Catalyst program. Besides reputational risk, the unit currently has three full-time employees and one additional hire on hold. If NCIF funding is permanently withdrawn, the stability of these staff positions could be in jeopardy. In addition, we may experience collateral harm to our other programs, many of which have been in place for several decades, including the Infrastructure State Revolving Fund, Small Business Finance Center, Expanding Venture Capital Access Program, and our conduit bond program. For example, the Infrastructure State Revolving Fund program has long enjoyed a AAA rating on the bonds it issues to fund its loan pool. Reputational harm could be viewed adversely by credit rating agencies, potentially placing this rating at risk, which would decrease the amount of bonds we can issue to grow the program, and increase the interest rates we charge the borrowers, most of which are small to medium municipalities.

34.     Lastly, the EPA's aggressive campaign to portray the "green lending" industry as inherently wasteful and fraudulent will cause lasting harm to IBank's business. Across all of IBank's programs, it has provided over $3.7 billion of climate-related financing, including a range of water and wastewater infrastructure, municipal solid waste projects, green building

construction, and forest resiliency projects. Recent events such as the wildfires in Los Angeles

further highlight the need for climate mitigation and adaptation projects in California. Curtailing

a significant portion of this activity could have negative consequences for the State's economy

and the well-being of its citizens.


I declare under penalty of perjury under the laws of the United States that the foregoing is

true and correct.

Executed on March 21, 2025, at San Francisco, California.

_____

Declaration of Scott Wu
Executive Director of California
Infrastructure and Economic Development
Bank

# EXHIBIT 1

**TO DECLARATION OF SCOTT WU, EXECUTIVE DIRECTOR OF CALIFORNIA INFRASTRUCTURE AND ECONOMIC DEVELOPMENT BANK**



**ACCOUNT CONTROL AGREEMENT**

**among**

**CALIFORNIA INFRASTRUCTURE AND ECONOMIC DEVELOPMENT BANK,
as PLEDGOR**

**COALITION FOR GREEN CAPITAL, as SECURED PARTY**

**and**

**CITIBANK, N.A., as BANK**

**Dated as of** _____January 22, 2025_____

**THIS ACCOUNT CONTROL AGREEMENT** (this "**Agreement**"), dated as of <u>January 22, 2025</u>, by and among California Infrastructure and Economic Development Bank, <u>an instrumentality</u> of the State of California (the "**Pledgor**"), Coalition for Green Capital, a District of Columbia nonprofit corporation (the "**Secured Party**") and Citibank, N.A., a national banking association organized and existing under the laws of the United States of America ("**Citibank**") and acting through its Agency & Trust business solely in its capacity as bank under this Agreement, and any successors appointed pursuant to the terms hereof (Citibank in such capacity, the "**Bank**").

**WHEREAS,** the Secured Party has entered into a certain federal financial assistance agreement with the United States Environmental Protection Agency, an agency of the United States Government, as identified in Addendum 1, (the "**Grant Agreement**").

**WHEREAS,** under the Grant Agreement, Pledgor and Secured Party have entered into a Subaward as identified in Addendum 1, (the "**Subaward Agreement**"), pursuant to which the Pledgor has granted the Secured Party a security interest in the accounts as identified in Addendum 1 established and maintained by the Bank for the Pledgor (the "**Accounts**").

**WHEREAS,** the Bank has been designated and authorized to act as a financial agent of the United States pursuant to the authority of the U.S. Department of the Treasury under 12 U.S.C. §§ 90 and 265.

**WHEREAS,** the parties wish that the Bank enter into this Agreement in order to provide for the "control" (as defined in Section 9-104(a) of the Uniform Commercial Code in effect in the State of New York ("**UCC**"), in the case of a deposit account, or Section 8-106 of the UCC, in the case of a security account) of the accounts as a means to perfect the security interest of the Secured Party.

**WHEREAS,** the Pledgor and the Secured Party have agreed that the terms and conditions in the Subaward Agreement indicate the conditions under which the Secured Party may exercise its right of control herein, and such conditions will be defined as "default" for the purposes of this Agreement.

**WHEREAS**, capitalized terms used herein without definition and that are defined in Article 8 or Article 9 of the UCC as adopted in the State of New York shall have the respective meanings set forth therein.

**NOW, THEREFORE,** for good and valuable consideration, the receipt and adequacy of which is hereby irrevocably acknowledged, the parties hereto agree as follows:

1.      **The Accounts.** The Pledgor and the Bank represent and warrant to, and agree with the Secured Party that:

(a)      The Bank maintains the Accounts for the Pledgor, and all property (including, without limitation, all funds and financial assets) held by the Bank for the accounts of the Pledgor are, and will continue to be, credited to the Accounts in accordance with instructions given by the Pledgor (unless otherwise provided herein).

(b)      To the extent that cash is credited to the Accounts, the Accounts are a deposit account; and to the extent that financial assets (other than cash) are credited to the Accounts, the Accounts are a securities account. The Bank is (i) the bank with which the Accounts are maintained

and (ii) the securities intermediary with respect to financial assets held in the Accounts. The Pledgor is (A) the Bank's customer with respect to the Accounts and (B) the entitlement holder with respect to all financial assets credited from time to time to the Accounts.

(c)    Notwithstanding any other agreement to the contrary, the Bank's jurisdiction with respect to the Accounts for purposes of the UCC is, and will continue to be for so long as the Secured Party's security interest shall be in effect, the State of New York.

(d)    The Pledgor and the Bank do not know of any claim to or interest in the Accounts or any property (including, without limitation, funds and financial assets) credited to the Accounts, except for claims and interests of the parties referred to in this Agreement.

2.    **Control over Accounts.**

The Bank shall comply with all instructions, notifications, and entitlement orders the Bank receives directing the disposition of funds and financial assets in the Accounts including, without limitation, directions to distribute proceeds of any such transfer or redemption of interest or dividends on financial assets in the Accounts, substantially in the form attached hereto as Exhibit B ("**Account Direction**"), originated by the Pledgor, until the time that that Bank receives a notice, substantially in the form attached hereto as Exhibit A (a "**Notice of Exclusive Control**") from the Secured Party that the Secured Party is exercising its right to exclusive control over an Account, and after such time that the Bank receives a Notice of Exclusive Control, the Secured Party for such Account, without further consent by the Pledgor.

3.    **Priority of Secured Party's Security Interest.** The Bank subordinates in favor of the Secured Party any interest, lien or right of setoff it may have, now or in the future, against the Accounts or assets in the Accounts; *provided; however*, that, subject to the foregoing, the Bank may set off all amounts due to it in respect of its fees and expenses (including, without limitation, the payment of any legal fees or expenses) or any amounts payable pursuant to Section 4 hereof.

4.    **Investment of Funds**.

(a)    The Bank shall deposit the assets in non-interest bearing Accounts and invest the assets in the Accounts consistent with the instructions provided by the Pledgor, in Addendum 1. The Pledgor's instructions will be in accordance with the Subaward Agreement, provided that the Bank is not responsible for verifying whether the Pledgor's instructions are in compliance with the Subaward Agreement. The Bank shall invest such assets in the Accounts on the date of deposit provided that such assets are received on or before 11:00 a.m. New York City time. Any assets received after 11:00 a.m. New York City time shall be treated as if received on the following Business Day. For purposes of this Agreement, "**Business Day**" shall mean any day that the Bank is open for business.

(b)    The Bank is hereby authorized and directed to sell or redeem any such investments as it deems necessary to make any payments or distributions required under this Agreement. The Bank shall have no responsibility or liability for any loss in the value of any investment made pursuant to this Agreement, or for any loss, cost or penalty resulting from any sale or liquidation of the assets in the Account. The Bank is hereby authorized to execute purchases and sales of investments through the facilities of its own trading or capital markets operations or those of any affiliated entity. The Bank does not have a duty nor will it undertake any duty to provide investment advice.

citi

(c)    The Bank shall transfer any earnings or proceeds received on or distributions of earnings or proceeds from the assets in the Accounts to the Pledgor's Program Income from Operations Account on a monthly basis.

5.    **Tax Matters.**

(a)    The Pledgor and the Secured Party agree that, unless and until the Subaward Agreement is terminated, any earnings or proceeds received on or distributions of earnings or proceeds from the assets in the Accounts shall be treated as the income of the Pledgor and shall be reported on an annual basis on United States Internal Revenue Service ("**IRS**") Form 1099-DIV, as required pursuant to the Internal Revenue Code of 1986, as amended (the "**Code**") and the regulations thereunder. Principal payments are not reportable to any payee hereunder. No earnings or proceeds received on or distributions of earnings or proceeds from the assets in the Accounts, or principal payments from the Accounts, are reportable to the Secured Party. The Pledgor, the Secured Party and the Bank agree that the Bank will not be responsible for providing tax reporting and withholding for payments that are for compensation for services performed by an employee or independent contractor.

(b)    The Pledgor and the Secured Party shall upon the execution of this Agreement provide the Bank with a duly completed and properly executed IRS Form W-9 or applicable IRS Form W-8, in the case of a non-U.S. person, for each payee, together with any other documentation and information requested by the Bank in connection with the Bank's tax reporting obligations under the Code and the regulations thereunder. With respect to the Bank's tax reporting obligations under the Code, the Foreign Account Tax Compliance Act and the Foreign Investment in Real Property Tax Act and any other applicable law or regulation, the Pledgor and the Secured Party understand, that, in the event valid U.S. tax forms or other required supporting documentation are not provided to the Bank, the Bank may be required to withhold tax from the assets in the Accounts and report account information on any earnings, proceeds or distributions from the assets in the Accounts.

(c)    Should the Bank become liable for the payment of taxes, including withholding taxes relating to any funds, including interest and penalties thereon, held by it pursuant to this Agreement or any payment made hereunder, Secured Party agrees to indemnify and hold the Bank harmless pursuant to Section 7(b) hereof from any liability or obligation on account of taxes, assessments, interest, penalties, expenses and other governmental charges that may be assessed or asserted against the Bank, provided that such liability shall not be satisfied by assets in the Accounts. If the Secured Party fails to indemnify the Bank for such taxes, the Bank will notify the United States Environmental Protection Agency.

(d)    The Bank's rights under this Section 5 shall survive the termination of this Agreement or the resignation or removal of the Bank.

6.    **Concerning the Bank.**

(a)    <u>Bank Duties</u>. Each of the Pledgor and the Secured Party acknowledges and agrees that (i) the duties, responsibilities and obligations of the Bank shall be limited to those expressly set forth in this Agreement, each of which is administrative or ministerial (and shall not be construed to be fiduciary in nature), and no duties, responsibilities or obligations shall be inferred or implied, (ii) the Bank shall not be responsible for any of the agreements referred to or described

citi

herein (including, without limitation, the Grant Agreement, the Subaward Agreement, and any defined term therein not otherwise defined in this Agreement), or for determining or compelling compliance therewith, and shall not otherwise be bound thereby, and (iii) the Bank shall not be required to expend or risk any of its own funds to satisfy payments from the Accounts hereunder.

(b)　　　Liability of Bank.  The Bank shall not be liable for any damage, loss or injury resulting from any action taken or omitted in the absence of gross negligence or willful misconduct (as finally adjudicated by a court of competent jurisdiction).   In no event shall the Bank be liable for indirect, incidental, consequential, punitive or special losses or damages (including but not limited to lost profits), regardless of the form of action and whether or not any such losses or damages were foreseeable or contemplated.  The Bank shall be entitled to rely upon any instruction, notice, request or other instrument delivered to it without being required to determine the authenticity or validity thereof, or the truth or accuracy of any information stated therein.  The Bank may act in reliance upon any signature believed by it to be genuine (including any signature affixed by DocuSign) and may assume that any person purporting to make any statement, execute any document, or send any instruction in connection with the provisions hereof has been duly authorized to do so.  The Bank may consult with counsel satisfactory to it, and the opinion or advice of such counsel shall be full and complete authorization and protection in respect of any action taken, suffered or omitted by it in good faith and in accordance with the opinion and advice of such counsel.  The Bank may perform any and all of its duties through its agents, representatives, attorneys, custodians and/or nominees.  The Bank shall not incur any liability for not performing any act or fulfilling any obligation hereunder by reason of any occurrence beyond its control (including, without limitation, any provision of any present or future law or regulation or any act of any governmental authority, any act of God or war or terrorism, or the unavailability of the Federal Reserve Bank wire services or any electronic communication facility).

(c)　　　Reliance on Orders.  The Bank is authorized to comply with final orders issued or process entered by any court with respect to the assets in the Accounts, without determination by the Bank of such court's jurisdiction in the matter.  If any portion of the assets in the Accounts are at any time attached, garnished or levied upon under any court order, or in case the payment, assignment, transfer, conveyance or delivery of any such property shall be stayed or enjoined by any court order, or in case any order, judgment or decree shall be made or entered by any court affecting such property or any part thereof, then and in any such event, the Bank is authorized to rely upon and comply with any such order, writ, judgment or decree which it is advised is binding upon it without the need for appeal or other action; and if the Bank complies with any such order, writ, judgment or decree, it shall not be liable to the Pledgor or the Secured Party or to any other person or entity by reason of such compliance even though such order, writ, judgment or decree may be subsequently reversed, modified, annulled, set aside or vacated.

(d)　　　Erroneous Payments.  If the Bank releases any funds (including but not limited to the assets in the Accounts or any portion of it) to the Pledgor or the Secured Party and subsequently determines (in its absolute discretion) that the payment (or any portion of it) was made in error, the Pledgor or the Secured Party, as applicable, shall upon notice promptly refund the erroneous payment, and none of the obligations of the Pledgor or the Secured Party, as applicable, or the remedies of the Bank will be affected by any act, omission, matter or thing (including, without limitation, any obligation pursuant to which an erroneous payment is made) which, but for this provision, would reduce, release, preclude or prejudice any such obligation or remedy (whether or not known by the Bank, the Pledgor or the Secured Party). Each of the Pledgor and the Secured Party agrees not to assert discharge for value, bona fide payee, or any similar doctrine as a defense to recovery of any erroneous payment by the Bank.

citi

170652298.1

7. **Compensation, Expense Reimbursement and Indemnification.**

(a)    <u>Compensation</u>. The Bank's compensation shall be as specified in <u>Schedule A</u>.

(b)    <u>Indemnification</u>. The Secured Party covenants and agrees to indemnify the Bank and its employees, officers, directors, affiliates, and agents (each, an "**Indemnified Party**") for, hold each Indemnified Party harmless from, and defend each Indemnified Party against, any and all claims, losses, actions, liabilities, costs, damages and expenses of any nature incurred by any Indemnified Party, arising out of or in connection with this Agreement or with the administration of its duties hereunder, including, but not limited to, attorney's fees, costs and expenses, except to the extent such loss, liability, damage, cost or expense shall have been finally adjudicated by a court of competent jurisdiction to have resulted solely from the Indemnified Party's own gross negligence or willful misconduct, provided that such liability shall not be satisfied by assets in the Accounts. The foregoing indemnification and agreement to hold harmless shall survive the termination of this Agreement and the resignation or removal of the Bank. If the Secured Party fails to indemnify the Bank pursuant to this Section 7(b), the Bank shall notify the United States Environmental Protection Agency.

8. **Statements, Confirmations and Notices of Adverse Claims.** The Bank will send copies of all statements and confirmations for the Accounts simultaneously to the Pledgor and the Secured Party. The Bank shall be deemed to have delivered statements and confirmations if such statements and confirmations are available on one or more of the Bank systems to deliver electronic media. The Bank will use reasonable efforts promptly to notify the Secured Party and the Pledgor if any other person claims that it has a property interest in the Accounts or any financial asset in the Accounts.

9. **Entire Agreement; Exclusive Benefit.** This Agreement constitutes the entire agreement between the parties and sets forth in its entirety the obligations and duties of the Bank with respect to the assets in the Accounts. This Agreement is for the exclusive benefit of the parties to this Agreement and their respective permitted successors, and shall not be deemed to give, either expressly or implicitly, any legal or equitable right, remedy, or claim to any other entity or person whatsoever. No party may assign any of its rights or obligations under this Agreement without the prior written consent of the other parties.

10. **Resignation and Removal.** The Bank may be removed only by the U.S. Department of the Treasury.

11. **Governing Law.** This Agreement is governed by and shall be construed and interpreted in accordance with federal law of the United States, except where there is no applicable federal law, in accordance with the laws of the State of New York, without giving effect to the conflict of laws principles thereof.

12. **Representations and Warranties.**

(a)    Each of the Pledgor and the Secured Party represents and warrants that it has full power and authority to execute and deliver this Agreement and to perform its obligations hereunder; and this Agreement has been duly approved by all necessary action and constitutes its valid and binding agreement enforceable in accordance with its terms, except as may be limited by applicable bankruptcy, insolvency, moratorium, reorganization or other similar laws affecting the enforcement

citi

of creditors' rights and subject to general equity principles.

(b)     Each of the Pledgor and the Secured Party represents that neither it nor any of its parents or subsidiaries, or any of their respective directors, officers, or employees, or to the knowledge of the Pledgor and the Secured Party, the affiliates of the Pledgor, the Secured Party or any of its subsidiaries, will, directly or indirectly, use any part of any proceeds or lend, contribute, or otherwise make available such assets in the Accounts in any manner that would result in a violation by any person of economic, trade, or financial sanctions, requirements, or embargoes imposed, administered, or enforced from time to time by the United States (including, without limitation, the Office of Foreign Assets Control of the U.S. Department of the Treasury and the U.S. Department of State), the United Kingdom (including, without limitation, His Majesty's Treasury), the European Union and any EU member state, the United Nations Security Council, and any other relevant sanctions authority.

### 13.    Notices; Instructions.

(a)     Any notice or instruction hereunder shall be in writing in English, and may be sent by (i) secure file transfer or (ii) electronic mail with a scanned attachment thereto of an executed notice or instruction, and shall be effective upon actual receipt by the Bank in accordance with the terms hereof.  Any notice or instruction must be executed (which execution may be manual or affixed by DocuSign) by an authorized person of the Pledgor or the Secured Party, as applicable (the person(s) so designated from time to time, the "**Authorized Persons**").  Each of the applicable persons designated on Schedule B and Schedule C attached hereto have been duly appointed to act as Authorized Persons hereunder and individually have full power and authority to execute any notices or instructions, to amend, modify or waive any provisions of this Agreement, and to take any and all other actions permitted under this Agreement, all without further consent or direction from, or notice to, it or any other party.  Any notice or instruction must be originated from a corporate or government domain.  Any change in designation of Authorized Persons shall be provided by written notice, signed by an Authorized Person, and actually received and acknowledged by the Bank.  Any communication from the Bank that the Bank deems to contain confidential, proprietary, and/or sensitive information shall be encrypted in accordance with the Bank's internal procedures.

(b)     Each of the Pledgor and the Secured Party understands and agrees that the Bank cannot determine the identity of the actual sender of any notice or instruction and that the Bank shall be entitled to conclusively presume that notices or instructions that purport to have been sent by an Authorized Person have been sent by such Authorized Person.  Each of the Pledgor and the Secured Party agrees: (i) to assume all risks arising out of the use of electronic means (including electronic mail, secure file transfer or such other method or system specified by the Bank as available for use in connection with its services hereunder) to submit instructions to the Bank, including, without limitation, the risk of the Bank acting on unauthorized instructions, and the risk of interception or misuse by third parties; (ii) that it is fully informed of the protections and risks associated with the various methods of transmitting instructions to the Bank and that there may be more secure methods of transmitting instructions than the method(s) selected by the Pledgor and the Secured Party, as applicable; (iii) that the security procedures (if any) to be followed in connection with its transmission of instructions provide to it a commercially reasonable degree of protection in light of its particular needs and circumstances; and (iv) to notify the Bank immediately upon learning of any compromise or unauthorized use of the security procedures.  The Pledgor and the Secured Party agree that the security procedures set forth in Section 13(a) and this Section 13(b) are commercially reasonable.

citi

If to the Pledgor:
As provided in Addendum 1

If to the Secured Party:

Coalition for Green Capital
Attn: David Pettit
Address: 1255 Union Street NE, 7th Floor,
Washington, D.C. 20002
Email: dpettit@coalitionforgreencapital.com

If to the Bank:

Citibank, N.A.
Agency & Trust
388 Greenwich Street
New York, NY 10013
Attn.: Nerlie Delly
Telephone: +1 212-816-6846
E-mail: CitiGGRFFinancialAgent@citi.com

If to the United States Environmental Protection Agency:

**The Office of the Greenhouse Gas Reduction Fund,**
**United States Environmental Protection Agency**
**Attention: David Widawsky**
**Telephone: +1 202-566-2215**
**E-mail: GGRF@epa.gov; widawsky.david@epa.gov**

      14.    **Amendment; Waiver.**  Any amendment of this Agreement shall be binding only if evidenced by a writing signed by each of the parties to this Agreement. No waiver of any provision hereof shall be effective unless expressed in writing and signed by the party to be charged.

      15.    **Severability.**  The invalidity, illegality or unenforceability of any provision of this Agreement shall in no way affect the validity, legality or enforceability of any other provision. If any provision of this Agreement is held to be unenforceable as a matter of law, the other provisions shall not be affected thereby and shall remain in full force and effect.

      16.    **Mergers and Conversions.**  Any corporation or entity into which the Bank may be merged or converted or with which it may be consolidated, or any corporation or entity resulting from any merger, conversion or consolidation to which the Bank will be a party, or any corporation or entity succeeding to the business of the Bank will be the successor of the Bank hereunder without the execution or filing of any paper with any party hereto or any further act on the part of any of the parties hereto except where an instrument of transfer or assignment is required by law to effect such succession, anything herein to the contrary notwithstanding.

      17.    **Termination.**  This Agreement shall terminate upon receipt by the Bank of notice from the Secured Party that its security interest in such Accounts and all assets therein have



terminated. Upon receipt of such notice, the Secured Party shall have no further right to originate instructions with respect to the assets in the Accounts. The Bank shall, upon payment of all outstanding fees and expenses hereunder, promptly forward any amounts held by the Bank in the Accounts to the Pledgor, and the Bank shall be relieved and discharged of any further responsibilities with respect to its duties hereunder.

      18.   **Counterparts.**  This Agreement may be executed simultaneously in two or more counterparts, any one of which need not contain the signatures of more than one party, but all such counterparts taken together shall constitute one and the same agreement. Signatures on counterparts of this Agreement executed and delivered in electronic format (i.e. "pdf") or by other electronic means (including DocuSign) shall be deemed original signatures with all rights accruing thereto except in respect to any non-US entity, whereby originals may be required.

**[Remainder of Page Left Intentionally Blank]**

citi

-8-

**IN WITNESS WHEREOF, each of the parties has caused this Agreement to be executed by a duly authorized representative as of the day and year first written above.**

**CITIBANK, N.A.,**
as Bank

By: _Nerlie Delly_
Name: Nerlie Delly
Title: Senior Trust Officer

**CALIFORNIA INFRASTRUCTURE AND ECONOMIC DEVELOPMENT BANK,**
as Pledgor

By: _Ross Culverwell_
Name: Ross Culverwell
Title: Chief Credit Officer

**COALITION FOR GREEN CAPITAL,**
as Secured Party

By: _____
Name: Eli Hopson
Title: Chief Administrative and Development Officer

S-1

**EXHIBIT A**

**FORM OF NOTICE OF EXCLUSIVE CONTROL**

VIA EMAIL: cts.spag@citi.com / CitiGGRFFinancialAgent@citi.com

Nerlie Delly
Vice President
Citibank, N.A.
Agency & Trust
388 Greenwich Street
New York, New York 10013
[Re. Account # [●]]

Pursuant to the Account Control Agreement dated January 22, 2025 , among California Infrastructure and Economic Development Bank (the "**Pledgor**"), Coalition for Green Capital (the "**Secured Party**"), and Citibank, N.A. (the "**Bank**"), we hereby instruct you of the following:

The Pledgor and the Secured Party have agreed that the terms and conditions in the Subaward Agreement indicate the conditions under which the Secured Party may exercise its right of control herein, and such conditions will be defined as "default" for the purposes of the Account Control Agreement.

As required by the Subaward Agreement, the Secured Party has issued a written determination and finding that:

1) Pledgor has failed to comply with the terms and conditions of the Subaward Agreement, and that noncompliance is substantial such that effective performance of the Subaward Agreement is Materially Impaired or there is adequate evidence of Waste, Fraud, or Abuse or material misrepresentation of eligibility status, and that the Secured Party has initiated action under 2 CFR 200.339, or 2 CFR 200.332(d) or (i), to wholly or partly suspend or terminate the Subaward Agreement as authorized in the terms of the Subaward Agreement or applicable provisions of 2 CFR Part 200,

   [or,

2) Another condition constituting a default in the Subaward Agreement has occurred and is continuing].

Therefore, the Secured Party hereby notifies you that (i) a default has occurred and is continuing under the Subaward Agreement and (ii) from and after the receipt of this notice until you receive further instruction from Secured Party, you are hereby directed to retain and hold all funds in the Account or Accounts named in this Notice and not to [invest or] disburse the same to any party whatsoever, other than as instructed by the Secured Party.

Exhibit A

**Coalition for Green Capital,**
as Secured Party

By:_____
    Name:
    Title:
    Date:

Exhibit A

**EXHIBIT B**

**FORM OF ACCOUNT DIRECTION (NCIF Financial Assistance Subrecipient)**
**Pledgor's UEI Number:** _____ LEKCJEPGPAE1 _____

[Date]

Citibank, N.A.
Agency & Trust
388 Greenwich Street
New York, NY 10013
E-mail: cts.spag@citi.com

VIA: CitiSFT

RE:    Account    Control    Agreement    dated    January 22, 2025 _____, among
California Infrastructure and Economic Development Bank (the "**Pledgor**"), Coalition for Green
Capital (the "**Secured Party**"), and Citibank, N.A. (the "**Bank**")

Pursuant to Section 2 of the above referenced Account Control Agreement, the Pledgor hereby
instructs the Bank to disburse a total amount of $[●] funds as per below and as per the attached
upload file named xxx:

**Check applicable boxes:**

( ) **Internal Transfer within the Bank (intra-entity).**

( ) **Internal Transfer within the Bank (inter-entity).**

( ) **External Transfer outside the Bank (for Predevelopment Activities, Market-Building
Activities, and/or Program Administration Activities).**

( ) **External Transfer outside the Bank (for Financial Assistance Activities).**

**If an Internal Transfer within the Bank (intra-entity), check the following applicable boxes:**

( ) **Transfer of $[●] across Pledgor's 'Budget' sub-accounts, as defined in the Subaward
Agreement.**

( ) **Transfer of $[●] from Pledgor's 'Program Income from Operations' account to Pledgor's
'Budget' sub-account(s), as defined in the Subaward Agreement.**

( ) **Transfer of $[●] from Pledgor's 'Reserve' account to Pledgor's 'Program Income from
Operations' account, as defined in the Subaward Agreement.**

( ) **Transfer of $[●] from Pledgor's 'Budget' sub-account(s) or 'Program Income from
Operations' account to 'Reserve' account, as defined in the Subaward Agreement. The
Pledgor hereby certifies to Secured Party the following in respect of this transfer:**

*"The amount of this expenditure is necessary to execute against the workplan for the Subaward
Agreement supported with EPA funding. Financing agreements for identified Qualified Projects*

*as defined in the Terms and Conditions of the Secured Party's Grant Agreement necessitating the transfer have been reviewed by Subrecipient's counsel for legal sufficiency. This certification is a material representation for the purposes of an EPA Financial Assistance Agreement and knowing and willful false statements may be subject to prosecution under 18 U.S.C. 1001 and other applicable criminal, civil and administrative sanctions"*

**If an Internal Transfer within the Bank (inter-entity), check the following applicable box:**

**( ) Transfer of $[●] from Pledgor's 'Budget' sub-account(s) to Secured Party's 'Budget' sub-account(s) as defined in the Subaward Agreement and compliant with the terms and conditions of the Grant Agreement, including the EPA Subaward Policy.**

**If an External Transfer outside the Bank (for Predevelopment Activities, Market-Building Activities, and/or Program Administration Activities), check one of the following boxes:**

**( ) Disbursement of $[●] for Predevelopment Activities as defined in the Subaward Agreement.**

**( ) Disbursement of $[●] for Market-Building Activities as defined in the Subaward Agreement.**

**( ) Disbursement of $[●] for Program Administration Activities as defined in the Subaward Agreement.**

**If an External Transfer outside the Bank (for Financial Assistance Activities), check the following applicable boxes:**

**( ) Disbursement of $[●] from Pledgor's 'Budget' sub-account to provide Financial Assistance to Qualified Projects as defined in the Subaward Agreement. The Pledgor hereby certifies to Secured Party the following in respect of this transfer:**

*"The amount of this expenditure is necessary to execute against the workplan for the Subaward Agreement supported with EPA funding. Financing agreements for identified Qualified Projects as defined in the Terms and Conditions of the Secured Party's Grant Agreement necessitating the transfer have been reviewed by Subrecipient's counsel for legal sufficiency. This certification is a material representation for the purposes of an EPA Financial Assistance Agreement and knowing and willful false statements may be subject to prosecution under 18 U.S.C. 1001 and other applicable criminal, civil and administrative sanctions"*

**( ) Disbursement of $[●] from Pledgor's 'Reserve' account to satisfy a legal obligation to a third party as defined in the Subaward Agreement. The Pledgor hereby certifies to Secured Party the following in respect of this transfer:**

*"The amount of this transfer is necessary to execute against the workplan for the Subaward Agreement supported with EPA funding and pay a third party pursuant to a financing agreement that has been reviewed by Subrecipient's counsel for legal sufficiency. This certification is a material representation for the purposes of an EPA Financial Assistance Agreement and knowing and willful false statements may be subject to prosecution under 18 U.S.C. 1001 and other applicable criminal, civil and administrative sanctions"*

Capitalized terms in this instruction letter not otherwise defined shall have the same meaning given to them in the Account Control Agreement.

Signature on this Account Direction executed and delivered in electronic format (i.e. "pdf") or by other electronic means (including DocuSign) shall be deemed original signatures with all rights accruing thereto.

IN WITNESS WHEREOF, the Pledgor has caused this Account Direction to be duly executed and delivered as of the date first written above.

Pledgor:

_____

Authorized Person

Exhibit B

**ADDENDUM 1**
**Account Control Agreement**

**(to be provided separately)**

170652298.1

## SCHEDULE A

## BANK COMPENSATION

### General compensation

For the services described in the Account Control Agreement, the Bank shall charge each Pledgor as follows:

| Agency & Trust Services | Fees |
|---|---|
| **Acceptance Fee**<br>This one-time fee covers the acceptance of the appointment, the review of the related Transaction documents submitted in connection with the execution and delivery thereof, setting up of internal controls, and communication with other members of the working group, as necessary. | Waived |
| **Annual Administration Fee**<br>To cover the administrative functions of Citi under the Agreement, including the establishment and maintenance of the account(s), safekeeping of assets, maintenance of the records, execution and administration of the Agreement provisions, and other duties required under the terms of the Agreement. | Waived |
| **Wire Fees** | Waived |
| **Legal Fees**<br>To cover the review of legal documents by Citibank Agency & Trust's outside counsel. | Waived |

The Transaction documents will be governed in accordance with federal law of the United States, except where there is no applicable federal law, in accordance with the laws of the State of New York, without giving effect to the conflict of laws principles thereof, as established in the Agreement and subject to internal approval and satisfactory review of all documentation. All outgoing payments processed by Citi will be made via wire. Account balances invested in an Institutional Money Market Fund will be chosen by the client from a list of providers that Citi will supply. If invested in a Money Market Fund, fund distributors may provide Citi with Shareholder Servicing fees. These fees are discussed in the fund's prospectus, which will be delivered to the client prior to investment. All of Citi's responsibilities will be non-discretionary and Citi will not be required to make any advances of its own funds. Therefore, all services provided by Citi must strictly follow the terms stated in the Agreements or in the written instructions of the authorized parties or third parties authorized to send instructions to Citi.

In accordance with US regulations regarding anti-money laundering and terrorist financing, Federal law requires Citi to obtain, verify and record information that identifies each business or entity that opens an account or establishes a relationship with Citi. What this means for our clients: when a client opens an account or establishes a relationship, we will ask for the client's business name, a street address and a tax identification number that Federal law requires us to obtain. In accordance with the Unlawful Internet Gambling Act (the "Act"), Citibank, N.A. accounts or other Citibank, N.A. facilities in the United States may not be used to process "restricted transactions" as such term is defined in U.S. 31 CFR Section 132.2(y).

**SCHEDULE B**

**PLEDGOR AUTHORIZED LIST OF SIGNERS**
**(to be provided separately)**

Each of the following person(s) is authorized to execute documents and to direct the Bank as to all matters on the Pledgor's behalf.  The Bank may confirm the instructions received by return call to any one of the telephone numbers listed below.

**PLEDGOR**

|  | Specimen Signature | DocuSign Specimen Signature |
|---|---|---|
| Name:<br>Title:<br>Phone:<br>Email: |  |  |

|  | Specimen Signature | DocuSign Specimen Signature |
|---|---|---|
| Name:<br>Title:<br>Phone:<br>Email: |  |  |

|  | Specimen Signature | DocuSign Specimen Signature |
|---|---|---|
| Name:<br>Title:<br>Phone:<br>Email: | ` |  |

**SCHEDULE C**

**SECURED PARTY AUTHORIZED LIST OF SIGNERS**
**(to be provided separately)**

Each of the following person(s) is authorized to execute documents and to direct the Bank as to all matters on the Secured Party's behalf.  The Bank may confirm the instructions received by return call to any one of the telephone numbers listed below.

**SECURED PARTY**

|  | Specimen Signature | DocuSign Specimen Signature |
|---|---|---|
| Name:<br>Title:<br>Phone:<br>Email: |  |  |

|  | Specimen Signature | DocuSign Specimen Signature |
|---|---|---|
| Name:<br>Title:<br>Phone:<br>Email: |  |  |

|  | Specimen Signature | DocuSign Specimen Signature |
|---|---|---|
| Name:<br>Title:<br>Phone:<br>Email: |  |  |

# EXHIBIT 2

**TO DECLARATION OF SCOTT WU, EXECUTIVE DIRECTOR OF CALIFORNIA INFRASTRUCTURE AND ECONOMIC DEVELOPMENT BANK**

**FORM OF ACCOUNT DIRECTION (NCIF Financial Assistance Subrecipient)**
**Pledgor's UEI Number: LEKCJEPGPAE1**

February 13, 2025

Citibank, N.A.
Agency & Trust
388 Greenwich Street
New York, NY 10013
E-mail: cts.spag@citi.com

VIA: CitiSFT

RE: Account Control Agreement dated January 22, 2025, among California Infrastructure and Economic
Development Bank (the "**Pledgor**"), Coalition for Green Capital (the "**Secured Party**"), and Citibank, N.A.
(the "**Bank**")

Pursuant to Section 2 of the above referenced Account Control Agreement, the Pledgor hereby instructs the
Bank to disburse a total amount of $415,314.46 funds as per below.

**Check applicable boxes:**

( ) **Internal Transfer within the Bank (intra-entity).**

( ) **Internal Transfer within the Bank (inter-entity).**

(X) **External Transfer outside the Bank (for Predevelopment Activities, Market-Building Activities,
and/or Program Administration Activities). Please see attached wire instructions.**

( ) **External Transfer outside the Bank (for Financial Assistance Activities).**

**If an Internal Transfer within the Bank (intra-entity), check the following applicable boxes:**

( ) **Transfer of $[●] across Pledgor's 'Budget' sub-accounts, as defined in the Subaward Agreement.**

( ) **Transfer of $[●] from Pledgor's 'Program Income from Operations' account to Pledgor's
'Budget' sub-account(s), as defined in the Subaward Agreement.**

( ) **Transfer of $[●] from Pledgor's 'Reserve' account to Pledgor's 'Program Income from
Operations' account, as defined in the Subaward Agreement.**

( ) **Transfer of $[●] from Pledgor's 'Budget' sub-account(s) or 'Program Income from Operations'
account to 'Reserve' account, as defined in the Subaward Agreement. The Pledgor hereby certifies
to Secured Party the following in respect of this transfer:**

*"The amount of this expenditure is necessary to execute against the workplan for the Subaward
Agreement supported with EPA funding. Financing agreements for identified Qualified Projects as
defined in the Terms and Conditions of the Secured Party's Grant Agreement necessitating the transfer
have been reviewed by Subrecipient's counsel for legal sufficiency. This certification is a material*

*representation for the purposes of an EPA Financial Assistance Agreement and knowing and willful false statements may be subject to prosecution under 18 U.S.C. 1001 and other applicable criminal, civil and administrative sanctions"*

**If an Internal Transfer within the Bank (inter-entity), check the following applicable box:**

**( ) Transfer of $[●] from Pledgor's 'Budget' sub-account(s) to Secured Party's 'Budget' sub-account(s) as defined in the Subaward Agreement and compliant with the terms and conditions of the Grant Agreement, including the EPA Subaward Policy.**

**If an External Transfer outside the Bank (for Predevelopment Activities, Market-Building Activities, and/or Program Administration Activities), check one of the following boxes:**

**( ) Disbursement of $[●] for Predevelopment Activities as defined in the Subaward Agreement.**

**( ) Disbursement of $[●] for Market-Building Activities as defined in the Subaward Agreement.**

**(X) Disbursement of $415,314.46 for Program Administration Activities as defined in the Subaward Agreement.**

**If an External Transfer outside the Bank (for Financial Assistance Activities), check the following applicable boxes:**

**( ) Disbursement of $[●] from Pledgor's 'Budget' sub-account to provide Financial Assistance to Qualified Projects as defined in the Subaward Agreement. The Pledgor hereby certifies to Secured Party the following in respect of this transfer:**

*"The amount of this expenditure is necessary to execute against the workplan for the Subaward Agreement supported with EPA funding. Financing agreements for identified Qualified Projects as defined in the Terms and Conditions of the Secured Party's Grant Agreement necessitating the transfer have been reviewed by Subrecipient's counsel for legal sufficiency. This certification is a material representation for the purposes of an EPA Financial Assistance Agreement and knowing and willful false statements may be subject to prosecution under 18 U.S.C. 1001 and other applicable criminal, civil and administrative sanctions"*

**( ) Disbursement of $[●] from Pledgor's 'Reserve' account to satisfy a legal obligation to a third party as defined in the Subaward Agreement. The Pledgor hereby certifies to Secured Party the following in respect of this transfer:**

*"The amount of this transfer is necessary to execute against the workplan for the Subaward Agreement supported with EPA funding and pay a third party pursuant to a financing agreement that has been reviewed by Subrecipient's counsel for legal sufficiency. This certification is a material representation for the purposes of an EPA Financial Assistance Agreement and knowing and willful false statements may be subject to prosecution under 18 U.S.C. 1001 and other applicable criminal, civil and administrative sanctions"*

Capitalized terms in this instruction letter not otherwise defined shall have the same meaning given to them in the Account Control Agreement.

Signature on this Account Direction executed and delivered in electronic format (i.e. "pdf") or by other electronic means (including DocuSign) shall be deemed original signatures with all rights accruing thereto.

IN WITNESS WHEREOF, the Pledgor has caused this Account Direction to be duly executed and delivered as of the date first written above.

Pledgor:

Signed by:

*Ross Culverwell*

CB804FD424C74BD...

Ross Culverwell
Authorized Person



**IBank**
California Infrastructure and
Economic Development Bank

Mailing Address:
P.O. Box 2830
Sacramento, CA
95812-2830

Office Address:
1325 J Street, Suite 1300
Sacramento, CA 95814

(916) 341-6600 Phone
(916) 322-6314 Fax

February 13, 2025

**Citibank, N.A.**
Agency & Trust
388 Greenwich Street
New York, NY 10013
E-mail: cts.spag@citi.com

---

## REQUEST FOR WIRE / ACH – Transfer Funds to State Account

---

Trust Fund Account Name:  **CitiBank CalINFRA Financial Assistance**

Trust Fund Account Number:  **14223500**

Program: **National Clean Investment Fund (NCIF) Program**

On Behalf of **IBank**

Total Amount: **$415,314.46**

Beneficiary Account Name: **State of California - GO-Biz for I-Bank Fund 9334**

Beneficiary Address: **1325 J Street, Suite 1300, Sacramento, CA 95814**

Beneficiary Account Number: **0148280005**

Amount of Wire/ACH:  **$415,314.46 (Four Hundred Fifteen Thousand Three Hundred Fourteen Dollars and Forty-Six cents)**

Bank:  **Bank of America (Main)**

**2000 Clayton Road Bldg. D, 5th Floor, Concord, CA 94520**

**ABA #026009593**

**CR: A/C #0148280005**

Please transfer $415,314.46 from the CitiBank CalINFRA Financial Assistance Account (14223500) to the State Climate Catalyst Revolving Fund 9334 (SMIF) for administration costs. If any questions arise, please contact Mei.Kwee@ibank.ca.gov. Thank you very much in advance.

.

Respectfully,

Signed by:

*Ross Culverwell*

Ross Culverwell
Chief Credit Officer

# EXHIBIT 3

**TO DECLARATION OF SCOTT WU, EXECUTIVE DIRECTOR OF CALIFORNIA INFRASTRUCTURE AND ECONOMIC DEVELOPMENT BANK**



**From:** dl.gts.us.sfs.internal.solutions.prod.support@citi.com
**To:** ▮▮@citi.com; ▮▮@citi.com; ▮▮@citi.com; ▮▮@citi.com; ▮▮@citi.com; ▮▮@citi.com; ▮▮@citi.com; ▮▮@citi.com; ▮▮@citi.com; ▮▮@citi.com; ▮▮@citi.com; ▮▮@citi.com; ▮▮@citi.com; ▮▮@citi.com; ▮▮@citi.com; ▮▮@citi.com; ▮▮@citi.com; ▮▮@citi.com; ▮▮@citi.com; ▮▮@citi.com; ▮▮@citi.com; ▮▮@citi.com; ▮▮@citi.com; ▮▮@citi.com; ▮▮@citi.com; ▮▮@citi.com; ▮▮@citi.com
**Cc:** ▮▮; ▮▮; ▮▮; Scott Wu
**Subject:** PRD - MIFT - files uploaded - California_Infrastru_CitiBank_Draw_Request_Signed_154641931.pdf
**Date:** Friday, February 14, 2025 1:31:48 PM

This email is sent to you on behalf of patrick.toppin@ibank.ca.gov.

| File Id | File Name | Custom File Name | File Memo |
|---------|-----------|------------------|-----------|
| 1872045 | California_Infrastru_CitiBank_Draw_Request_Signed_154641931.pdf | | |

**MIFT Application URL :** *https://issuerservices.icg.citigroup.com*

| Source Company Name | California_Infrastru - California Infrastructure |
|---------------------|-------------------------------------------------|
| Target Company Name | CITI_CSG - CITI CSG TEAM |
| Uploaded By | Toppin,Patrick |
| Uploaded Date | 02/14/2025 |
| Approved By | Culverwell,Ross |
| Approved Date | 02/14/2025 |

Regards,
ISW Application Support | *GTS US SFS Internal Solutions Prod Support |
dl.gts.us.sfs.internal.solutions.prod.support@citi.com



This email is sent to you on behalf of patrick.toppin@ibank.ca.gov.

| File Id | File Name | Custom File Name | File Memo |
|---------|-----------|------------------|-----------|
| 1872046 | California_Infrastru_Copy_of_GGRF_ATT_Client_Wire_Instruction_Template_NCIF_v01242025_-_Copy_154641930.xlsx | | |

**MIFT Application URL :** *https://issuerservices.icg.citigroup.com*

| Source Company Name | California_Infrastru - California Infrastructure |
|---------------------|------------------------------------------------|
| Target Company Name | CITI_CSG - CITI CSG TEAM |
| Uploaded By | Toppin,Patrick |
| Uploaded Date | 02/14/2025 |
| Approved By | Culverwell,Ross |
| Approved Date | 02/14/2025 |

Regards,
ISW Application Support | *GTS US SFS Internal Solutions Prod Support |
dl.gts.us.sfs.internal.solutions.prod.support@citi.com

# EXHIBIT 4

**TO DECLARATION OF SCOTT WU, EXECUTIVE DIRECTOR OF CALIFORNIA INFRASTRUCTURE AND ECONOMIC DEVELOPMENT BANK**



C A L I F O R N I A
**DEPARTMENT** OF **JUSTICE**

*Rob Bonta*
**Attorney General**

600 WEST BROADWAY, SUITE 1800
SAN DIEGO, CA 92101
P.O. BOX 85266
SAN DIEGO, CA 92186-5266

Public:  (619) 738-9000
Telephone:  (619) 738-9003
Facsimile:  (619) 645-2271
E-Mail:  Theodore.McCombs@doj.ca.gov
Dylan.Redor@doj.ca.gov

February 26, 2025

VIA EMAIL

Attention: Nerlie Delly
Citibank, N.A.
Agency & Trust
388 Greenwich Street
New York, New York 10013
Email: CitiGGRFFinancialAgent@citi.com

RE:    Account Control Agreement relating to Account Numbers 14223000, 14223300,
14222900, 14223600, 14223500, 14223400, and 14223100

Dear Ms. Delly:

I am writing in connection with the Account Control Agreement relating to Account
Numbers 14223000, 14223300, 14222900, 14223600, 14223500, 14223400, and 14223100 ("the
Accounts") dated as of January 22, 2025 (the "Agreement") among California Infrastructure and
Economic Development Bank ("Pledgor"), the Coalition for Green Capital ("Secured Party"),
and Citibank, N.A. ("Citi").

Under the Agreement, Pledgor is Citi's customer with respect to deposits in the Accounts
and the entitlement holder with respect to all other financial assets credited to the Accounts.
Agreement §1(a).  Pledgor is a subgrantee of Secured Party, and Secured Party is one of the
prime award recipients under the EPA's National Clean Investment Fund.  On February 14,
2025, Pledgor submitted instructions to Citi to disburse funds in accordance with the terms of the
Agreement.  As of this writing, such funds have not been disbursed.

Pursuant to Section 2 of the Agreement, Citi must "comply with instructions,
notifications, and entitlement orders received from Pledgor regarding disposition of funds and
financial assets in the accounts."  Agreement §2.  Citi "maintains the Accounts for the Pledgor,
and all property (including, without limitation, all funds and financial assets) held by the Bank
for the accounts of the Pledgor are, and will continue to be, credited to the Accounts in

February 26, 2025
Page 2

accordance with instructions given by the Pledgor (unless otherwise provided herein)." *Id.* §1(a). The Agreement provides for one sole, well-defined exception, a "Notice of Exclusive Control." *Id.* §2; *see id.* Ex. A. To our knowledge, Citi has not received a notice of exclusive control under the Agreement and therefore has no basis for rejecting Pledgor's instructions as to the Accounts.

Please immediately identify the basis for Citi's refusal to comply with valid disbursement instructions and explain why Citi's refusal should not constitute a breach of its obligations under the Agreement, and indeed, willful misconduct under Section 6(b) of the Agreement. Citi's refusal to abide by the Agreement and its fundamental obligations as a bank threatens to cause significant harm to the Pledgor, as Pledgor will be unable to fulfill its contractual obligations to third parties. Citi's refusal to comply with Pledgor's instructions sets a disturbing precedent for its treatment of depositors well beyond the immediate circumstances, and Citi's disregard for its contractual duties surely harms public confidence in Citi as a financial institution as well.

Pledgor therefore demands that Citi immediately comply with its obligations under the Agreement and disburse Pledgor's funds in accordance with the instructions provided to date, and continue to do so as instructed pursuant to the terms of the Agreement. If Citi refuses to do so, Pledgor demands immediate notice and information in writing regarding the basis for such refusal.

Pledgor hereby reserves all rights in law and equity, under its Agreement, and otherwise.


Sincerely,


THEODORE A. MCCOMBS
DYLAN REDOR
Deputy Attorneys General

For    ROB BONTA
       Attorney General


Cc:    Brent McIntosh, Chief Legal Officer, Citibank, N.A. (brent.mcintosh@citi.com)